IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

```
- - - - - - - - - - - - - - x
                            :
LEVITON MANUFACTURING        :
COMPANY, INC., et al.,       :
                            :
             Plaintiffs,     :
                            :
         v.                  :  Civil Action
                            :  No. AMD-05-889
UNIVERSAL SECURITY           :
INSTRUMENTS, INC., et al.,   :
                            :
             Defendants.     :  September 3, 2008
                            :
- - - - - - - - - - - - - - x  Baltimore, Maryland
```

MOTIONS HEARING

BEFORE THE HONORABLE SUSAN J. GAUVEY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiffs:      JAMES T. HOSMER, Esq.
                         Nixon and Vanderhye, P.C.
                         901 North Glebe Road
                         11th Floor
                         Arlington, VA  22203
                           On Behalf of Leviton Manufacturing
                           Company, Inc.

For the Defendants:      SUSAN BAKER MANNING, Esq.
                         Bingham McCutchen, L.L.P.
                         2020 K Street N.W.
                         Washington, D.C.  20006
                           On Behalf of Shanghai Meihao
                           Electric, Inc.

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
Audio Operator:          Unknown


Transcription Company:   CompuScribe
                         5100 Forbes Boulevard
                         Suite 102
                         Lanham, Maryland  20706
                         (301) 577-5882
```

I N D E X

| | Page |
|---|---|
| Discussion Re. Defendants' Motion Re. Materiality | 4 |
| Discussion Re. Defendants' Motion Re. Intent | 35 |
| Discussion Re. Plaintiffs' Motion for Attorney's Fees | 60 |

Keynote:  "---" indicates inaudible in the transcript.

gaw                                                                        4

                              P R O C E E D I N G S

1

2          THE COURT:  Good afternoon.  Please be seated.

3          Do you want to call the case, Ms. Smith?  And then

4    counsel can identify themselves.

5          THE CLERK:  Yes.  Before the Court is Civil Case No.

6    AMD-05-0889, Leviton Manufacturing Company, Inc., et al.,

7    versus Universal Security Instruments, Inc., et al.  This

8    matter is now before the Court for motion hearing.  Counsel,

9    please identify yourselves for the record.

10         MS. MANNING:  Good morning.  I'm Susan Baker Manning

11   on behalf of Shanghai Meihao Electric, Inc.

12         MR. HOSMER:  Your Honor, I'm James Hosmer from Nixon

13   and Vanderhye representing Leviton Manufacturing.

14       THE COURT:  All right.  How are you all today?

15         MS. MANNING:  Very well.  Thank you.

16         MR. HOSMER:  Fine, Your Honor.

17         THE COURT:  Good.  I'm sorry I'm delayed coming out.

18   I have a whole bunch of lawyers, and we're trying to settle

19   something.  And we didn't settle it yet.  So we're still

20   working at it.  But sorry that I was delayed.

21         I have, as you can imagine, had a chance to read

22   everything.

23         MR. HOSMER:  Okay.

24         THE COURT:  I've had a chance to look at the law.  I

25   have some questions.  But I want to start, if either party

1    wants to make any particular points to me that you want to make

2    sure I understand about your argument, before I begin with my

3    questions both on the issue of the 285 issue and inequitable

4    conduct and whether there are any material disputes as to fact,

5    which -- and then go to the attorney's fees, which I know that

6    you have not really objected to in terms of hourly rates, et

7    cetera.  I have some questions, though, as to whether the

8    submissions are sufficient even though those issues haven't

9    been raised by the opposing side.

10           So Ms. Manning, as the movant, is there anything

11   that you want to say to me overall, knowing that I have read

12   everything?  And don't question me on GFCIs, but I think I have

13   a little bit of knowledge about the case.

14           MS. MANNING:  The good news is that I don't think it

15   turns on too many GFCI issues, Your Honor.  I'm happy to

16   discuss any aspect that you'd like.  Frankly, I think that

17   these are often most productive, if I can answer your

18   questions.  So I'm happy to move straight to that, if Your

19   Honor would prefer.

20           THE COURT:  Okay.  Fine.

21           And anything you want, Mr. Hosmer, to tell me before

22   we go into questions?

23           MR. HOSMER:  Actually, Your Honor.  With some fear

24   and trepidation, I actually had a booklet of some of excerpts

25   of some of the exhibits.  I know the record is fairly

gaw                                                                              6

 1   voluminous.  There are a couple things that I was intending to

 2   emphasize during the course of this short hearing.  And I

 3   wanted to give you the benefit of that booklet.

 4          And I'd like to take a couple minutes maybe to

 5   explain the significance of the things that are tabbed there

 6   and also just to point out a couple of new things that I think

 7   are relevant.

 8          THE COURT:  Right.  When --

 9          MR. HOSMER:  Can I give you these booklets?

10          THE COURT:  Sure.  But Mr. Hosmer, if anything

11   you're giving me is already in the record, I really would --

12   can you let me know that or --

13          MR. HOSMER:  Yes.

14          THE COURT:  Is it on the document already?

15          MR. HOSMER:  Yes.  Actually, I can represent that

16   everything is already a matter of record except for one thing,

17   which is at the end, which I would like to make a matter of

18   record.  And it relates to a point that I'd like to make for

19   purposes of the hearing today.

20          THE COURT:  Okay.  And I will take the books only --

21   do the books actually show me where that is in the previous

22   record that we have poured over and have stickies on, et

23   cetera?  And I don't want to --

24          MR. HOSMER:  No, but I -- the only new item, Your

25   Honor, is identified in this booklet as tab number 11.

gaw                                                                          7

 1                    THE COURT:  Okay.

 2                    MR. HOSMER:  It's the very last tab.  And if we

 3      could make a note for the record of that, we could --

 4                    MS. MANNING:  Perhaps I could make the suggestion

 5      that the item at tab 11, which -- although it has not yet been

 6      made part of the record, I won't object to it being made part

 7      of the record.  But perhaps we could just add that in rather

 8      than the whole booklet, if that might help Your Honor.

 9                    THE COURT:  Okay.  We can --

10                    MR. HOSMER:  But for convenience of the hearing

11      only.  And then if it turns out that you take the first 10 tabs

12      and discard whatever you feel --

13                    THE COURT:  Okay.  Sounds good.  Mr. Hosmer, thank

14      you.  I'll take that so I can follow your argument.  And then

15      what we'll do is that you can just let me know as to the one

16      through ten where they are in the record.

17                    MR. HOSMER:  Right.

18                    THE COURT:  Okay.  Great.

19                    MR. HOSMER:  ---

20                    THE COURT:  Great.  That would be great.  Okay.

21      Good.  All right.

22                    MR. HOSMER:  If you wanted me to take just a few

23      minutes to talk about --

24                    THE COURT:  I want you to do whatever you want to do

25      initially.  And then I want to --

1          MR. HOSMER:  I will just take a few minutes.  In

2     fairness to Ms. Manning, I think that would be fair to just

3     focus on a few things.

4          THE COURT:  Okay.

5          MR. HOSMER:  I'm sure Your Honor, having read the

6     case law, is familiar with the standard that we're talking

7     about for clear and convincing evidence, and that we need to

8     show, the moving party needs to show, that there was either

9     vexatious litigation, unjustified and frivolous litigation, or

10     inequitable conduct, the two separate tiers that we're talking

11     about with respect to this motion.  And I just wanted to

12     revisit for a moment the history of what happened in the case,

13     as it reached its culmination in 2007.

14          In approximately, I think, the middle of 2007, after

15     persisting for information about the design of the accused

16     products, Leviton learned for the first time that the design

17     had actually been changed in mid-2007.  And it was shortly

18     after that that there were some 30(b)(6) depositions taken of

19     the various witnesses at Shanghai Meihao responsible for that

20     change.

21          The testimony of those witnesses is resonant in one

22     of the tabs here, indicating that they did in fact change that

23     design.  It was that design change which really, quite frankly,

24     was a catalyst for the possibility of resolution of the case.

25     That was the original accused product, which was no longer on

 1    the table.  So in effect, what had happened is that Leviton had

 2    succeeded in having that product removed from the U.S. market.

 3            In the end, they opted, because of the design change

 4    and the difficulty of moving forward and the cost benefit

 5    associated with that, they opted to offer to resolve the case

 6    through some settlement discussions with the other side.  When

 7    those broke down, Leviton in its wisdom decided that it was

 8    better to let this case go rather than pursue it, particularly

 9    since they had in effect accomplished the primary objective of

10    the litigation in the first place, to remove the original

11    accused product.

12            THE COURT:  Let me just ask you if there were

13    changes made and it wasn't the original device or product

14    anymore, you would have to file a new lawsuit on a new product,

15    if you thought --

16            MR. HOSMER:  Actually it would have been somewhat

17    problematic.  There was a doctrine of equivalence argument.

18    I'm sure you've heard that phrase used.  There could have been

19    an equivalence argument with respect to the new product design.

20    But obviously, the intention of the new design from Meihao's

21    standpoint, honestly I think in fairness even to Meihao, that

22    suggests that they were aware that there was some concern about

23    potential infringement.  They opted to change the design.  They

24    took the other product out of the market.  It basically ended

25    the controversy.

1           The other thing that happened at the tail end of the

2    case at about the same time was that Meihao changed its markmen

3    construction.  This is the construction, Your Honor, as you

4    know as a matter of law, that determines the legal scope of the

5    claims, claim terms, which are asserted in the litigation.

6    They changed those markmen constructions and made them much,

7    much narrower.  That was the subject of considerable debate in

8    front of Judge Davis, as to why they did that, what the impact

9    was on the litigation and so forth.

10           Another significant event in Leviton's mind, because

11   that was an indication that Meihao itself was very concerned

12   about the possibility that the claims, as originally construed

13   in a related case in Maryland, would read on the new product

14   design.  So they were espousing a new, much narrower,

15   construction to try and get those new products free and clear.

16           Basically, all those events occurred in the middle

17   of 2007.  It was at that point in time that Leviton had already

18   begun to settle a case in New Mexico, which was the other major

19   litigation.  Commercially, it was in their interest to try and

20   resolve some of these disputes.  That's really what happened.

21           When it was clear unequivocally that Meihao had

22   decided to move in a different direction, so did Leviton.  They

23   decided that enough was enough in this litigation; let's see if

24   we can't resolve it.  And that really is what happened in the

25   end.

 1              The one thing that has always -- and just a few

 2     moments about inequitable conduct.  It is very clear from our

 3     brief, and it is very clear from the record, that this major

 4     point that has been made by Meihao on inequitable conduct, the

 5     failure to disclose the Germane application, is completely

 6     erroneous.  And I'll tell you why.  Because the Germane

 7     application by definition cannot possibly legally qualify as

 8     prior art.

 9              THE COURT:  And that is because it precedes the 766,

10     is that correct, in time?

11              MR. HOSMER:  The Germane application was filed a

12     couple months before the 766 application, Your Honor, was.

13     However, the 766 application is the last in a series, the last

14     of the -- the fifth, actually, in a series of applications --

15              THE COURT:  Right.

16              MR. HOSMER:  -- that have the exact same disclosure,

17     the exact same specification and claim priority back three

18     years before Germane.  It is inconceivable.

19              THE COURT:  Right.  And that's -- I think I do

20     understand that argument, because it's continuation patent.  It

21     goes back and precedes Germane.

22              MR. HOSMER:  Right.

23              THE COURT:  Okay.  I believe I understand that.

24              MR. HOSMER:  Another -- one last point I'd like to

25     make before we get to your questions.  And that is Meihao has

1   made a considerable argument about the fact that there were

2   related litigations and information that prior wasn't disclosed

3   that surfaced in those litigations.  That brings us to tab 11.

4              Every one of the references that we were aware of,

5   that Meihao had identified, including the Germane application,

6   was brought to the attention of the Patent Office during the

7   reexamination proceedings that relate to the 766 patent.  And

8   in tab 11, you will see, Your Honor, the listing of the

9   references that were submitted to the patent office for

10  consideration by the very examiner, who, during reexamination,

11  already had found that the claims of the 766 patent were

12  allowable over any of the reexamination art that was

13  considered.  This was additional art, every conceivable thing

14  that could be considered as prior art that Meihao had cited,

15  including the Germane application.

16             And you'll see in tab 11 that the examiner

17  responsible for that reexamination not only looked at all of

18  that prior art but decided that there was not a single

19  reference, and particularly not Germane, that was material to

20  patentability of the claims of the 766 patent.  And you can see

21  that in the highlighting on tab 11 toward the bottom.  You can

22  see that the examiner, if you will look in tab 11, Your Honor,

23  quickly, you'll see that I think I actually flagged for you a

24  tab.  The first tab is the indication from counsel that the

25  Germane application was being submitted for the examiner's

1   consideration and the board of appeals at the Patent Office.

2           It is says and the Germane -- and it indicates the

3   Germane publication is not prior art to the 766 patent for the

4   reasons that we have talked about in our brief and just briefly

5   here.

6           The second tab that you see there, the yellow tab,

7   has a notation by the examiner responsible in the Patent Office

8   for reviewing this information, where he indicates in

9   highlighting, "All references considered except where lined

10  through."  There isn't a single reference that's lined through.

11  The examiner is indicating to the board of appeals that he has

12  looked at every single reference here, including information in

13  interrogatories, including Germane, including all of that.  He

14  found absolutely nothing that would indicate that it was

15  material to the patentability of the claims previously allowed

16  in the reexamination.  These are the exact same claims that are

17  in the 766 patent today.

18          What's the point of all of this?  The point is that

19  none of this information that they're talking about being

20  withheld is material to the patentability of the claims at

21  issue in the case.  And on top of that, their second job after

22  they show that there is materiality -- and if that doesn't

23  establish beyond doubt that it isn't material, and Germane

24  doesn't qualify as prior art to begin with, there is absolutely

25  no evidence in this record of intent to deceive on the part of

1   any of the people that were responsible for the prosecution.

2   They --

3              THE COURT:  Let me just stop you a minute,

4   Mr. Hosmer, because we did look at how you decide materiality.

5   And there seem to be several different tests.  There's not one

6   test.  And you seem to be arguing, well, the patent examiner

7   had all this information that you claim is material.  And it

8   didn't make any difference.  He or she found that the 766 was

9   a -- that those patents were -- the patentability of the 766

10  had been established.

11             But that's not the test.  But for is not the only

12  test that the Federal Circuit really adopts, though.  Correct?

13             MR. HOSMER:  The but for test is one of the tests

14  that are applied.  The rule 56 test does indicate that

15  information that's material to patentability should be

16  submitted.  But this indication by the reissue examiner, quite

17  frankly, is that this information that they're talking about is

18  not material to patentability.

19             And, Your Honor, it is --

20             THE COURT:  Are they saying it's not material to

21  patentability or they're not -- having looked at it, they still

22  think that there is patentability.  There is -- the patent is

23  valid.

24             MR. HOSMER:  It's hard to say what's in the mind of

25  an examiner, Your Honor.  But certainly if he did think that it

gaw                                                                          15

1   was material to patentability, you would have seen some kind of

2   a comment, a rejection.  It is possible for the examiner to go

3   back to the drawing board and say, I see this reference; this

4   reference is significant; the claims are not allowable over

5   this reference.  That never happened.

6            It isn't dispositive.  It's just a very clear

7   indication that the materiality that they talk about, the

8   failure to disclose that they talk about, you know, is a very

9   weak argument.

10           THE COURT:  Because I think of what you -- I think

11  of what you say is you say no foul, no harm.  Basically, you're

12  saying that --

13           MR. HOSMER:  That's true.  It is.  That is the --

14  excuse me.  I didn't mean interrupt you.

15           THE COURT:  Okay.  So that's what your point is,

16  that when the examiner had all this information, it didn't make

17  any difference.

18           MR. HOSMER:  It didn't make any difference

19  whatsoever.  But the worst part about this story is the Germane

20  application.  To suggest that that is prior art is absolutely

21  logically and legally wrong.  There was no obligation

22  whatsoever for Leviton to disclose a Germane application.  It

23  couldn't possibly qualify as prior art to 766.  The same

24  inventors, the same specification for over, I think, about

25  seven years and five different applications.  And to suggest

1    that somehow they deliberately, intentionally failed to

2    identify inventors on subject matter three years later is

3    absurd on its face.  It's logically and legally incorrect.  The

4    Germane application is not material to patentability in this

5    instance.  It cannot lead to inequitable conduct.

6                On the other side of the equation, let's not forget

7    that even if you show materiality in some form --

8                THE COURT:  Before you go to intent, let me ask you,

9    looking at the various provisions that were cited to me, it

10   says very clearly that you are to let -- it's misconduct not to

11   let the patent examiner, the Patent Office, know if you copy

12   claims.

13               Now I read Mr. Narcisse's deposition.  He denies

14   copying claims, as a matter of, I guess, law or technicality.

15   But he doesn't deny the facts of copying.  So I don't -- can

16   you tell me under the patent scheme what happens if you are

17   found to have committed misconduct by not telling the Patent

18   Office that you copied claims?

19               MR. HOSMER:  The copying claims theory, Your Honor,

20   relates to patent interference procedures.  If you copy claims

21   in an existing application, you need to tell the Patent Office

22   that you did that, because the Patent Office may declare an

23   interference.

24               The problem with the interference theory in this

25   case is it must be between two different entities.  It says by

gaw                                                                                    17

1    statute and under the rules of the Patent Office that the

2    interference is by -- it's applications of another.  And you'll

3    see that tab in the book there, the MPEP.  It says "of

4    another."

5              Leviton copying claims in an application that it

6    owns and is the assignee cannot possibly give rise to the duty

7    to tell the Patent Office.

8              THE COURT:  And we -- and I understand that issue, I

9    think, now.  And the "of another," whether it means another

10   inventor or another owner, I guess that's the issue.

11             MR. HOSMER:  He's another owner, Your Honor,

12   absolutely.  It doesn't mean another inventory.

13             THE COURT:  Why do you say that?

14             MR. HOSMER:  I can tell you from patent prosecution

15   experience that many companies file applications having similar

16   disclosures and support claims that are virtually identical,

17   very, very close, very close in scope, very close in verbiage.

18   It happens every day in the Patent Office with companies that

19   own more than one application.

20             If it is of another in a different corporate entity,

21   then the obligation gives -- there is an obligation with

22   respect to the Patent Office to tell the Patent Office we have

23   a different corporate entity, a different assignee, who has

24   claims that you have copied.  That could precipitate an

25   interference.

18

1            Interference law in this context has nothing to do

2   with this inequitable conduct.  There is no interference rule

3   which has been violated.

4            THE COURT:  Okay.  But --

5            MR. HOSMER:  There is no copying claims prohibition

6   that has been violated.

7            THE COURT:  Okay.  Now let me just ask, I looked at

8   the language.  And it says "of another."  And I understand

9   that -- well, in -- so just reading the text itself -- and I

10  can't remember what else persuaded me that that referred to

11  inventor, not owner.  What do you have by way of case law or

12  commentary in *The Federal Register* or wherever these sorts of

13  things are put, which suggest that that another refers to an

14  owner, as opposed to an inventor.

15           MR. HOSMER:  Well, Your Honor, I think we originally

16  submitted portions of 37 CFR on this point and the regulations

17  that govern this.

18           THE COURT:  Well, help me out then.

19           MS. MANNING:  If I may direct Your Honor to the

20  relevant provisions.  I think what Your Honor may have been

21  thinking of, when you were reading about this, footnote 14 of

22  our opening brief --

23           THE COURT:  Wait, wait.  I want to find it.  Just

24  give me a minute.

25           MS. MANNING:  Sure.  And that's page 20.

1                (Pause.)

2                THE COURT:  Okay.  You said your opening brief,

3      page --

4                MS. MANNING:  Our opening brief, page 20, footnote

5      14, Your Honor.

6                THE COURT:  Footnote 14?

7                MS. MANNING:  Yes, ma'am.

8                THE COURT:  Okay.  Do you have any tabs?  Anybody

9      have any Post-Its here, so I can keep myself straight?

10               Okay.  Thanks.

11               MS. MANNING:  I'll give Your Honor a chance to tab

12     that, but I'll refer you to what's cited there.  Among others

13     it's 37 CFR, Section 1.41(a), which clarifies that a patent is

14     applied for in the name or names of the actual inventor or

15     inventors.

16               And then 37 CFR 1.41(b) is very clear.  "Unless the

17     contrary is indicated, the word applicant, when used in these

18     sections, refers to the inventor or joint inventors who are

19     applying for the patent."

20               When that section is referring to "of another," it's

21     another inventory.  It's not another company.  And the fact

22     that these are commonly assigned has nothing to do with it.

23               What Leviton is doing here is they are taking one

24     set of engineers -- let's call them that, rather than

25     inventors.  One set of engineers are working on a project.

1    They come up with something that Leviton's attorney, Claude

2    Narcisse, describes in particular language.  He uses that

3    language.  Claude Narcisse testified in the deposition that you

4    read -- and we've cited it in our papers, as well.  He

5    describes how he realizes, not the inventors realize, he

6    realizes years later that the specification from an old patent,

7    the 558, which is continued through which the 766 is related

8    through several continuations, which goes on back to the 976, a

9    very old patent, he realizes, not the inventors, he realizes

10   that there is arguably a hook in that for the same thing that

11   he said six months earlier Mr. Germane had invented.

12            And so he just -- as you know, he denies copying,

13   but there's no other explanation.  He copies the language from

14   the Germane application, sticks it in the application that

15   later issues as the 766.  And in doing so, he moves the

16   priority date of those claims back by at least three-and-a-half

17   years, possibly more, depending on whether -- and nobody's ever

18   had to resolve this -- depending on which priority date of

19   Leviton's date you buy.

20            But critically, by moving the priority date,

21   attempting to move the priority date, back by three-and-a-half

22   years, Mr. Narcisse could avoid Meihao's product.  Meihao's

23   product shipped before the allegedly infringing 2003 UL

24   compliant product.

25            THE COURT:  I'm going to -- I want to make sure I

1   understand this.  So I think the three-and-a-half years, he

2   gets -- it then becomes a continuation patent.  So he goes back

3   to the --

4            MS. MANNING:  Yes.  He goes back in time in terms of

5   priority date three-and-a-half years, at least to the 558

6   patent.  And that's the priority date Leviton has identified

7   for the patent.  The other times they've identified an even

8   earlier one, but what have you.

9            But that's critical for the value of this patent to

10  Leviton.  And the reason it's critical is not only does it get

11  rid of three-and-a-half years of prior art, but Leviton is

12  trying to capture the standard.  The UL standard governs these

13  products.  GFCIs, as a practical matter, can't be marketed in

14  this country unless they comply with the UL standard.

15           The UL standard evolved.  There was a 2003 UL

16  standard that is the original product.  There's the 2006 UL-

17  compliant product that is the product that Leviton eventually

18  admitted it did not infringe despite having pursued a year of

19  litigation based on the theory they didn't infringe.

20           That 2003 UL-compliant product, that actually

21  shipped into this country before the Germane application was

22  filed.  So if it's true --

23           THE COURT:  Well, you've got -- it ships into the

24  U.S. before --

25           MS. MANNING:  Into the U.S. on, I want to say -- I

22

 1 │ can actually come up with the date.  I believe the date is

 2 │ December 3, 2006.

 3 │           THE COURT:  Okay.  And you're about to tell me the

 4 │ significance of that.  So the 2003 --

 5 │           MS. MANNING:  I'm sorry.  Not 2006.  December 3,

 6 │ 2002.  December 3, 2002, Meihao's 2003 UL standard-compliant

 7 │ product is shipped into this country.  The Germane application

 8 │ is filed for February 3, 2003.  That's the provisional that the

 9 │ Germane application harkens back to.  That provisional

10 │ application priority date is, therefore, two months after

11 │ Meihao's product comes into the country.

12 │           If it's true, as Leviton at one time claimed, that

13 │ Meihao's 2003 product infringes those claims that were first in

14 │ Germane and later ended up in the 766, they would be

15 │ anticipated by Meihao's product.

16 │           So unless Mr. Narcisse can find a way to move the

17 │ priority date back even further than that provisional

18 │ application for Germane, unless he can move it into the DeSalvo

19 │ patent family instead of pulling a fast and loose one on what

20 │ it means to invent something, unless he can do that, those

21 │ claims are going to be invalid in light of Meihao's product,

22 │ and it's going to be zero value to Leviton.  By moving --

23 │           THE COURT:  Okay.  Let me stop you one second.

24 │           MS. MANNING:  Sure.

25 │           THE COURT:  Mr. Hosmer, do you disagree with what

1   she said in terms of the dates and the effect of the dates, in

2   terms of the 2003-compliant product shipped into the United

3   States on December 3, 2002; the Germane application, February

4   3, 2003, after the Meihao product came into the United States

5   and the product would have been -- wait a minute -- the Germane

6   product would have been anticipated by the Meihao product, if

7   that were the case.

8           MR. HOSMER:  Your Honor, here's how it works in

9   terms of priority.  This is --

10          THE COURT:  Can you do me a favor, Mr. Hosmer?

11  Because, you know, I'm wading, I'm wading in your territory.

12  So --

13          MR. HOSMER:  The answer is we totally disagree that

14  the Germane application or anything that Meihao did

15  commercially could possibly be prior art to the 766.  We

16  totally, unequivocally disagree with that.

17          And it is a basic fundamental proposition of patent

18  law.  The 766 patent, although filed in this same time frame in

19  2003, is entitled to a filing date, an effective filing date,

20  as if it were filed in 1998 or 1999.  It has the exact same

21  specification.  It's called the continuation application.  It

22  is the last in the series.  It is how the patent system has

23  been set up for the last 50 years.  It is entitled to that

24  date.

25          The Germane application cannot possibly be prior

1   art.  The --

2             MS. MANNING:  With all due respect, that's not an

3   answer.

4             THE COURT:  I'm sorry.  Please.

5             MR. HOSMER:  Excuse me.  The sales activity of

6   Meihao that she's talking about in 2003 could never possibly be

7   cited as prior art or in any way affect the validity of the 766

8   patent application.  Yes, it was filed in 2003.  It is accorded

9   the effective filing date of 1998, to the extent it has common

10  subject matter.  And the words in four of those applications

11  are absolutely identical.  The figures are absolutely

12  identical.

13            As a matter of law, it's entitled to a filing date

14  in 1998, at the very latest.  All of the events that occurred

15  in 2002 and 2003 with Meihao have nothing to do with the

16  validity of the 766 patent, nothing.

17            THE COURT:  Okay.  Go ahead.

18            MS. MANNING:  And I apologize for interrupting.  But

19  with all due respect to Mr. Hosmer, I don't think that's an

20  answer to Your Honor's question.  Because the point I'm making

21  is that Leviton's attorneys, its former attorneys, were highly,

22  highly motivated to do whatever it took to get an earlier

23  priority date for these claims.  Because they're attempting to

24  capture the standard.  They're attempting to draft claims that

25  read on Meihao's products.  And don't get me wrong, that's

gaw                                                                     25

1    okay.  The patent law is very clear that you can draft a claim

2    that reads under a competitor's product, if you actually

3    invented that first, if you invented it first.

4            The disconnect that I think the parties have -- you

5    see it in the papers.  You see it in the conversation we're

6    having here today -- is that I think that Leviton's idea of

7    what it is to invent something is just fundamentally wrong.

8    When you invent something -- inventing something is the aha

9    moment.  You have to appreciate exactly what it is that you

10   have invented.

11           And we cite the particular test in our papers.

12   Inventorship is what inventor had in mind.  It's not what a

13   clever prosecutor years later can come up with and find a hook

14   to in the specification.  It's what the inventor had in mind at

15   the time of the invention.

16           The case law tells us the conception of invention is

17   the formation in the mind of the inventor of a definite and

18   permanent idea of the complete and operative invention, as it

19   is hereafter to be implied in practice.  What that means is

20   that unless Mr. DeSalvo, Mr. Ziegler, actually had the aha

21   moment, then even, even if you could find a hook for these

22   claims in the patent specification, they didn't invent it,

23   unless they can show that they had that aha moment.

24           And the difficulty here is, you know, Meihao deposed

25   all of these people.  Nobody has any idea where the claim

1   language came from.  Nobody has any idea what the claim

2   language even means, because it's Mr. Narcisse, the attorney,

3   who years later thinks to himself, I can help my client out.  I

4   can find a hook for this.  And I can just kind of draft these

5   claims on, these claims that I said six months ago were

6   invented by these guys over here, this entirely separate team

7   of engineers, I can slip it over here.  I can move it over

8   here.  I can do some good.  And arguably there's a hook for it

9   in the specification.

10           Now you don't have to decide whether there's a hook

11  for it in the specification, because -- and this goes to tab

12  11, as well.  It's not whether the claims are actually invalid.

13  It's not whether Mr. DeSalvo actually had the aha moment.  It's

14  the fact that the attorneys deprived the examiner of critical

15  information, information that the examiner certainly would have

16  deemed important.  And that is the test to patentability.  They

17  would have -- the examiner would have known to ask questions

18  about did DeSalvo actually invent this, or did, as the same

19  attorney told me six months ago, did Germane invent this.  It

20  can't be true both times.

21           MR. HOSMER:  Can I respond, Your Honor?

22           THE COURT:  I just want to follow -- but didn't the

23  patent examiner by number 11 then have everything that he --

24  well, this is the -- I'm getting confused.

25           MS. MANNING:  Tab 11 is the attorney's submission to

27

1    the examiner.  It's not the examiner with this first tab, I

2    think, page 12.  That's Mr. Narcisse that's arguing why Germane

3    is not material to patentability.  It's not the examiner

4    finding.

5                MR. HOSMER:  The examiner initialed off on the

6    invention disclosure in its entirety, Your Honor.  That

7    means --

8                THE COURT:  I'm sorry.  You all are going too fast

9    for me.  And I want to decide this case.  I have to understand

10   what you're saying.  And I'm not a patent lawyer.

11               So number 11, the tab is sent to what -- to a patent

12   examiner information disclosure statement for what purpose?

13   This is part of the reexamination proceeding of the Germane,

14   that's the 766 patent.

15               MS. MANNING:  This is the 766 patent.  The 766

16   patent was issued by the PTO.

17               THE COURT:  Right.

18               MS. MANNING:  Later the PTO put it in reexamination,

19   which means they go back and they look at it again.  They

20   reconsider it.

21               THE COURT:  Right.

22               MS. MANNING:  And during the reexamination, Mr.

23   Narcisse submitted this information disclosure statement.

24               THE COURT:  Okay.

25               MR. HOSMER:  You can't cure inequitable conduct

1    after the fact.  You can't go back in the reexamination and

2    cure the inequitable conduct from the first examination.

3              THE COURT:  I understand that the examiner who first

4    looked at 766 didn't have the Germane application.

5              MS. MANNING:  That's right.

6              THE COURT:  I understand that.  Now he or she does

7    have it.  And do I understand that on reexamination the

8    patentability of 766 was upheld?

9              MS. MANNING:  That's right, which is not a finding

10   about whether or not the references are material.

11             THE COURT:  I understand.

12             MS. MANNING:  Materiality is different from prior

13   art.

14             THE COURT:  I understand that.

15             MS. MANNING:  Okay.

16             THE COURT:  That what Mr. Narcisse did was give all

17   of the information that you would have liked to have been given

18   to the original patent examiner.

19             MS. MANNING:  Yes.  And as I noted to Mr. Hosmer

20   earlier, I think some of these lists in here are lists I

21   originally came up with during the litigation, some of the

22   lists of references.  Yes, he did the right thing in the

23   reexamination.  But it doesn't cure the inequitable conduct in

24   the initial issuance.  And it doesn't speak to whether or not

25   the references are material.  Because the fact that they don't

1    anticipate, the fact that the patent may still be issued, is a

2    different consideration from whether those references are

3    materials to patentability.

4          The PTO regulations require examiners to submit a

5    good deal of information, not just prior art, not just

6    invalidating information, but everything that fits in the

7    ballpark.  You know, patent prosecutors, responsible patent

8    prosecutors, know that it's their job and they're required by

9    PTO rules and federal circuit law to err on the side of

10   caution.  They give the PTO everything, exactly so we can avoid

11   these kinds of issues.  They give the PTO everything in an

12   abundance of caution, so that the examiner looks at everything

13   and can make that call him or herself.

14         But because it's an ex parte proceeding -- you don't

15   have two sides here.  It's an ex parte proceeding.  If the

16   patent applicant doesn't provide the information, it just

17   doesn't happen.

18         THE COURT:  Okay.

19         MR. HOSMER:  Just a couple of points.  First of all,

20   the reexamination was in parte, not ex parte.  And Mr. Narcisse

21   indicated, although he submitted the Germane application in

22   this reexamination, he indicated on the face of it why it was

23   not considered prior art.  He did it out of an abundance of

24   caution, because there had been such a hue and cry over the

25   fact that it might somehow relate to the 766.  He indicates in

1    here that it's not even qualified as prior art, which is

2    absolutely correct.

3           The examiner initialed off, after looking at all of

4    this information, and didn't change one iota of his opinion

5    that the claims of the 766 patent were affirmed under

6    allowability over this art.  It's a dispositive, clear

7    indication of non-materiality.  Your Honor, it is reversible

8    error, I can tell you, for any Court to find that the Germane

9    application is prior art to the 766.

10          The aha moment that she's talking about for the 766

11   patent occurred back in 1999 with the 558 application.  It is

12   absolutely perfectly appropriate for a patent owner or patent

13   applicant to file continuation cases based on the exact same

14   disclosure and to claim the original date of their conception

15   back to 1998.

16          THE COURT:  But doesn't --

17          MR. HOSMER:  The Germane case was four years later,

18   different specification, different embodiments of an invention,

19   different inventor.  There is nothing wrong with claiming an

20   early priority dates.  There was nothing sinister about it,

21   nothing misleading, no intent to deceive anybody.  Leviton was

22   perfectly entitled under the law to do that, and they did it.

23          And the claims were allowed in their original form,

24   Your Honor, in their original form.  What does that mean?  It

25   means that under Section 112 of the patent statute that the

1    examiner looked at the inventorship, saw that the inventorship

2    was correct, looked at the specification of the 766 patent

3    application, and saw that the claims were fully supported under

4    the law, fully supported.

5              The fact that those claims were similar to the

6    claims in the Germane case is really immaterial.  It happens a

7    lot in patent prosecution.  Were the Germane claims, although

8    similar, supported by their specification?  Yes.  The subject

9    matter is similar in nature.  They're supported.  That's the

10   test.  Different inventors, different embodiments.  You can

11   look at the two patents and see, the two applications, and see

12   that they have very different embodiments in many respects.

13   The facts that the claims are similar is not sinister at all.

14   It's a commonplace event in patent prosecution.

15             But the one thing that is critical is for Germane to

16   be considered prior art, it needs to have a date earlier, much

17   earlier, than 1998.  Inconceivable.

18             MS. MANNING:  And again, we seem to be arguing past

19   one another, because the point is not whether it's prior art.

20   The point is whether it's material.

21             MR. HOSMER:  It can't possibly --

22             THE COURT:  Wait.  I'm sorry.  Please.  Let me

23   just --

24             MR. HOSMER:  Rule 56 relates only to material --

25             THE COURT:  Wait just one second.  She was speaking.

gaw                                                                        32

1    So your point is --

2              MR. HOSMER:  She's misstating those statutes.  She's

3    mischaracterizing those statutes.

4              MS. MANNING:  No, I'm not.  No, I'm not.

5              THE COURT:  You know, you're not helping me when you

6    argue.  You help me when you cite to something specific that I

7    can look at.

8              MR. HOSMER:  I apologize.

9              THE COURT:  Ms. Manning, you were saying?

10             MS. MANNING:  Yes.  What I was saying was that the

11   test -- and this is the test in impact, which we have cited in

12   our papers numerous times.  There are multiple tests for

13   materiality.  One of the tests is whether it's invalidating

14   prior art.  Okay.

15             One of the other tests, the reasonable examiner

16   test, is would a reasonable examiner consider the information

17   important to patentability.  The Germane reference would be

18   important to patentability to a reasonable examiner, because it

19   raises serious questions about --

20             THE COURT:  About who is the inventor.

21             MS. MANNING:  -- inventorship, about written

22   description, about whether it's actually supported by that '98

23   or '99 or what have you specification.  Because if you look at

24   Germane, there's some key terminology in the claims about a

25   moveable bridge.  It's really one of the critical terms here.

1          Moveable bridge shows up in the Germane application

2    specification 46 times.  It shows up in the DeSalvo patent

3    family zero times.  It's just not in the specification.  So

4    where did it come from?  Well, it came from Germane.  In real

5    life, it came from Germane.

6          Mr. Narcisse is arguing that there's a hook for it

7    in the earlier patents, in the DeSalvo patent family, the 558,

8    and the others.  But that written description, it's a real

9    question that the examiner would ask or would be more likely to

10   ask when he was informed that the claims had been copied from

11   the Germane application.

12         So that's critical.  So it's written description.

13   It's inventorship.  There's a double patenting issue.

14         Now Mr. Hosmer is right that if the Germane

15   application in fact post-dates the effective filing date of the

16   766, that you can't get a double patent --- rejection.

17         THE COURT:  I'm sorry.  Repeat that again for me.

18         MS. MANNING:  Let me start in a slightly different

19   way.  The law is very clear that you can only get one patent

20   per invention.

21         THE COURT:  Per idea, yes.

22         MS. MANNING:  And inventions are called patentably

23   distinct, when they are different enough that you can actually

24   justify two patents on them.

25         THE COURT:  Yes.

34

1            MS. MANNING:  What actually happened in this case

2  is, after the 766 patent issues, Mr. Narcisse discloses the 766

3  patent to the examiner, who's got the Germane application in

4  front of him.

5            THE COURT:  And he says double patent.

6            MS. MANNING:  And he says double patent, ding, we're

7  done.  And he rejects those claims.  And they never --- so

8  there's argument that these claims are somehow distinct despite

9  the tiny differences in terminology.  A becomes the and so on.

10 So they're the same.

11           Now if the priority dates are the way Leviton wants

12 them to be, that is, 766 gets an earlier priority date than

13 Germane, that's correct.  That's the correct way to do that.

14 You would reject the Germane application claims.  But if

15 they're wrong, if the spec does not actually support those

16 claims, if, even worse, the inventor didn't actually have the

17 aha moment, if they didn't actually invent what's in those

18 claims, then they're not entitled to this earlier priority

19 date.  And at that point, once the examiner had made that

20 determination, it would have been appropriate for the examiner

21 to reject the 766 claims on a double patenting theory in light

22 of Germane.

23           So if the priority dates work the other way, you

24 would have the other results.  Again, the examiner never gets

25 to that question, because the examiner doesn't know they've

1    been copied, doesn't know that the Germane application is out

2    there and relevant.  This is, again, a reason why not

3    necessarily because Germane is invalidating, but because

4    Germane is relevant.  It is important to the patentability.  It

5    would raise substantial questions.  That's the test.  That's

6    why they should have disclosed it.

7              MR. HOSMER:  Just one brief response on that, Your

8    Honor.

9              THE COURT:  Yes.

10             MR. HOSMER:  The first order of business for a

11   patent examiner is to determine whether the inventorship is

12   proper, as I mentioned.  They look to see.  They look to see in

13   the related applications going back four years whether or not

14   the inventorship was changed, because the specification is

15   identical.  That's the first order of business.

16             The second order of business is to look at the

17   claims that the patent application has filed and determine

18   whether or not the specification, the written description of

19   the invention and figures support those claims, as required

20   under Section 112.  That is the first order of business.

21   They're told to do that.

22             That's exactly what happened in the 766 case.

23   Regardless of their similarity or dissimilarity to anything

24   else, the patent examiner found that they were in fact

25   supported, and they were absolutely patentable.  He found that

1    initially.

2            That's not surprising, given the fact that the

3    Germane application could not possibly qualify as prior art for

4    that application.  There's nothing sinister, nothing

5    surprising, about it.

6            I'd like to talk for just a minute about intent to

7    deceive.  Eve assuming that you could drum up some materiality

8    with respect to Germane or some of these other obscure

9    references, which were submitted later in the reexamination,

10   even assuming there might be some semblance of materiality

11   there, where in the record can you show any intent to deceive

12   on the part of Leviton?

13           They deposed every inventor, except one, in Germane

14   and in 766.  They deposed every attorney who signed a document

15   relating to the 766 application.  And there isn't a scintilla

16   of evidence in the record indicating that they ever intended to

17   deceive the Patent Office by filing the 766 case.

18           In fact, when you look at what happened, they

19   discovered, they, the attorneys that prosecuted the

20   application, that there was an infringing product in the

21   market.  They knew that the claims of one of the earlier cases

22   that they had that related to 766 did not have claims that

23   necessarily covered it.  But they also knew that the

24   specification was sufficient enough to support broader claims

25   that would cover this new infringing device.

1            So they filed a petition to make the application

2    special, pointing out why the infringement was there.  And that

3    petition to make special is another indication of what we

4    consider to be a good faith effort to use what it is that

5    you're entitled to.  The full specification, description of

6    your invention, and the full scope of claims that are supported

7    by that specifications.  That is precisely what happened here.

8    There was no intent to deceive anyone.  There was no intent to

9    defraud the Patent Office by not citing Germane or any other

10   application.  There was an effort to obtain exactly what they

11   were entitled to under the law.  And that's what happened.

12            THE COURT:  So you -- when Ms. Baker, excuse me,

13   Ms. Manning makes the argument that what Mr. Narcisse was

14   attempting to do for Leviton was to advance the date and was in

15   his interest not to let the patent examiner know about Germane

16   for the reasons she says it might have made a difference to the

17   patent examiner, you don't think there's anything wrong with

18   that.

19            MR. HOSMER:  If they had done that -- Your Honor,

20   the answer is no, there is nothing wrong with that.  If they

21   had done that, the examiner would say, well, here's the Germane

22   application filed in 2003.  The 766 application is filed in

23   2003, a couple months later.  But I see in the 766 application

24   it claims priority back to 1998.  So I guess the Germane

25   application is not even relevant.  It's not relevant to

1    patentability in any way.

2            And despite there -- even if there is similarity in

3    some descriptions perhaps, because they all relate to GFCI

4    products, that does not necessarily mean that there's some

5    question of inventorship.  The inventorship in all of the

6    predecessor patents was exactly the same, the same two people

7    with the same specifications.  This is just the latest

8    generation of a patent that they are perfectly entitled to

9    have.

10           It happens all the time.  There are patents out

11   there that have seven, eight, ten related applications,

12   different sets of claims all supported by the same

13   specification.  And the fact that an intervening application is

14   filed somewhere in the middle that relates to the same general

15   subject matter does not mean that there was some evil intent or

16   trying to defraud the patent office or get an earlier date.

17   This is what they're entitled to do under the law.

18           THE COURT:  But didn't it make it easier for Leviton

19   by the fact that the Germane application was not revealed,

20   because their inventors were different?  Wouldn't it have

21   slowed down the train and required a greater examination, if

22   the Germane application had been provided to the patent

23   examiner?

24           MR. HOSMER:  In all likelihood, it wouldn't have

25   made any difference whatsoever.  Why?  The examiner faced with

1   this would look and say, Germane is not prior art.  It's not

2   related in that sense.  It can't possibly be an encumbrance to

3   granting and allowing claims based on this application that I

4   have in front of me, which has a so much earlier effective

5   filing date.  Germane would have been irrelevant.  It is

6   immaterial as prior art.  It can't possibly qualify.

7           THE COURT:  But I guess I'm just trying to figure

8   the argument that if you look at the language, there is

9   enormous similarity in the language.  I mean, and Mr. Narcisse

10  said there was not coincidence.  And he clearly said that was

11  not an explanation for it.

12          And there are two different set of inventors.

13          MR. HOSMER:  That's right, Your Honor.

14          THE COURT:  So wouldn't the patent examiner wonder

15  what was going on, if you have the 766, which looks like to me

16  or could look to somebody perhaps not skilled, and that may be

17  your point, like there was copying that was done?  And it was

18  the same invention, and you had different inventors.  Wouldn't

19  that have caused some stir and some discussion?

20          MR. HOSMER:  The only thing that the examiner could

21  have done, the only possibility, is to issue what's called a

22  provisional rejection of Germane, not 766.  A provisional

23  rejection, the examiner looks at it and says we have very

24  similar claims here.  It looks as if we have a provisional

25  rejection, based on the earlier effective filing date of 766.

gaw                                                                    40

 1   He said --

 2            THE COURT:  Provisional --

 3            MR. HOSMER:  And then he --

 4            THE COURT:  Excuse me.  I'm sorry.  I'm trying to

 5   understand.  Provisional rejection of?

 6            MR. HOSMER:  Germane, not 766.  That's how the

 7   patent procedures work.  Once that provisional rejection, even

 8   if you made that provisional rejection, it would become a

 9   statutory double patenting rejection of Germane, because of the

10   early filing date of 766.  766 wouldn't have been rejected at

11   all, because the examiner recognized that it had an earlier

12   filing date.

13            Germane could suffer from a statutory rejection,

14   once the 766 patent issued.  I don't know what has happened to

15   Germane.  Maybe it's possible it has gotten that.  Okay?  But

16   it would have been a provisional rejection of Germane, not 766.

17            THE COURT:  Okay.  Let me just ask you to -- is that

18   correct?

19            MS. MANNING:  Well, if I may suggest one other thing

20   that the examiner could have done, if it had come to his

21   attention that the claims had been copied.  He could have

22   reported Mr. Narcisse to the PTO for violation of his ethical

23   duties.  That's the other thing that could have happened.

24            There are -- because there are explicit regulations

25   that require Mr. Narcisse and the other attorneys involved in

gaw                                                                                          41

1    the prosecution to disclose when claims have been copied.  It

2    didn't do that.

3            THE COURT:  Okay.  Now I want to go back --

4            MS. MANNING:  It is defined as misconduct --

5            THE COURT:  Right.  I understood that.

6            MS. MANNING:  -- to fail to do that.  That's the

7    other thing the examiner could have done, in addition to

8    possibly issuing a rejection in Germane, if -- and again, that

9    rejection in Germane assumes that once the examiner had all the

10   information, the examiner would have looked at the issue and

11   concluded that the 766 claims that had been copied were in fact

12   legitimate.  They were entitled to this earlier priority date.

13           But the examiner would have gone through that whole

14   process.  The examiner would have considered Germane,

15   considered what impact it did or did not have on the 766.  But

16   it's the mere fact that he is deprived of the information.

17           THE COURT:  I understand that.  But what I'm trying

18   to understand is what are the range or possibilities of what

19   the examiner could have done.  I understand about reporting the

20   misconduct.  And Mr. Hosmer said he could have issued a

21   provisional rejection of the Germane application.

22           What else could he have done had he been given all

23   of the information the first time around?

24           MS. MANNING:  Well, if he had come to the conclusion

25   that the written description didn't support the 766, he could

42

1    have rejected the claims.  If he came to the conclusion that

2    Mr. DeSalvo or Mr. Zeigler did not in fact invent these claims,

3    he could have rejected on that basis, as well.

4              THE COURT:  He could have rejected the 766.

5              MS. MANNING:  That's correct.

6              THE COURT:  But if the written descriptions didn't

7    support the claims or that the --

8              MS. MANNING:  The inventorship was misstated.

9              THE COURT:  -- the inventorship was misstated.

10   Okay.

11             MR. HOSMER:  And why didn't he do that, Your Honor?

12   Because, like I said, the first order of business is for him to

13   look at the inventorship and look to see whether or not the

14   specification supports the claims of 766.  And the examiner

15   obviously came to the conclusion that it did support and that

16   the inventorship was correct, not a surprising conclusion given

17   the fact that there were five predecessor patents with the

18   exact same two inventors and the same specifications.

19             And Your Honor, the discussion we have been having

20   about the interference rule of practice, it's 604(b) in the

21   Code of Federal Regulations, in the last hearing we went

22   through this drill again with Ms. Manning.  And you will see

23   quoted in tab 9 there, we reminded Ms. Manning that she

24   admitted to you that it does apply to different owners, not

25   just different applications.

```
 1              And I can tell you as a matter of law interference

 2    practice under 604(b) relates to different owners, not just

 3    different applications of the same owner.

 4              MS. MANNING:  And if I may, Your Honor, that's in

 5    their papers, this I gotcha.  That discussion, this is

 6    discussed in their opening papers.  You know what?  If I

 7    misspoke, my bad.  But I don't think I misspoke.  In that

 8    earlier hearing what I saw was that if Mr. Hosmer was right

 9    that the rule applied to different owners, then he was right.

10    But I would go back and look at the rule.

11              Well, I did go back and look at the rule.  And it's

12    addressed explicitly in our opening papers.  That's what at

13    footnote 14 that I directed Your Honor to earlier.  It doesn't

14    apply to different owners.  It applies to different applicants.

15    That's what the law says.  It's very clear.

16              And we've cited that for you.  There's not a word

17    about this in Mr. Hosmer's papers.

18              MR. HOSMER:  It's a very misleading, erroneous,

19    legally erroneous, thing she's telling you, Your Honor.  I

20    mean, with all due respect, that is absolutely legally

21    incorrect.

22              THE COURT:  You mean the --

23              MR. HOSMER:  604(b) does not apply to different

24    applicants of the same owner.

25              THE COURT:  I know, but I'm telling you I've tried
```

1     to look at --

2                MR. HOSMER:  It applies to --

3                THE COURT:  Excuse me.  I've tried to look at that

4     independently, and my tentative conclusion is that it does

5     refer to inventors, not owners.  And you need to give me

6     something statutory case-wise --

7                MR. HOSMER:  I'll be happy to do that, Your Honor.

8     I'll be happy to do that.  And I invite Ms. Manning to provide

9     case law that indicates that 604(b) of the Code of Federal

10    Regulations applies to different applicants of the same owner,

11    same assignee.  I'd like to see that case law.  I will provide

12    you with the authority for that.  This is interference

13    practice.  Interference practice relates to different corporate

14    entities.  That's different.

15               THE COURT:  Okay.  Well, why don't you do that?  And

16    today is Wednesday.  Can you do that by Friday?  Because I'm

17    trying desperately to try to finish this.

18               MR. HOSMER:  Yes.

19               THE COURT:  Okay.

20               MR. HOSMER:  Yes, I can.

21               MS. MANNING:  Since we addressed that in our opening

22    papers, would you mind if I took a look at what Mr. Hosmer has

23    to say on Friday?

24               THE COURT:  How about Thursday?  Can you do that by

25    Thursday, Mr. Hosmer?

1             MR. HOSMER:  Sure.

2             THE COURT:  And then you can do that by Friday.

3             MS. MANNING:  I appreciate that, Your Honor.  Thank

4    you.

5             THE COURT:  Great.  All right.  I think at this

6    point, Mr. Hosmer, is there anything else you want to

7    particularly say?

8             MR. HOSMER:  No, Your Honor.  It just -- the only

9    final notes would be in the booklet that you have there.  I did

10   want to note that in tab six, that is the letter that was sent

11   in tab six indicating, finally indicating, to Leviton that

12   there had been a change in the design of the device that had

13   been accused.  And that was the beginning of the end of the

14   story, knowing that the litigation had eventually succeeded in

15   removing that original accused product.

16            THE COURT:  Okay.

17            MR. HOSMER:  So if there was any evidence of intent

18   to deceive in the record, Your Honor, I would be delighted to

19   see it in some citation.

20            THE COURT:  Well, I guess as I look at this issue of

21   intent to deceive, when I read Mr. Narcisse's deposition, he

22   acknowledge, in answer to Mr. Hnath's questions, that he knew

23   all of these obligations.  He knew about the copying.  He knew

24   about the inventor.  He knew about all of these things, and

25   that you should err on the side of more disclosure, rather than

1  less.  And yet, he didn't do it.

2          And so I don't know why he didn't do it, whether he

3  decided he was too busy and he -- or it would complicate

4  getting the patent, the 766 patent.  I don't know.  But he

5  clearly acknowledged the duty.  And then he didn't do the duty.

6  Now what do you draw from that?

7          MR. HOSMER:  The standard from the Federal Circuit

8  is very high.  It's not just that you made an admission.  There

9  needs to be at least the level of specific intent to deceive.

10          THE COURT:  Specific intent?

11          MR. HOSMER:  A mental intent to deceive or there

12  needs to be at least a minimum of gross negligence on the part

13  of the applicant's attorney with respect to the information

14  that was not disclosed.  At a minimum, there needs to be high

15  materiality and a level of negligence called gross negligence.

16          THE COURT:  Okay.  And you --

17          MR. HOSMER:  It's a very, very difficult standard.

18  they do not find inherent specific intent to deceive.

19          THE COURT:  Okay.  So that was the point I was sort

20  of trying to get to.  It seemed to me in looking at the case

21  that gross negligence would be sufficient, not garden variety

22  negligence.

23          MR. HOSMER:  That's right.  And there has to be

24  hard, clear, and convincing evidence --

25          THE COURT:  Right.

```
 1          MR. HOSMER:  -- of gross negligence.

 2          THE COURT:  Right.

 3          MR. HOSMER:  Not speculation, not innuendo, you

 4  know, not suggestion, particularly about a reference that is

 5  not even material to patentability.  Mr. Narcisse's failure to

 6  identify Germane is virtually irrelevant.  It couldn't have

 7  been.  Anyone would have known that it's not material to

 8  patentability, because it just didn't qualify as prior art, as

 9  the Patent Office has now found.

10          THE COURT:  This petition to make special, as I

11  understand it, that's to expedite the Patent Office's

12  consideration.

13          MR. HOSMER:  Yes.  They wanted to expedite the

14  consideration because they had just become aware that there was

15  an infringing product on the market.

16          THE COURT:  But if the Germane application had been

17  revealed, would that not have slowed down the train for that?

18  Would you --

19          MR. HOSMER:  Likely not.

20          THE COURT:  Okay.

21          MR. HOSMER:  Likely not.  The reason is because it

22  was filed in connection with the 766 case.  What did Leviton do

23  actually, when they saw this infringing device?  They looked at

24  the claims of the various patents that they had.  And they

25  said, "We have this specification that supports disclosures for
```

1    broader claims.  These claims are not the best that we could

2    use.  We should get claims that read on it even better."

3    That's the genesis for the 766 case.  That's what happened.

4              Are you entitled to do that in America in the patent

5    system?  Absolutely.  Absolutely entitled to do it.

6              THE COURT:  And your real complaint, though,

7    Ms. Manning is that he didn't go back to the inventors and

8    say -- I know he said he didn't talk to the inventors.

9              MS. MANNING:  He didn't talk to them.  He didn't

10   tell them he was doing it.  He didn't tell anybody he was doing

11   it.  They went out -- the attorneys went out very much on their

12   own and decided to go seek additional patents to fuel this long

13   campaign of litigation that we described for you in our papers.

14   You know, the 17 cases that they filed, none of which have been

15   successful, all depended on getting new patents.  The latter

16   ones depended on getting new patents, because they had failed

17   in all of the earlier litigation.

18             They filed five new cases based on the 766 patent.

19   That's a big motivation, both for Leviton, because it's working

20   very hard to compete via patents, rather than compete on the

21   merits of the products and their price, and it's also a big

22   motivation for Greenberg Traurig.  I think we can count on the

23   fact that Greenberg made millions and millions of dollars on

24   the 17 cases it litigated on the DeSalvo patents, including the

25   five 766 cases.

1              THE COURT:  Let's just say that Mr. Narcisse had

2    called up the inventors and then filed the patent application.

3    Would there be a problem then?

4              MS. MANNING:  Well, there wouldn't be a problem if

5    Mr. Narcisse called up the inventors and had even a slight

6    reason to think that they had invented what they said they

7    invented.  If Mr. Narcisse had any reason to think that the

8    inventors actually had in their minds the particular invention

9    descried by the claims, then it would be perfectly fine.  But

10   he didn't do that.  And it would be -- you know, your

11   hypothetical describes what I think has got to be an extremely

12   unlikely scenario.  Because how is it that the inventors had

13   the aha moment and they invented the same thing that could in

14   fairness be described in the same language Mr. Narcisse had

15   used six months earlier to describe Germane's invention?

16             It's just -- it's too cute, frankly.  He writes an

17   application for Germane.  Six months later he takes the

18   language and pops it in to another application without talking

19   to the actual inventors that he credits for this invention.

20   What are the chances?  What are the chances?

21             THE COURT:  What did the -- I didn't read the

22   inventors' depositions.  What did they say?

23             MS. MANNING:  The inventors have no idea where the

24   language came from.  They have no idea what that language

25   means, where it came from.  It's Mr. Narcisse on his own.

gaw                                                                          50

1          THE COURT:  Okay.  Thank you.

2          All right.  Anything further?

3          MR. HOSMER:  I would just finally add that the acid

4   test for determining whether or not a claim is appropriate is

5   in reading the specification, the description of the invention,

6   to see if it supports it.  I can have two applications, one of

7   which has a chair that looks like this and the other has a

8   highchair for a child.

9          And the claims in both of those cases could be, you

10  know, a chair comprising of a back support, a seat, and four

11  leg supports.  Both of those specifications support under

12  Section 112 exactly the same claim language.  It's perfectly

13  appropriate.

14         The test here is whether or not the Germane

15  application supported the claims as filed.  The examiner said

16  yes.  Were the claims as filed in 766 supported under Section

17  112?  Absolutely.  Is there anything wrong in having similar

18  claims under those circumstances?  No.

19         THE COURT:  Okay.  I think a number of my questions

20  have been answered in the course of our discussion.  Let me see

21  if I have any others.

22         (Pause.)

23         THE COURT:  So if I understand correctly, there

24  would never have been -- and I think you agreed to this, when

25  we talked about, Ms. Manning, what the range of things the

 1    patent examiner could have done had he been given the Germane

 2    application in the beginning, there would never have been a

 3    double patenting rejection of the 766.

 4            MS. MANNING:  No.  there could have been a double

 5    patenting rejection of the 766, if the examiner, faced suddenly

 6    with all of the information, came to the conclusion that the

 7    766 wasn't entitled to its earlier priority date, either

 8    because of a misstatement of inventorship or because of a lack

 9    of written description.

10            THE COURT:  So he or she would have had to find

11    either -- found that it wasn't a continuation, basically.

12            MS. MANNING:  That's right.  That's right.

13            THE COURT:  And you gave me two situations where he

14    could have found it wasn't a continuation.

15            MS. MANNING:  Lack of written -- the written

16    description does not in fact support the claim. --

17            THE COURT:  Written description doesn't support the

18    claims, yes.

19            MS. MANNING:  -- or the claim's subject matter was

20    not actually invented by DeSalvo and Zeigler.

21            THE COURT:  Okay.  For some reason the patent

22    examiner was not bothered by the fact that you have two

23    different groups of inventors with the same language.  This --

24    you made such a large deal out of that.  And this seemed to be

25    of no moment to him.

1              MS. MANNING:  Well, in the reexamination,

2    Mr. Narcisse does ultimately disclose it.  The examiner did in

3    fact reissue the patent.  I'm sorry.  It survived reexam.

4    Let's put it that way.

5              THE COURT:  Yes.

6              MS. MANNING:  Which is fine.  That's exactly the

7    process the examiner should be able to go through.  The

8    examiner should look at all the information and make whatever

9    call he or she feels is appropriate.  It's being deprived of

10   the information.

11             THE COURT:  I got that, but it's just -- and I

12   understand it's not but for.  I understand it's reasonable

13   examiner.  And I disagree to a large extent with your papers,

14   because you seem to be arguing a but for.  And I don't think

15   that's the only test.  And I think there are other tests.  And

16   I think under the other test it seems material to me, this

17   information.

18             MR. HOSMER:  What seems material, Your Honor?

19             THE COURT:  I mean the fact that there was a Germane

20   application which had the same language in it and had different

21   inventors.  I mean, to a layperson or a lay judge, a non-patent

22   expert, you look at it, it seems very similar.  In reading

23   Narcisse's deposition, it looks like he was moving fast and

24   loose and moving at a high speed to protect the interests of

25   his client.

1          So I agree with Ms. Manning that the fact that under

2    reexamination you say the patent survived.  I guess that's the

3    way you say.  I don't think that is the test, but it certainly

4    takes some wind out of your sail, because they had all the

5    information, he or she had all the information, and they didn't

6    do it.

7          So it just becomes a question of really what

8    advantage was Mr. Narcisse attempting to gain, or how slipshod

9    was he being and how much of an affront is that to the Patent

10   Office's right to know and procedures.  So it loses some of its

11   sting, because ultimately it's looked at again, it's not found

12   to be -- the patent survives.

13              MR. HOSMER:  One last point about that.

14              THE COURT:  Yes.

15              MR. HOSMER:  In the reexamination proceedings filed

16   by the requester, you won't find one word about the Germane

17   application in there, because the requesters, which are not

18   Shanghai Meihao, understood quite well that the Germane

19   application couldn't possibly qualify as prior art to the 766

20   application, just because of its priority.

21              MS. MANNING:  I think that's speculation.

22              MR. HOSMER:  And likewise, the examiner never, ever,

23   depended on or cited or seriously considered Germane as being

24   an encumbrance to allowability of the 766 claims.

25              THE COURT:  But you have given me a number 11.

 1    That's just the submission of Leviton.

 2              MR. HOSMER:  Out of an abundance of caution, they

 3    said, "This has been raised Meihao people.  Here it is.  It's

 4    not prior art.  But in the interest of making a complete

 5    record, we're submitting it."

 6              The examiner didn't even comment on it for good

 7    reason.  It's not prior art.

 8              THE COURT:  Well, that's what I was going to ask

 9    you, because I'm not familiar.  Do they give a written opinion?

10              MR. HOSMER:  No.  What the examiner does is -- and

11    you can see it in the bottom legend in tab 11 -- the examiner

12    goes through the citation of prior art, this extensive

13    citation, and indicates and then initials off, indicating that

14    he did in fact look at all of the prior art and the initials.

15    And you'll see his signature there.  I think it's dated in

16    January 2008.  And it's highlighted there in tab 11 --

17              THE COURT:  Right.

18              MR. HOSMER:  -- indicating that yes, he received the

19    invention, the information, disclosure statement, from the

20    applicant.  And he looked at those references.  He initialed

21    off on it, indicating, as you can see there, that he thought --

22    if he didn't consider it, he would line through it.  But he

23    considered every one of them.

24              THE COURT:  Right.

25              MR. HOSMER:  And if you look at the examiner's

1   answer that has been filed with the board of appeals, there

2   isn't one mention of any additional reason for allowability

3   that relates to those references.  He didn't consider them even

4   worth discussing.

5              THE COURT:  Does he discuss --

6              MR. HOSMER:  And that particularly includes Germane.

7              THE COURT:  Does he discuss -- I'm sorry,

8   Mr. Hosmer.  Does he discuss some?  I'm trying to find out

9   where he has any substantive discussion.

10             MR. HOSMER:  His answer, Your Honor, is a matter

11  before the board of appeals.  It's not a matter of the record

12  here.  But, you know, the examiner has now answered the appeal

13  defending his position that the 766 claims, as originally

14  issued in light of all of the prior art, that those claims are

15  allowable, including, including, allowable including the

16  references that are cited in the information disclosure

17  statement.  That's what that record shows.

18             MS. MANNING:  I'm sorry.  I don't have it in front

19  of me either.  I think -- my recollection is that it talks

20  about four references, none of which are Germane.

21             MR. HOSMER:  The examiner's answer was filed many

22  months after the information disclosure, many months after he

23  initialed off on looking at the information, disclosure

24  information.  So the only conclusion is, in his answer

25  defending his position that the claims are all allowable, you

1   have to believe that he did not consider any of the references

2   in the information disclosure statement to be material to

3   patentability.

4               MS. MANNING:  Or just not discussed.

5               THE COURT:  All right.  Let me just see if I have

6   any other questions on this.

7               (Pause.)

8               THE COURT:  Do you -- you rely on the reasonable

9   examiner standard, the broad standard.

10              MS. MANNING:  Yes.

11              THE COURT:  Do you -- what about the case, your

12  case, under 37 CFR 1.56(b), the newer rule on patentability,

13  unpatentability.

14              MS. MANNING:  I'm sorry, which?

15              THE COURT:  Well, if we apply the 1.56 rule, I guess

16  it's called --

17              MS. MANNING:  Yes.

18              THE COURT:  -- if we look at that, because there are

19  several different tests --

20              MS. MANNING:  Yes.

21              THE COURT:  -- what is your argument, what is the

22  prima facie case of unpatentability under 1.56(b)?

23              MS. MANNING:  To the extent that there would be a

24  prima facie case, it would simply be that the inventorship is

25  wrong.  Again, it raises a substantial question that the

 1   inventorship is wrong.  You cannot get a patent on something

 2   you did not actually invent.

 3              THE COURT:  Okay.  And the section that says it's

 4   misconduct not to reveal that you're copying claims --

 5              MS. MANNING:  That's right.

 6              THE COURT:  I don't know that we ever looked at the

 7   whole context of that section.  That's like a section on code

 8   of conduct.

 9              MS. MANNING:  Yes.

10              THE COURT:  And so it's just a statement.  Like in

11   any professional organization, you can't do this, you can't do

12   that.  It could result in loss of his patent attorney rights,

13   his rights before the PTO.

14              MS. MANNING:  I believe that is the penalty.

15              THE COURT:  Okay.  But it's not a substantive --

16   well, I guess we should really look at where it is in the --

17              MS. MANNING:  It is -- there are requirements to

18   disclose the copying of claims.  And that's 37 CFR 1.604(b),

19   about which we've had some lengthy discussion.

20              THE COURT:  Yes.

21              MS. MANNING:  And misconduct is separately --

22              THE COURT:  1.604(b)?  Excuse me.

23              MS. MANNING:  1.604(b), 37 CFR 1.604(b).

24              THE COURT:  And that has the copying prohibition.

25              MS. MANNING:  That's the duty to disclose when --

1    it's not even -- I'm sorry.  That's the duty to disclose when

2    claims are drawn to the same invention claimed in the

3    application of another.

4            THE COURT:  But the only place where the copying

5    prohibition is in the misconduct section, and you're saying the

6    reason for that -- the reason that -- that's a strong

7    statement, to have an actual definition of misconduct not to do

8    something.  What -- help me out.  How does that sort of -- why

9    did they do that?  Why is that such a strong statement, that

10   copying is -- not revealing copying is verboten?

11           MS. MANNING:  Why is copying verboten?

12           THE COURT:  Yes.  Why -- to list it as a specific

13   species of misconduct is a very strong statement.  And your

14   reason why the patent officer or the regulators did that, why

15   were they so adamant that that be viewed seriously by patent

16   practitioners?

17           MR. HOSMER:  Well, I -- this is my surmise, not

18   having read any sort of commentary of what they were actually

19   thinking --

20           THE COURT:  Right.

21           MS. MANNING:  -- but my surmise would be that,

22   again, it goes to the seriousness, the heart of inventorship.

23   You can get a patent on something you invent.  Now, as we know,

24   you can have very small distinctions between claims to make

25   things patentably distinct.  You know, there are crowded art

gaw                                                                    59

1   fields out there.  But if you're actually copying from somebody

2   else, that's a problem.  You're not inventing it; you're

3   copying it.  The heart of the patent system is protecting

4   invention.

5                THE COURT:  Yes.

6                MS. MANNING:  So this copying goes to the very heart

7   of what the Patent Office is trying to do.

8                THE COURT:  It has to be original to you.  And if

9   you're not, it's not original to you.  Okay.

10               MS. MANNING:  --- 35 USC 101.

11               THE COURT:  I'm sorry?

12               MS. MANNING:  35 USC 101 is the basic conditions of

13  patentability.

14               THE COURT:  Okay.  Thank you.

15               MR. HOSMER:  Obviously we do disagree about this

16  point about, you know, whether or not the Code of Federal

17  Regulations provisions that relate to the declaration of

18  interference would apply to applications of the same corporate

19  entity, Your Honor.

20               THE COURT:  Right.

21               MR. HOSMER:  Our position obviously is -- and I

22  apologize for raising my voice about it, but it's something

23  that I truly believe.  If it turns out to be wrong, I will

24  apologize again.  But over the years interferences are declared

25  between different corporate entities.  Ms. Manning was correct

1    in agreeing to that earlier.  I'll try and show you that.  It

2    has -- interference practice has nothing to do with this issue.

3              THE COURT:  Okay.  And you're going to see what you

4    can find and give me.  That would be great.  Okay.

5              And then that's, I think, all the questions I have

6    about the equitable/inequitable conduct.  I did have a couple

7    questions, Ms. Manning, about your attorney's fees submission.

8              MS. MANNING:  Yes, ma'am.

9              THE COURT:  One is Andrews Kurth and Bingham

10   McCutchen.  I realize that Andrews Kurth from July '06 to

11   November '06 was counsel.  And they billed $375,000 during that

12   period of time.  So it's an enormous amount of time.  Do I

13   gather that it's because that one lawyer left the firm and then

14   took the case with him --

15             MS. MANNING:  Yes.  If I --

16             THE COURT:  -- and then came back?

17             MS. MANNING:  If I may explain the relationship

18   there.

19             THE COURT:  Right.

20             MS. MANNING:  My partner, Gary Hnath, and my former

21   partner, Fei Fei Chao, and I -- I believe I was actually the

22   very senior associate when we first got this case.  We were

23   working on the case together.  When Dr. Chao left our firm and

24   went to Andrews Kurth, the case went with her for I forget the

25   exact number of months right now off the top of my head, but

1   went with her for some period of time.

2              And then the clients decided to bring the case back

3   to Mr. Hnath and myself at Bingham.  So that's why we get both

4   of them coming together.

5              THE COURT:  Okay.  So there might have some

6   inefficiency in moving it from one place to the other, but not

7   as much inefficiency -- it wasn't a completely new set of legal

8   team.  Okay.

9              MS. MANNING:  There may be some to the extent that,

10  you know, when Dr. Chao went to Andrews Kurth, she certainly

11  got other people to work on the case with her.  I will tell you

12  I think the inefficiencies were probably not significant.

13             THE COURT:  Okay.  In the -- I asked -- I've gotten

14  the docket, but what events in the litigation occurred during

15  the period of Andrews Kurth that had finish property, finished

16  product?  Because if she's sort of working on things and

17  working on things and working on things and it doesn't come to

18  closure, and then your firm gets back involved, that is waste.

19  But --

20             MS. MANNING:  Right.  If I may --

21             THE COURT:  July '06, November '06.

22             MS. MANNING:  Right.  If I may, Your Honor, direct

23  you to Exhibit 2, which I hope Your Honor has.  This was the

24  exhibit that we had a phone call asking for.

25             THE COURT:  We have it now.

1          MS. MANNING:  I think that's the exhibit that will

2   answer your question on that particular point.  What we did for

3   both Andrews Kurth and for Bingham's time is instead of

4   submitting the bills themselves with the privileged

5   communications, I did my best to summarize as thoroughly as I

6   could what the time was devoted to for each timekeeper for each

7   month.

8          And if you look at Exhibit 2 -- and I'm not --

9          THE COURT:  Let me get that.

10          MS. MANNING:  I'm not sure I have an extra copy.  I

11   apologize.

12          THE COURT:  I know we did get it.  And I did look at

13   it, but I want to look at it while you're talking.

14          MS. MANNING:  I should tell you, Your Honor, that

15   even though Dr. Chao is no longer with our firm, she and

16   Mr. Hnath are very good friends.  We talk with Fei Fei a lot.

17   We just finished a different case with her.  So --

18          THE COURT:  Let me just see if I can --

19          MS. MANNING:  -- we actually consult a lot and

20   consulted a lot while these cases were ongoing, even though the

21   case was at one or the other.

22          THE COURT:  Okay.  I do want to -- I don't see it

23   quickly, and I'd like to have it, so we can finish it.  The

24   Exhibit 2 was to --

25          MS. MANNING:  Exhibit 2 to Dr. Chao's declaration.

 1          THE COURT:  Oh, here it is.  Okay.  Got it.

 2          MS. MANNING:  Got it?

 3          THE COURT:  And I know you describe, and that's

 4   another issue, but -- and I can put the docket next to this

 5   time period.  But can you testify -- can you tell me today, not

 6   testify, can you tell me what was begun and ended in that

 7   period of time, so there wasn't any overlap?  And therefore,

 8   you all had to get back involved and up to speed again.

 9          MS. MANNING:  Well, Your Honor, I know that

10   discovery was ongoing at that time.  I know Dr. Chao was

11   working on discovery.  I believe she was working on a written

12   discovery.  As I recall, Fred Frei, her partner at Andrews

13   Kurth came along.  And I know he participated in some of that

14   and did a fair amount.

15          As you'll see from the description in July 2006,

16   which is the second full page of Exhibit 2 to Dr. Chao's

17   declaration, Mr. Frei, in addition to doing things like

18   reviewing documents, you know, he was doing some startup

19   things, like I know that he studies the patents.  That's

20   obviously a startup cost for Mr. Frei.  Things like amending

21   the case management order that he's doing, those are the kinds

22   of activities.

23          I will be honest with you, if you're looking for

24   projects that were begun and completed during that time, I

25   don't have a better recollection off the top of my head than

gaw                                                                          64

1   what's here.  I'm happy to go through it.  As I mentioned, I'm

2   happy to submit the bills in camera.  We didn't do so, because

3   they contain attorney-client privilege communications.  I don't

4   know that that would help Your Honor, though.

5            THE COURT:  Well, let me just tell you that there's

6   no more onerous and difficult task than reviewing attorney's

7   fees petitions.

8            MS. MANNING:  I believe you.

9            THE COURT:  And it is because you have to try -- and

10  some of these entries are very cursory.  And you have to try to

11  understand where this work is done, whether it's a reasonable

12  amount of hours done.  It is extraordinarily hard.  And give me

13  the contemporaneous bills, which, at least under our guidelines

14  for other kinds of cases, is required and you didn't do.  That

15  doesn't really help me essentially in trying to wade through

16  all of this.

17            So I do need the contemporaneous records.

18            MS. MANNING:  I'd be happy to submit them.

19            THE COURT:  And --

20            MS. MANNING:  With your permission, I'll submit them

21  in camera, given the privilege communications in them.

22            THE COURT:  Well, that's up to Mr. Hosmer whether he

23  agrees with that.  He has -- at this point, they have not

24  objected to your attorney's fees.  So he's kind of late in

25  coming to any objection.  I know it's an enormous task for you,

1    if you have to redact and everything.  So I'm -- I will take

2    those in an in camera situation.  And if there might be some

3    information that helps me on that, because that's another big

4    issue here --

5           And I would also have you tell me what, if anything,

6    is started and finished.  Because it says research for markmen

7    brief, but I don't know that the markmen brief was filed before

8    the case went back to -- it says "markmen outline, conferred

9    with colleagues."

10          So I don't think there was anything that was started

11   and finished.  And I'm sure Dr. Chao --

12          MS. MANNING:  Dr. Chao, yes.

13          THE COURT:  Yes -- might have talked to you, handing

14   the case back, as we would hope lawyers would do.  But I don't

15   know whether she handed all this research back and everything

16   like that.  So --

17          MS. MANNING:  The entirety of the file came back to

18   us.  We -- when the file came back to us, it came back in its

19   entirety.  So we got everything that had been done.  We got

20   literally everything that had been done.  So there's that.

21          THE COURT:  Okay.  You got the fruits of their --

22   where it says research, you got it.

23          MS. MANNING:  We did.  We did.  We got it.

24          THE COURT:  All right.  That's the first point.  So

25   I need those contemporaneous.  And, also, if you look at our

1    local rules -- and I know that it's onerous, but you're asking

2    for over $1 million.  You haven't given -- you made a reference

3    in your affidavit to historical data maintained by a major

4    private bank, why your rates, hourly rates, are reasonable.

5    And you didn't reference the study.

6             Our local rules -- again, it's guidelines not

7    directly applicable to patent case, but we use those as a

8    guideline.  And they're not applicable to patents, so they may

9    be lower, much, much, much, much lower presumptive rates.  So

10   you need to give some basis.  I know I have some ability,

11   because I've practiced law, to draw on my own experience.  I

12   think the Costar case says that of one of the judges in the

13   Southern Division.  And I believe that.  But right now, those

14   hourly rates are -- while they may be what's charged and paid

15   in D.C. and New York, they're not supported in what you've

16   given me.

17             MS. MANNING:  I'll be happy to supplement that.

18             THE COURT:  Okay.  Additionally in paragraph 21, you

19   have what I call nontraditional timekeepers.  And I'm looking

20   at this.  I know there's more use of librarians and research

21   technicians, et cetera, in the practice of law.  But I don't

22   have any description of what they are nor anything about their

23   education or experience.

24             So, you know, I know this is maybe another category

25   we need to be thinking about as judges and their duties.  So I

 1    don't have -- and that may be de minimis.  And you maybe don't

 2    even want to bother yourself with it.  But that's paragraph

 3    21.

 4              Also, it wasn't clear to me the difference between

 5    Manning Exhibit 6, let's see, and Exhibit 3.  There were

 6    deposition expenses on both of them.  Let me see.  Manning

 7    Exhibit -- let's see.  Exhibit 7 is Bingham McCutchen versus

 8    Exhibit 3.  So let me see if --

 9              MS. MANNING:  Oh.  There are -- Exhibit 3 relates to

10    costs recoverable under Rule 54 and 28 USC 1920.  And Exhibit 6

11    relates to so-called attorney's fees recoverable under 35 USC

12    285.  What's clear is that under the rubric of attorney fees

13    under 285, you may recover both time and expenses not otherwise

14    recoverable.  There's an exception for things like expert

15    witness fees, which we have not sought.

16              THE COURT:  Okay.  So --

17              MS. MANNING:  But in general, you are made whole

18    under 285.  Now -- go ahead.  I'm sorry.

19              THE COURT:  So 285 is -- you're not asking for the

20    same expense under -- okay.

21              MS. MANNING:  No.  There's no duplication.  And we

22    took a good deal of time trying to get all the numbers perfect.

23    In doing this, we made very certain there was no overlap

24    between the costs requested on the bill of costs under Rule 54

25    and the 285 request.

gaw                                                                        68

1              THE COURT:  Okay.  And so if you could claim it

2      under Rule 54, you claimed it under Rule 54.

3              MS. MANNING:  Yes.

4              THE COURT:  If you couldn't, you claimed it under

5      285.

6              MS. MANNING:  Yes, Your Honor.

7              THE COURT:  Okay.  And some of what you claimed

8      under 54 might be claimable under 285?

9              MS. MANNING:  Yes.

10             THE COURT:  Okay.  Now you have -- and the same --

11     you have all this thing that says "legal research."  You don't

12     say what the legal research is.  And so, you know, my job is

13     to say, if I were to give you fees, are the hours reasonable?

14     Is the work reasonable?  And I don't know how I can possibly

15     do that on what you've given me.  And even though the other

16     side probably didn't object because its numbers were higher or

17     at least as high, and his hourly rates were probably just as

18     high, I need more here, if I'm going award you anything.

19             MS. MANNING:  Sure.  So we can give you more detail

20     on the legal research aspect of Exhibit 6.  Are there other --

21             THE COURT:  Right.

22             MS. MANNING:  -- line items there that you need more

23     detail on?

24             THE COURT:  If you look at our local rules -- and

25     I'm going to think whether I'm going to require you to do

 1   that, because our local rule says how you organize it.

 2   Because it's organized so the judge can actually evaluate.

 3   And so --

 4            MS. MANNING:  I would like to think that I followed

 5   the local rules.  I'm sorry.  Which one is that?  You're

 6   looking at 109?

 7            THE COURT:  It says it's the rules and guidelines

 8   for determining lodestar attorney's fees in civil rights and

 9   discrimination cases.  So it doesn't apply.

10            MS. MANNING:  Right.

11            THE COURT:  But if you could see what it says is

12   that "fee applications accompanied by time records shall be

13   submitted in the following format, organized by litigation

14   phase."  So it has case development, pleadings,

15   interrogatories, depositions, motions practice, attending

16   hearing, court hearings.  It's just some way of being able to

17   say here's all our records.  And yes, there's some description.

18   But it doesn't -- what you've done doesn't really help in terms

19   of saying here are a thousand hours, and we spent these

20   thousand hours writing this two-page memorandum.  And it's

21   reasonable.

22            That's what is not humanly possible going through

23   here to be able to say.  So if there's -- and you have here

24   monthly -- and that's the issue of contemporaneous records --

25   you have monthly totals with 20 tasks or 10 tasks.

1              MS. MANNING:  Right.

2              THE COURT:  And again, whether we call it block

3      billing or whatever, it's impossible again to really understand

4      whether of those 60 hours, if you spent 10 of those hours

5      working on a revised notice of change of date of the

6      deposition, whether it's reasonable or unreasonable.

7              Do you see what I'm saying?

8              MS. MANNING:  I do understand your point.

9              THE COURT:  It's impossible.  Your making my job

10     impossible.  So --

11             MS. MANNING:  And I apologize for that, because I

12     assure you we strove to do our best to make this easier for

13     Your Honor, because it's even more complicated with the raw

14     data.  But I will --

15             THE COURT:  I'm sure it's better than the raw data.

16     So when -- if I go back, well, you have monthly summaries.  In

17     your contemporaneous records, it will show .6 hours for

18     discovery.

19             MS. MANNING:  Well, I should tell Your Honor that we

20     do block billing by day.  For example, if I write a summary

21     judgment motion for six hours and I spend an hour reading a

22     deposition, it says seven hours.

23             THE COURT:  Okay.

24             MS. MANNING:  And it doesn't break that down in the

25     day.

     1              THE COURT:  Okay.  Well, then --

     2              MS. MANNING:  And that's just how we bill.

     3              THE COURT:  I know.  And then you know what the case

     4    law says.  With block billing -- I have one decision where I

     5    reduced it by 30 percent.  And I think I have another where I

     6    did.

     7              So if you want to present anything additional to me,

     8    otherwise I'm going to make -- if I award you, I'm going to

     9    slash it significantly, because there's no way for me to really

    10    understand.  I know you did some good things.  I really

    11    certainly noticed that -- I think you said if you were working

    12    on one -- you had two cases in-house at the same time --

    13              MS. MANNING:  Yes.

    14              THE COURT:  -- under one billing number.  And if

    15    there was any work done on the other case, you took the whole

    16    entry out.

    17              MS. MANNING:  Yes, Your Honor.

    18              THE COURT:  So I realize you were reasonable about

    19    that.  But right now, it's very impossible, very difficult, for

    20    me to assess the reasonableness of what you did.

    21              MS. MANNING:  Okay.  If I may, Your Honor, I'll go

    22    back and look at the lodestar local rule and talk with my

    23    colleague who worked hard on this the first time.  And we will

    24    see what we can do to get you something that's helpful.

    25              THE COURT:  It helps me -- you don't even

1   necessarily have to follow that, because it's -- it's not

2   necessarily the best in this case.  But just the idea of being

3   able to say you spent this amount of time on this task, that

4   would -- and I realize you can't really do that when you block

5   bill that way.  But -- so give that some thought, knowing that

6   if you can help me at all, then I might be able to -- I would

7   be more generous on the attorney's fees.

8              MS. MANNING:  We will do that, Your Honor.

9              THE COURT:  Because I can't, if you don't give me

10  the specifics.

11             Now let me just see.  How were the summaries

12  prepared?  You said the contemporaneous records will be no

13  better as to breakdown of time.  Is that what you said?

14             MS. MANNING:  They will not be any better in terms

15  of breakdown of time by task on a daily basis.  But the records

16  are on a daily basis.

17             THE COURT:  Right.

18             MS. MANNING:  So you will see what I or Mr. Hnath or

19  Ms. Chao, when she was at our firm, did on a daily basis --

20             THE COURT:  Okay.

21             MS. MANNING:  -- from those contemporaneous records.

22             THE COURT:  Okay.  And the last thing is you have to

23  get, for all timekeepers, you have to give me the number of

24  years at the bar, because that's one thing that we look at.  So

25  I don't have any information about anybody other than you.  I

1    don't even know if you told me anything about Mr. Hnath.  So I

2    don't have any way of assessing whether they should get $300 or

3    $500 or $400.

4              MS. MANNING:  Okay.  I'll be happy to provide that.

5              THE COURT:  Okay.  And what time frame would we be

6    talking about?

7              MS. MANNING:  I realize Your Honor wants to get this

8    as soon as possible.  If I could have until early next week, I

9    would appreciate it, just because I need to pull somebody

10   off -- the person who is going to help me with this is -- I

11   know she's doing something else.

12             THE COURT:  That's fine.  And maybe we could even

13   say -- obviously, I was very taken with the argument on

14   materiality.  I think you have, notwithstanding your argument,

15   Mr. Hosmer, to me, he for whatever reason, I don't know, he

16   got busy, it was inconvenient, he was used to owning the

17   patents, all the patents being invented by the same and owned

18   by the same, whatever it is, we had a misunderstanding of the

19   law, I think she's won me over, I think, on the materiality

20   issue.

21             On the intent issue, it is more difficult.  And as

22   you know, you look at materiality, you look at intent.  And

23   then if you've got a lot of materiality and a little bit of

24   intent, it's still inequitable conduct.

25             And I have looked at the other issues in terms of

1    the previous discovery, because you know I was a discovery

2    judge.  And I did have -- I did find really no basis for

3    instructing those attorneys not to answer.  And you all

4    didn't offer any, when you had the time to brief it.  And all

5    of those questions seemed highly relevant to inequitable

6    conduct.

7              So that's -- the issue about whether you should have

8    dismissed the case sooner, I do think I'm not as -- I do think

9    that you had the right to negotiate, whether you were

10   negotiating for some de minimis damages or, you know, what took

11   so long, I don't know, but it did change the product.  But the

12   question becomes should you have even brought the lawsuit,

13   because you knew, because Mr. Narcisse does it all -- I mean,

14   he knows everything about the Leviton product.  He knew that

15   there was -- that he copied, used, whatever, the Germane

16   application in coming up with the 766.

17             So whether it should have been brought at all as a

18   lawsuit because of that impropriety or apparent impropriety --

19   so that's -- the intent issue is the difficult issue.  And so

20   I'm going to look at those cases a little more closely.

21             MR. HOSMER:  If I could just mention thing.  The

22   record is pretty clear that when the depositions were taken

23   of all of the inventors and all of the attorneys, that, you

24   know, the instructions not to answer on privilege were based

25   on the fact that there was a lawsuit filed relating to the

 1    766 patent the minute that it issued.  And all of that

 2    information was considered to be attorney work product,

 3    because it was in anticipation of litigation.  It clearly

 4    was.  They had an infringer in mind.  And the record is very

 5    clear.  We did brief it.  We did support it, I believe, Your

 6    Honor.

 7              And I just want to remind Your Honor that to find

 8    any attorney's fees in this case, there has to be a specific

 9    finding that the litigation was vexatious.  And for various

10    reasons that we pointed out, it couldn't possibly, I don't

11    believe, be considered vexatious under the circumstances of

12    their changing the design and so forth and the way in which it

13    was prosecuted.  And there has to be clear and convincing

14    evidence of inequitable conduct.  That clear and convincing

15    evidence cannot, as a matter of law, be based on the Germane

16    application.

17              THE COURT:  Well, see, that's where I disagree with

18    you.  I really do disagree.  It doesn't matter.  No harm, no

19    foul doesn't work.  It really doesn't work, because the cases

20    say if the examiner would have liked to have seen it, maybe he

21    would have reached the same decision.  But we can't make the

22    decision for him.

23              So if there was only that one test, then you would

24    win.  But it isn't.  And I guess it's the Digital case that

25    goes through that discussion.

 1            So I'm a -- I think I understand what you're saying,

 2    but I'm not thoroughly convinced.

 3            MR. HOSMER:  Rule 56, the reasonable standard, Rule

 4    56 in the Patent Office regulations, requires that the withheld

 5    material or withheld information be material patentability.

 6    Your Honor, the Germane application can never qualify as

 7    material patentability.  It's as simple as that.

 8            I'm sorry that you feel that way.  I truly,

 9    honestly, sincerely believe that's wrong as a matter of law.

10            THE COURT:  Well, you're going to let me know about

11    the issue --

12            MR. HOSMER:  604(b), the interference.

13            THE COURT:  Right.

14            MR. HOSMER:  We'll do that.

15            THE COURT:  Right.  And you're going to let me know

16    on Friday.  And then you're going to let me know any

17    clarification on the fees by Wednesday.  Okay?

18            MS. MANNING:  Wednesday.  May I just -- I want to

19    make sure that I've got --

20            THE COURT:  For Friday.

21            MS. MANNING:  I've got five things listed as

22    additional points of information Your Honor would like.  I want

23    to make sure that I've got everything down.

24            THE COURT:  Okay.

25            MS. MANNING:  What I have is you need the actual

gaw                                                                      77

 1  bills, the information about why our rates are reasonable.  You

 2  need additional information about these nontraditional

 3  timekeepers in paragraph 21.  You need information about

 4  essentially, you know, X amount of time spent on Y task at a

 5  relatively high level, as I understand it.

 6              THE COURT:  I'm sorry?  I'm sorry, Ms. Manning?

 7              MS. MANNING:  The fourth thing that I have down is

 8  you need additional detail on how much time was spent on tasks,

 9  not on a sort of daily basis --

10              THE COURT:  Right.

11              MS. MANNING:  -- but as a broader basis for the

12  tasks.  And then the fifth item I have is the number of years

13  at the bar for each of the attorneys.  Have I missed anything?

14  Because I want to make sure I've got everything.

15              THE COURT:  No.  That's basically it.  Right.

16  Because I think the next to the last one you list in terms of

17  topics of -- I had said topics of legal research.  So somehow

18  you --

19              MS. MANNING:  Yes.  I have that next to that, yes.

20              THE COURT:  Okay.  So -- and if there's anything

21  more on that topic, Mr. Hosmer, send it to me tomorrow.  And

22  I'm going to look back at the cases again.  But it looked to me

23  like Mr. Narcisse was going really fast and had -- there

24  appears to be a motive for him not to have revealed the

25  Germane.  And I understand you disagree with that.  It's

1    irrelevant.  The Germane application would always be irrelevant

2    to the patentability of 766.

3              Okay.  Is there anything else then?

4              MS. MANNING:  Thank you, Your Honor.

5              THE COURT:  All right.  Thank you very much.

6              MS. MANNING:  If I may, Your Honor.  Thank you for

7    your understanding about the timing of the hearing.  My three-

8    week-old twins especially thank you.

9              THE COURT:  Right.  I appreciate it.  All right.

10             THE CLERK:  Please rise.  This Honorable Court

11   stands adjourned.

12             (Whereupon, the hearing was concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

gaw                                                                    79

CERTIFICATE

I certify that the foregoing is a correct transcript from the

electronic sound recording of the proceedings in the above-

entitled matter.



_____/s/_____        <u>Oct. 27, 2008</u>
        Gail A. Williams                         Date