IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LEVITON MANUFACTURING                :
COMPANY, INC.,                       :
      Plaintiff                      :
                                     :
      v.                             :        Civil No. AMD 05-889
                                     :
SHANGHAI MEIHAO ELECTRIC, INC.,      :
et al.,                              :
      Defendants                     :
                                ...o0o...

MEMORANDUM AND ORDER ADOPTING REPORT AND RECOMMENDATION OF
MAGISTRATE JUDGE *SUR* ATTORNEYS' FEES AND COSTS

     In this consolidated patent infringement action, now pending are the objections of plaintiff

Leviton Manufacturing Co., Inc. ("Leviton"), to the Report and Recommendation of Magistrate

Judge Susan K. Gauvey, who has recommended that defendant Shanghai Meihao Electric, Inc.

("Meihao"), be awarded attorneys' fees and costs. For the reasons set forth by Judge Gauvey and

stated herein, the court overrules Leviton's objections and awards fees and costs.

I.

     On March 31, 2005, Leviton filed suit against Universal Security Instruments, Inc., and

USI Electric, Inc., for infringement of U.S. Patent No. 6,864,766 ('766 Patent), claiming a

ground fault circuit interrupter ("GFCI"). On May 5, 2005, Meihao, which manufactured and

supplied the products alleged by Leviton to be infringing, sought a declaratory judgment that the

'766 Patent is (1) not infringed; (2) invalid; and/or (3) unenforceable. In due course, the two

cases were consolidated.

     Discovery on the issue of patent enforceability, i.e., inequitable conduct, proved

contentious and protracted; consequently, by order entered on May 24, 2007, the court referred

the case to Magistrate Judge Gauvey pursuant to 28 U.S.C. § 636(b)(1)(A) for the management

of discovery.  Judge Gauvey promptly turned her attention to that task, issuing several orders and holding a hearing on various motions to compel and/or for protective order.

Somewhat abruptly, on November 28, 2007, just as Judge Gauvey was prepared to issue a comprehensive opinion rejecting Leviton's motion for a protective order and requiring Leviton to produce documentary and testimonial evidence regarding inequitable conduct, Leviton sought leave to dismiss voluntarily all its claims.  Meihao responded that, provided its right to seek an award of fees and costs was preserved, it (and the other defendants) would have no objection to the dismissal of the claims for infringement.  Thereafter, the court dismissed all claims while preserving Meihao's right to seek fees and costs. Meihao timely filed its motion.  As Judge Gauvey had become intimately familiar with the case through her extensive work on discovery issues, I referred the motion for fees and costs to her on February 25, 2008, for a report and recommendation.

Judge Gauvey reviewed the parties' voluminous briefing on the motion for fees and costs and held a hearing on  September 3, 2008.  In an extraordinarily thorough and meticulous 128-page Report and  Recommendation (which I adopt and attach hereto) issued pursuant to Fed. R. Civ. P. 72(b), she  found and concluded that the case presented exceptional circumstances under 35 U.S.C. § 285 (i.e., that Leviton had been shown to have engaged in (1) inequitable conduct before the United States Patent and Trademark Office ("PTO") and (2) vexatious litigation tactics in this case).  Ultimately, Judge Gauvey also found and concluded that an award of fees and costs was necessary to avoid gross injustice.  Thus, she recommended an award to Meihao in the amount of $84,080.20 in costs and $726,579.15 in attorneys' fees.  (She has also recommended that Meihao be awarded its reasonable costs and fees incurred in litigating the

motion for fees and costs).  Leviton timely filed its objections and the issues have been fully

briefed by the parties.  No hearing is necessary.

## II.

The role of the district judge in these circumstances is clear and well-settled.  *See* Rule

72(b)(3) ("The district judge  must determine de novo any part of the magistrate judge's

disposition that has been properly  objected to.  The district judge may accept, reject, or modify

the recommended disposition; receive further evidence; or return the matter to the magistrate

judge with instructions."); *see Segal v. L.C. Hohne Contractors, Inc.*, 303 F.Supp.2d 790, 792-95

(S.D.W.Va. 2004).  After a searching, de novo review of Judge Gauvey's Report and

Recommendation, in light of Leviton's objections, and the exhaustive briefing by the parties, the

court is satisfied that Judge  Gauvey committed no error of fact or law.  To the contrary, her

findings and conclusions reflect that she correctly identified controlling legal principles, she

cogently identified and marshaled the undisputed facts bearing on the issues presented, and she

faithfully applied those principles to those undisputed facts. I adopt her findings and conclusions

as the opinion of this court.

## III.

## A.

Under 35 U.S.C. § 285 and Fed. R. Civ. P. 54(d), attorneys' fees and costs may be

awarded  to a prevailing party. *Inland Steel Co. v. LTV Steel Co*., 364 F.3d 1318, 1319-20 (Fed.

Cir. 2004).  Here, Meihao is the prevailing party because Leviton voluntarily dismissed all of its

claims with prejudice.  *See Power Mosfet Technologies, LLC v. Siemens AG*,  378 F.3d 1396,

1415 (Fed. Cir. 2004) ("The dismissal of a claim with prejudice . . . is a judgment  on the merits

under the law of the Federal Circuit.").  As the prevailing party, Meihao is eligible  for an award

of attorneys' fees upon proving the existence of an "exceptional case."  As relevant here, an

exceptional case is one in which one party has (1) committed inequitable conduct before the

PTO or (2) engaged in litigation misconduct (through vexatious litigation tactics) in the district

court. *See Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1034 (Fed. Cir.

2002). Judge Gauvey properly focused on, and found that fees and costs were appropriately to be

awarded, under each of these rubrics.

B.

Leviton's objections to the Report and Recommendation comprise in the main a jumble

of miscitations to legal standards; blatant ignoring of other, controlling standards; reliance on

arguments that are waived (because they were not presented to the Magistrate Judge) or utterly

irrelevant to the issues presented; and a veritable sea of red herrings.  Most striking of all, it

makes the curious assertion, which it repeatedly and vigorously advances, that "no evidence"

supported the subsidiary factual findings arrived at by Judge Gauvey.  None of these plaints,

either singly or in the aggregate, provide a basis for rejecting the Report and Recommendation.

As a concession to the shortness of life, the court here simply identifies (and rejects) the most

plausible and earnestly urged challenges Leviton has mounted.

1.

Leviton objects that Judge Gauvey erred  in ruling without a factual basis for her

conclusions and that, in any event, in opposing the motion for fees and costs, it demonstrated the

existence of genuine disputes of fact, thus precluding the resolution of the request for fees and

costs absent a full-blown evidentiary hearing.  Indeed, Leviton asserts that Judge Gauvey's

adjudication of the motion for fees and costs deprived it of due process.  These contentions

wholly lack merit.

It is well-established that, under Federal Circuit law, a court may decide a claim for

attorneys' fees under § 285 after a dismissal with prejudice.  *Highway Equip. Co., Inc. v. FECO,*

*Ltd.*, 469 F.3d 1027, 1035 (Fed. Cir. 2006); *see also Tenax Corp. v. Tensar Corp.*, 22 U.S.P.Q.

2d 1264, 1267 (D. Md. 1991) (collecting cases).  Judge Gauvey's determination of inequitable

conduct (one way of  establishing an exceptional case under § 285) was procedurally and

substantively proper.  In particular, as is clear in her detailed, lengthy analysis of the issues, she

relied on undisputed facts and sound interpretations of controlling legal principles.  *Digital*

*Control, Inc. v. Charles Machine  Works*, 437 F.3d 1309, 1313 (Fed. Cir. 2006) (courts may

make a ruling on inequitable conduct  as a matter of law). To the extent Leviton complains of the

absence of an adversary *evidentiary* hearing, it suffices to observe that a litigant cannot be

deprived of that which it never sought. *Wilson v. Bd. of Trustees*, 333 F.Supp.2d 392, 396

(D.Md. 2004) ("It is difficult to see how one can be unconstitutionally deprived of that which

one never desired or sought in the first instance.").

2.

As previously stated, an exceptional case is one, *inter alia*, in which one party has

committed (1)  inequitable conduct before the PTO or (2) litigation  misconduct (e.g., vexatious

litigation tactics).  *See Epcon Gas Sys., Inc. v. Bauer Compressors,  Inc.*, 279 F.3d 1022, 1034

(Fed. Cir. 2002). The gravamen of Leviton's objections is that inequitable conduct before the

PTO has not been proven. Leviton is wrong.

Inequitable conduct results from an applicant's failure to comply with his duty of candor

in all dealings with the PTO. *Cf.* 37 C.F.R. § 1.56; *Molins P.L.C. v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995). Actions of a patent applicant's attorney are chargeable to the applicant. *See, e.g., id.* An issued patent may be deemed unenforceable due to inequitable conduct where it is shown by clear and convincing evidence that (1) the patentee (or his agent/attorney) withheld or misrepresented material information and (2) did so with the intent to deceive the PTO examiner into granting the patent. *See, e.g., Impax Labs., Inc. v. Aventis Pharmaceuticals, Inc.*, 468 F.3d 1366, 1374 (Fed. Cir. 2006). Under one of several equally applicable tests, information is "material" if a reasonable examiner "would have considered such [information] important in deciding whether to allow" the application. *Id.* (*citing Digital Control Inc.*, 437 F.3d at 1314; *Agfa Corp. v. Creo Prods., Inc.*, 451 F.3d 1366, 1373 (Fed. Cir. 2006). Furthermore, an intent to deceive may be "inferred from the facts and circumstances surrounding the applicant's overall conduct" and need not be proven, indeed, can rarely be proven, by direct evidence. *Impax*, 468 F.3d at 1374-75. Once materiality and intent have been established, courts must conduct a balancing test in order to determine whether to adopt the mixed factual/legal conclusion that inequitable conduct has been established by the requisite evidentiary standard. *Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1128-29 (Fed. Cir. 2006).

In addition, "[l]itigation misconduct and unprofessional behavior are relevant to the award of attorney fees, and may suffice to make a case exceptional under § 285." *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1574 (Fed. Cir. 1996); *see also Rambus Inc. v. Infineon Tech. AG*, 318 F.3d 1081, 1106 (Fed. Cir. 2003); *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1034 (Fed. Cir. 2002). Judge Gauvey correctly concluded that Leviton was guilty of inequitable conduct and, as well, that it had engaged in litigation misconduct in its prosecution of

this case.  (She acknowledged that an award on the latter ground alone would justify only a smaller award, but that it was unnecessary to conduct such an analysis in light of the determination reached on the former ground.)

3.

In challenging the determination that it was guilty of inequitable conduct, Leviton argues that the Germain application (another Leviton patent application claiming GFCI technology prepared and prosecuted by its longtime counsel, which it hid from the PTO examiner) was not material to the patentability of the '766 Patent.  Leviton points to the fact that the *effective filing date* of the '766 is August 20, 1999, which predates the filing of the Germain application (February 3, 2003).  Moreover, the Germain  application and the '766 have different inventors. Therefore, according to Leviton, the Germain  application "could not possibly qualify as material 'prior art' to the '766 Patent."  Leviton's Objections at 23.

These arguments are largely inapposite and, in any event, as the Magistrate Judge concluded, unavailing.  Leviton was required to inform the PTO of the  existence of the Germain application under any reasonable understanding of the overarching "duty of candor" and specifically under 37 C.F.R. § 1.604(b), which provides, "[w]hen an applicant presents a claim known to the applicant to define the same patentable invention  claimed in a pending application of another, the applicant shall identify that pending application, unless the claim is presented in response to a suggestion by the examiner."  As a matter of law, Leviton should have disclosed the Germain application to the examiner.  It is undisputed that the '766 Patent and the Germain application have many claims that are either identical (word-for-word) or very nearly so.  As a matter of law, the claims in the '766 Patent and  the Germain application therefore claim the

same subject matter.  Manifestly, as Judge Gauvey found and concluded by clear and convincing evidence, the claims in the '766 Patent were copied from the Germain application.

*Any reasonable examiner* would have found the Germain application "important in deciding  whether to allow" the '766 Patent. *Impax*, 468 F.3d at 1374.  Aside from identical claim  language, it is also undisputed that the '766 and the Germain application were both filed by  Leviton and were drafted and prosecuted by the same attorney, Claude Narcisse, Esq.; however, they  list different inventors.  These facts led Judge Gauvey to find and conclude – rightly so – that a  reasonable examiner would have thought the Germain application important in allowing the  '766.  As a matter of law, the Germain application would have raised in the mind of any reasonable examiner questions about (1) the '766's inventorship, (2) whether  the '766's specification supports its claims, and (3) the possibility of double patenting. In short, the existence of the Germain application was material as a matter of law.

Leviton devotes many pages in its submission to its arguments that there is "no evidence" that: (1) the inventors of the Germain application are the inventors of the '766; (2) the specification of the '766 does not support the claims; or (3) an examiner would have issued a double patenting rejection in light of  the Germain application.  However, Judge Gauvey did not need to make rulings on these specific issues.  For example, Judge Gauvey was not required to determine whether the specifications of either  the Germain application or the '766 Patent support their respective claims.  *See* 35 U.S.C. § 112.   This determination was wholly unnecessary.  Judge Gauvey found and concluded that the Germain  application was material to the '766 Patent because the Germain application and the '766 patent contain the same claims and are written by the same patent prosecutor but have different specifications.  In light of the

-8-

Germain application, a reasonable examiner would have, at the  very least, questioned whether the specification of the '766 properly supports the claims.

Notably, both the Germain application and the '766 Patent use the term "movable bridge."  This term appears no fewer than 46 times in the Germain application,  including its specification.  This term appears in the claims of the '766 Patent but is nowhere to be found in the '766's specification.  Judge Gauvey *did not find* that the absence of the term "movable bridge" in the specification of the '766 necessarily meant that the claim was unsupported, i.e., ran afoul of § 112 ¶ 1.  *Nor did she need to do so.*  What Judge Gauvey  properly found and concluded was that the disclosure of the Germain application would have led  a reasonable examiner to question the '766's compliance with § 112.  Thus, the Germain  application is information that a reasonable examiner would have considered important in deciding whether to allow the '766 Patent.  *See Impax*, 468 F.3d at 1374.

The same analysis applies to inventorship and double patenting.  Judge Gauvey did not err in finding that the Germain application was indeed material (and therefore should have been disclosed to the PTO)  because it puts inventorship, § 112, and double patenting into question. Contrary to Leviton's view, Judge Gauvey did not have to rule on the ultimate issues of proper inventorship, validity under § 112, or double patenting in order to find the Germain application material.  *See, e.g.,  PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1322 (Fed. Cir. 2000)  ("[W]hether the inventorship of the patents as issued is correct does not determine the materiality  of the statements in this case.").

Leviton also strenuously argues that only prior art is material to an inequitable conduct analysis.  This argument directly contravenes Federal Circuit law.  *See, e.g., Bristol-Myers*

*Squibb Co. v. Rhone-Poulenc Rorer,  Inc.*, 326 F.3d 1226, 1234 (Fed. Cir. 2003) ("Materiality is not limited to prior art but embraces any information that a reasonable examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a patent.") (*citing GFI Inc. v. Franklin  Corp.*, 265 F.3d 1268, 1274 (Fed. Cir. 2001)); *accord Dayco Products, Inc. v. Total  Containment Inc.*, 329 F.3d 1358, 1363 (Fed. Cir. 2003) (*citing Akron Polymer Container Corp. Exxel Container, Inc.*, 148 F.3d 1380, 1382 (Fed. Cir. 1998) ("Information did not need to be  prior art in order to be material, but 'instead embrace[d] any information that a reasonable examiner would substantially likely consider important in deciding whether to allow an  application to issue as a patent.'")).  Leviton's desire to have the court blink at these authorities is scant reason for the court to do so.

Plainly, the Germain application is material even though it was filed subsequent to  the *effective filing date* of the '766 Patent.  Patent examiners are required to "search all applications *based on the actual U.S. filing date of the application* rather than on the filing date of any parent U.S. application for which benefit is claimed.  Examiners should cite of interest *all material prior art having an effective filing date after the filing date of the U.S. parent application but before the actual filing date of the application being examined*."  Manual of Patent Examination Procedure § 700.05, Examiner Note (emphasis added).  The '766 application's effective filing date is August 20, 1999 because it claims priority to its parent application's filing date.  The '766 application was *actually filed* on April 19, 2004,  *after the Germain application was filed*.  The Germain application was material prior art because its effective filing date is after the filing date of the '766's parent application but before the '766's actual filing date.

Judge Gauvey also properly found and concluded that the Germain application was

withheld with the intent to deceive the PTO.  Intent to deceive must be "viewed in light of all the evidence . . . . Intent need not, and can rarely be, proven by direct evidence.  Rather, intent to deceive is generally inferred from the facts and circumstances surrounding the applicant's overall conduct."  *Impax*, 468 F.3d at 1374-75.  Leviton points to the lack of direct evidence of its intent to deceive, *see* Leviton's Objections at 37-41 ("Meihao never submitted evidence that attorney Narcisse made any *affirmative* [mis]representation to the PTO."  But direct evidence, as the Federal Circuit has noted, is rarely available and is unnecessary to sustain a finding by clear and convincing evidence of an intent to deceive.  *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1364 (Fed. Cir. 2007) ("[B]ecause direct evidence of deceptive intent is rarely available, such intent can be inferred from indirect and circumstantial evidence").  "An inference of intent to deceive is generally appropriate . . .when (1) highly material information is withheld; (2) the applicant knew of the information [and] . . . knew or should have known of the materiality of the information; and (3) the applicant has not provided a credible explanation for the withholding."  *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1313-14 (Fed. Cir. 2008) (internal citations omitted).

Here, Narcisse withheld highly material information in the form of the Germain application.  He knew of the materiality of this information.  In fact, he drafted the '766 Patent and the Germain application within a relatively short time period of one another.  And, he has not offered any credible explanation as to why the information was withheld.  Narcisse's bare denials of his subjective belief that disclosure was not required contradict his own testimony that he not only was familiar with MPEP requirements and PTO regulations, but that he was also aware of 37 C.F.R. § 10.23, which prohibits copying of claims, and 37 C.F.R. § 1.604(b), which requires disclosure of material information.  Having conducted a plenary de novo review of the

evidence of record, the court has no hesitation in finding and concluding, as did Judge Gauvey,

by clear and convincing evidence, that Leviton acted with the specific intent to deceive the PTO

in prosecuting the '766 Patent.

Judge Gauvey did not err in finding inequitable conduct, where the materiality of the

undisclosed prior art is extremely high and the circumstantial and indirect evidence of intent to

deceive is strong.  *See Purdue Pharma*, 438 F.3d at 1128-29 ("This requires a careful balancing:

when the misrepresentation or withheld information is highly material, a lesser quantum of proof

is needed to establish the requisite intent.  In contrast, the less material the information, the

greater the proof must be.").

4.

Leviton complains that there is no evidence that the accused Meihao GFCIs do not

infringe the '766 Patent.  This statement is true;  however, it has no relevance to the issue at

hand.  It is a non sequitur.  Leviton moved to dismiss  its infringement claims with prejudice,

thereby making Meihao the prevailing party and therefore entitled to attorneys' fees if this was

an exceptional case.  This is an exceptional case.  Leviton's strategic decision to abandon the

litigation in order to avoid adjudication of the inequitable conduct defense fall short for the

reasons identified herein and in the Report and Recommendation.

5.

Leviton argues that there is no evidence that the '766  Patent is invalid over prior art.  But

the absence of a finding of invalidity has no bearing on whether a  piece of prior art, such as the

Germain application, should have been disclosed to the patent  examiner.  The Federal Circuit is

clear that "materiality of prior art is distinct from validity  issues."  *Agfa Corp.*, 451 F.3d at

-12-

1373. A finding of validity may not shield a patentee from  unenforceability due to inequitable

conduct.  *Gardco Mfg., Inc. v. Herst Lighting Co.*, 820 F.2d  1209, 1213 (Fed. Cir. 1987) ("a

patent may be valid and yet be rendered unenforceable for misuse or inequitable conduct").

6.

Leviton objects to Judge Gauvey's characterization of its suit as "frivolous."  Leviton's

Objections at 42.  Leviton argues that the suit cannot be deemed "frivolous" because there has

not been any finding of non-infringement or invalidity.  Leviton's Objections at 42.  Leviton also

maintains that it did not engage in vexatious litigation tactics.  Leviton's Objections at 43.

Although I do not agree with Judge Gauvey's conclusion that Leviton should never have asserted

the '766 Patent in the first place, I embrace entirely her conclusion that Leviton committed

egregious misconduct during litigation.  Because she managed discovery in this case, Judge

Gauvey was intimately familiar with all of Leviton's (1) refusals to cooperate with discovery

requests; (2)  filing of baseless motions and objections; and (3) failure to respond to properly

issued  subpoenas.  The following facts found by Judge Gauvey exemplify Leviton's vexatious

litigation  tactics:

Leviton's patent prosecutor, who at the time served as trial counsel, failed to appear at
depositions, without proper excuse.

When Leviton's patent prosecutors finally appeared for depositions, Leviton peppered
Meihao with numerous objections based on work product immunity and  attorney-client
privilege, all of which Judge Gauvey found to be strategic,  unsupported, baseless, and designed
to hinder discovery.

When Meihao moved to compel, Leviton still failed to provide any good faith defense
for its objections.

Before receiving an imminent unfavorable ruling on Meihao's motion to compel,
Leviton dismissed the case with prejudice.

Leviton made the same baseless objections to requests for documents.

Judge Gauvey found Leviton's filings and objections to be "measured to maximize delay and costs and to thwart discovery on the key inequitable conduct defense."

I fully adopt Judge Gauvey's findings of fact and conclusions of law in respect to litigation misconduct. The inference is inescapable that the misguided efforts by Leviton's counsel to resist discovery on inequitable conduct arose in significant part because it was members of that firm that had engaged in such conduct. Under the circumstances, this case played out quite predictably. *Cf. ABS MB Ltd. Partnership v. IVAX Corp.*, 1996 WL 173131 (D.Md. April 10, 1996) ("[T]here is good reason why many law firms whose transactional advice forms the basis for both damage claims asserted against the client-recipient of that advice, and of defenses to those claims, do not undertake the litigation of such cases on behalf of such clients.").

IV.

For the reasons set forth herein and in the following Memorandum Opinion issued by Magistrate Judge Susan K. Gauvey, which the court adopts as its own, the motion for an award of attorneys' fees and costs is GRANTED. (The court will soon review the briefing on the request for fees and costs incurred in connection with the motion for fees and costs).

Movant shall promptly submit a judgment order embodying the rulings set forth herein.


Date: May 12, 2009                          /s/_____
                                            ANDRE M. DAVIS
                                            United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LEVITON MANUFACTURING CO.,          *
INC.,
                                    *
     v.
                                    *   CIVIL NO. AMD-05-889
UNIVERSAL SECURITY INSTRUMENTS,
INC., ET AL.,                       *
(consolidated)
*    *    *    *    *    *    *
SHANGHAI MEIHAO ELECTRIC,
INC.,                               *

     v.                             *

LEVITON MANUFACTURING CO.,          *
INC.

## MEMORANDUM OPINION

     This case is currently before the Court on Shanghai Meihao
Electric, Inc.'s ("Meihao") motion to recover costs and
attorneys' fees. (Paper No. 145) By Order dated May 24, 2007,
Judge Andre M. Davis referred to the undersigned the
determination of discovery disputes. (Paper No. 111) On December
17, 2007, Judge Davis issued an order granting Leviton's motion
to dismiss the entire case with prejudice, but granted leave to
Meihao to file this application for attorneys' fees. (Paper No.
137) By Order dated February 25, 2008, Judge Andre M. Davis
referred to the undersigned the resolution of the motion for
attorneys' fees. (Paper No. 157) Since the motion for attorneys'
fees is a case dispositive motion, See Fed. R. Civ. P. 72(b) and
54(d)(2)(D) and Local Rule 301(5)(b), this memorandum opinion is

in effect a "report and recommendation" to the referring district judge, with proposed findings of fact. A hearing was held on September 3, 2008.

For the reasons set forth below, the Court recommends that Meihao's motion be granted, having found exceptional circumstances under 35 U.S.C. § 285, having further found an award of fees and costs necessary to avoid a gross injustice and finally having found that Meihao is entitled to costs in the amount of $84,080.02 and fees in the amount of $726,579.15.

## Background

### The '766 Patent

Shanghai Meihao Electric, Inc. ("Meihao") manufactures electrical devices, including ground-fault circuit interrupters ("GFCIs") equipped with reverse wiring protection ("RW-GFCIs")-the products at issue in this litigation.[1] Meihao sells these devices throughout the United States, including to Universal Security Instruments, Inc., and USI Electric, Inc. (collectively "USI").

Leviton Manufacturing Co., Inc. is a corporation and owner of multiple patents issued by the United States Patent and

---

[1] Unless otherwise indicated, this description is based on Leviton's complaint (Case No. 05-889, Paper No. 1), USI's answer (Case No. 05-889, Paper No. 9), Meihao's complaint (Case No. 05-01243, Paper No. 1), and the briefing and exhibits for this litigation. All disputed facts are taken in the light most favorable to Leviton.

2

Trademark Office ("PTO"), including the subject of this
litigation, U.S. Patent No. 6,864,766 ("'766 patent"), which
involves GFCI technology. The '766 patent is the sixth in a
series of related Leviton patent applications covering similar
inventions developed by the same two inventors over an extended
period of time. All of these patents were prosecuted by Leviton's
patent counsel, Greenberg Traurig. Barry Magidoff, Claude
Narcisse and Paul Sutton were the Greenberg Traurig attorneys
involved with the patents at issue in this litigation. The first
patent in this series was filed on August 24, 1998 and issued as
U.S. Patent No. 6,040,967. The second, filed as a continuation-
in-part[2] application to '967, was filed on August 6, 1999 and
issued as U.S. Patent No. 6,282,070. The third, filed as a
continuation-in-part to both '967 and '070, was filed on
September 20, 1999 and issued as U.S. Patent No. 6,246,558.
Magidoff worked on this third application, but Narcisse did not,

---

[2] "A continuation is a second application for a patent filed by the
same inventor and containing the same disclosure as a prior
application (called the "parent"). If the continuation is filed during
the pendency of the parent (i.e., before issuance, abandonment, or
termination of proceedings, including any appeal) and makes a specific
reference to the parent, the continuation is entitled to the benefit
of the patent's filing date. A continuation can be used to secure
further examination and to add claims after a final action by the
examiner. A series of continuations (grandparent, parent, etc.) is
possible so long as each application makes reference to all previous
ones in the chain." A continuation-in-part application "is like a
continuation application except that it adds some new matter to the
original or parent application. It is entitled to the benefit of the
parent application to the extent that it contains common subject
matter. A continuation-in-part may be used to add improvements
developed after the date of filing the parent application." Donald S.
Chisum, Chisum on Patents Glossary(2008).

as he was not yet employed by Greenberg Traurig.

On April 19, 2004, Leviton filed the continuation application that issued as the '766 patent. This patent claims priority from the '558 and '953 patents. It has the exact same written description as the '558 patent and lists the same two inventors, DiSalvo and Ziegler, but includes new claims not in either the '558 or '953 patents. These claims were drafted by Narcisse. Also in April 2004, Leviton's counsel filed a Petition to Make Special, along with a supporting declaration by Magidoff, requesting expedited prosecution of the '766 application in light of infringing activity. The '766 patent issued on March 8, 2005.

### The Current Litigation

On March 31, 2005, Leviton filed suit against USI for infringement of the '766 patent, alleging that USI made, used, offered for sale or sold, and/or induced the sale of GFCI products manufactured by Meihao that embodied the invention protected by the '766 patent. (Case No. 05-889). On May 5, 2005, Meihao filed a declaratory judgement action, seeking a judgment that the '766 patent is not infringed by Meihao's products, is invalid, and is unenforceable due to Leviton's inequitable conduct (Case No. 05-1243).[3]

Specifically, Meihao alleges that Leviton's counsel

---

[3] Leviton's action against USI and Meihao's action against Leviton were consolidated into the case presently before the Court on January 24, 2006. (Paper No. 32)

4

committed inequitable conduct by withholding material information
- the already pending U.S. Patent Application Serial No. 10/690,
776 ("Germain application") — from the PTO during the prosecution
of the '766 patent. (Paper No. 145, 3) The Germain application
was filed on October 22, 2003 and claims priority to February 3,
2003. It was filed and prosecuted by Greenberg Traurig attorneys
Paul J. Sutton, Barry Magidoff, and Claude Narcisse. Its claims,
like those in '766, were drafted by Narcisse. It lists Frantz
Germain and five others as co-inventors. It is undisputed that
the '766 patent and the Germain application have no common
inventors. It is also undisputed that the '766 patent and the
Germain application have many claims that are identical or very
nearly so. Related to this fact, is Meihao's allegation that
Narcisse copied Germain claims into the '766 application, without
so informing the PTO in direct contravention of PTO regulation.
37 C.F.R. § 10.23(c)(&)("It is misconduct for a patentee to
"[k]nowingly withhold[] from the [PTO] information identifying a
patent or patent application of another from which one or more
claims have been copied."). USI and Meihao also allege that
Leviton's counsel withheld from the PTO information about related
litigation involving the '766 patent. (Paper No. 149, 11-12)[4]

---

[4] Meihao also alleges that Leviton's filing of, and continued
prosecution of this case and its vexatious litigation conduct in its
prosecution constitutes inequitable conduct.

5

### Governing Law

A patentee commits inequitable conduct anytime he breaches his duty to the PTO of "candor, good faith, and honesty." <u>Eli Lilly and Company v. Zenith Goldline Pharmaceuticals, Inc.</u>, 471 F.3d 1369, 1381 (Fed. Cir. 2006). Breaches of this duty include "affirmative misrepresentations of material facts, non-disclosure of material information, or submission of false material information, coupled with an intent to deceive." <u>Id.</u> Because inequitable conduct may render a patent unenforceable, the defense serves as a shield to liability against infringement claims. <u>See</u> <u>Nobelpharma AB v. Implant Innovations, Inc.</u>, 141 F.3d 1059, 1070 (Fed. Cir. 1998); <u>Korody-Colyer Corp. v. General Motors Corp.</u>, 828 F.2d 1572, 1578 (Fed. Cir. 1987).

After dismissal of the litigation, Meihao filed this motion to recover attorneys' fees and costs as provided by Federal Rule of Civil Procedure 54(d)(1) and 35 U.S.C. § 285. Section 285 of the Patent Act provides: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. Leviton does not dispute Meihao's "prevailing party" status, which is clear under <u>Power Mosfet Technologies, LLC v. Siemens AG</u>, 378 F.3d 1396, 1416 (Fed. Cir. 2004). Moreover, neither the early stage of the litigation nor the dismissal with prejudice prevents an award of fees. <u>See</u> <u>Highway Equip. Co., Inc. v. FECO, Ltd.</u>, 469 F.3d 1027, 1035 (Fed. Cir. 2006) (concluding that as a matter of patent law, a court may

6

decide a claim for attorneys' fees under § 285 after a dismissal with prejudice); <u>see also</u> <u>Tenax Corp. v. Tensar Corp.</u>, 22 U.S.P.Q. 2d 1264, 1267 (D. Md. 1991) (collecting cases in which courts recognized a right to recovery of attorney's fees under § 285 where patent claims were dismissed with prejudice prior to trial). Furthermore, this Court need not reopen discovery nor conduct a bench trial in order to rule on the motion; if there are no genuine disputes as to material fact, this Court may rule on the issue of attorneys' fees as a matter of law. <u>See Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986) (finding that judgment as a matter of law is appropriate when there is no genuine issue as to any material fact); <u>Digital Control, Inc. v. Charles Machine Works</u>, 437 F.3d 1309, 1313 (Fed. Cir. 2006) (finding that courts may make a ruling on inequitable conduct as a matter of law).

The determination to award fees is strictly in the discretion of the district court. The determination has two steps: first, the court determines whether there is clear and convincing evidence that the case is exceptional; and second, the court determines in its discretion whether to award fees to the prevailing party, in an exceptional case. <u>Digeo, Inc. v. Audible, Inc.</u>, 505 F.3d 1362, 1366-67 (Fed. Cir. 2007);[5] <u>see also Century</u>

---

[5] Federal Circuit law governs the § 285 analysis, as the issue is unique to patent law. <u>Digeo</u>, 505 F.3d at 1366 (citing <u>Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.</u>, 182 F.3d 1356, 1359 (Fed. Cir. 1999)). Federal Circuit law also governs the more specific issue of determining the effect of a dismissal with prejudice on § 285. <u>Highway</u>

<u>Wrecker Corp. v. E.R. Buske Manufacturing Co.</u>, 913 F. Supp. 1256, 1292 (N.D. Iowa 1996).

The prevailing party seeking the fee award bears the burden of showing by clear and convincing evidence that the case is exceptional. It may do so by demonstrating one of two types of misconduct: first, misconduct of a party during the litigation, such as vexatious discovery tactics, continued pursuit of unjustified litigation, or conduct that violates Federal Rule of Civil Procedure 11; or second, misconduct giving rise to the litigation, such as inequitable conduct. <u>See</u> <u>Brooks Furniture Mfg., Inc. v. Dutailier Intern., Inc.</u>, 393 F.3d 1378, 1381 (Fed. Cir. 2005); <u>Reactive Metals & Alloys Corp. V. ESM Inc.</u>, 769 F.2d 1578, 1582 (Fed. Cir. 1985); <u>Mach. Corp. of America v. Gullfiber AB</u>, 774 F.2d 467, 470-72 (Fed. Cir. 1985); <u>Tenax</u>, 22 U.S.P.Q.2d at 1266-68. Such a demonstration may not rely on unproven factual allegations and assertions, but must present evidence of misconduct to show that the case is exceptional. <u>See</u> <u>Stephens v. Tech International, Inc.</u>, 393 F.3d 1269, 1276 (Fed. Cir. 2004) ("[A]n exceptional case finding is not to be based on speculation or conjecture but upon clear and convincing evidence."). Moreover, "it is incumbent on the trial court not only to make the ultimate finding that the case is exceptional, but also to articulate the more particular factual findings from which the

_____

<u>Equipment Co., Inc. v. Feco, LTD.</u>, 469 F.3d 1027, 1032 (Fed. Cir. 2006).

finding of 'exceptional circumstances' follows." <u>Reactive Metals</u>, 769 F.2d at 1582.

The standards governing fee awards under § 285 apply equally to patentees and infringers who engage in misconduct. <u>See</u> <u>Eltech Systems Corp. v. PPG Industries, Inc.</u>, 903 F.2d 805, 811 (Fed. Cir. 1990)("The balance is not tipped in favor of either side when each is required to prove the other guilty of bad faith litigation by clear and convincing evidence in light of the totality of the circumstances."). An award of attorneys' fees against a plaintiff (in favor of an alleged infringer) is appropriate when the plaintiff brings the suit without a good faith belief that his patent has been infringed. <u>Instituform of North America, Inc. v Midwest Pipeliners, Inc.</u>, 26 U.S.P.Q. 2d 1125, 1126-27 (S.D. Ohio 1992). In such situations, bad faith can be inferred from the facts and circumstances. <u>See</u> <u>Digeo</u>, 505 F.3d at 1367 ("[I]f there is clear and convincing evidence that a plaintiff has brought a baseless or frivolous suit against an accused infringer, that is a sufficient basis to require a district court to deem the case exceptional under § 285."); <u>Eltech</u>, 903 F.2d at 810 ("Where, as here, the patentee is manifestly unreasonable in assessing infringement, while continuing to assert infringement in court, an inference is proper of bad faith, whether grounded in or denominated wrongful intent, recklessness, or gross negligence.").

A finding that the plaintiff engaged in inequitable conduct

9

in procuring the patent can be sufficient to make a case
exceptional. <u>See</u> <u>Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.</u>,
279 F.3d 1022, 1034 (Fed. Cir. 2002); <u>Beckman Instrum., Inc. v.</u>
<u>LKB Produkter AB</u>, 892 F.2d 1547, 1551 (Fed. Cir. 1989); <u>Stevenson</u>
<u>v. Sears, Roebuck & Co.</u>, 713 F.2d 705, 713 (Fed. Cir. 1983);
<u>Century Wrecker</u>, 913 F. Supp. at 1292; <u>Tenax</u>, 22 U.S.P.Q. 2d at
1268-69. There is a presumption, however, that patents issued by
the PTO are valid and assertions of infringement are made in good
faith. <u>Springs Window Fashions LP v. Novo Ind.</u>, 323 F.3d 989, 999
(Fed. Cir. 2003).

As stated previously, a determination that the case is
exceptional does not mandate an award of fees. Both the Federal
Circuit and Congress have made clear that such awards under § 285
are appropriate only where necessary to prevent a gross
injustice. <u>See</u> <u>J.P. Stevens Co., Inc. v. Lex Tex Ltd., Inc.</u>, 822
F.2d 1047, 1052 (Fed. Cir. 1987) (citing S.Rep. No. 1503, 79th
Cong. 2d Sess. (1946), <u>reprinted in</u> 1946 U.S.C.C.A.N. 1386,
1387); <u>Forest Labs. v. Abbott Labs., Inc.</u> 339 F.3d 1324, 1329
(Fed. Cir. 2003); <u>Instituform</u>, 26 U.S.P.Q.2d at 1126. In
determining whether to award attorneys' fees in an exceptional
case, the Federal Circuit advises trial judges "[who] are in the
best position[s] to weigh considerations, such as the closeness
of the case, tactics of counsel, the conduct of the parties and
any other factors that may contribute to a fairer allocation of
the burdens of litigation as between winner and loser." <u>J. P.</u>

10

Stevens, 822 F.2d at 1051.

## Discussion

This Court must first decide whether Meihao has demonstrated by clear and convincing evidence that this case is exceptional. If exceptional, the Court then will determine whether to grant Meihao an award of attorney fees and costs, and if so, the amount.

Meihao asserts that it can demonstrate exceptionality on three bases: first, Leviton's inequitable conduct in procuring the '766 patent; second, Leviton's pursuit of frivolous infringement claims for months; and third, Leviton's vexatious litigation conduct, including its protracted and unreasonable efforts to resist inequitable conduct discovery. (Paper No. 147, 1.) All bases are recognized as supporting a finding of exceptionality. See Tenax, at 1266-68; Reactive Metals, 769 F.2d at 1582; Machine Corp. of America v. Gullfiber AB, 774 F.2d 467, 470-72 (Fed. Cir. 1985). Meihao seeks attorney fees and costs under § 285 on each of these bases.

## Inequitable Conduct: Failure of the Duty of Candor and Disclosure

This Court must make a determination regarding Meihao's allegations of inequitable conduct prior to determining whether the case is exceptional. See Enzo Biochem, Inc. v. Calgene, Inc., 188 F.3d 1362, 1380 (Fed. Cir. 1999). As the docket reflects, this case was dismissed during the early stages of the

11

litigation. However, neither the early stage of the litigation nor the dismissal with prejudice prevents an award of fees. See Highway Equip. Co., Inc. v. FECO, Ltd., 469 F.3d 1027, 1035 (Fed. Cir. 2006); Tenax, 22 U.S.P.Q. 2d at 1267. Furthermore, no trial or evidentiary hearing is needed if the Court can make factual findings on the evidence in the record. Of course, if there are genuine disputes as to material facts, which prevent the judge as factfinder from determining the facts without the taking of further evidence or assessing the credibility of the witnesses, the motion should be denied.[6] See Digital Control, 437 F.3d at 1313. However, "[a] genuine issue of material fact is not raised by the submission of 'merely conclusory statements or completely insupportable, specious, or conflicting explanations or excuses.'" Id. (quoting Monsanto Co. v. Bayer BioScience N.V., 363 F.3d 1235, 1240 (Fed. Cir. 2004) (quoting Paragon Podiatry Lab., Inc. v. KLM Labs., Inc., 984 F.2d 1182, 1191-92 (Fed. Cir. 1993))). Similarly, affidavits containing "bare declaration[s] of lack of intent to mislead," supplemented by nonresponsive or unsupported explanations are insufficient. Paragon Podiatry, 984 F.2d at 1191. "The affiant must at least state facts supporting a plausible justification or excuse..." Id.

    As stated above, a finding that the plaintiff engaged in

---

[6] The Federal Circuit has determined that since the defense of inequitable conduct in a patent suit is entirely equitable in nature, it is an issue for the judge, not the jury, including the factual element of intent. Gardco Mfg., Inc. v. Herst Lighting Co., 820 F.2d 1209, 1211-13 (Fed. Cir. 1987).

12

inequitable conduct in procuring the patent is sufficient to make a case exceptional for the purposes of § 285. <u>See</u> <u>Stevenson v. Sears, Roebuck & Co.</u>, 713 F.2d 705, 713 (Fed. Cir. 1983); <u>Tenax Corp.</u>, 22 U.S.P.Q. 2d at 1268-69. Meihao alleges that Leviton's counsel committed inequitable conduct before the PTO in two ways:

> (1) by withholding material information—the already pending U.S. Patent Application Serial No. 10/690, 776 ("Germain application")—from the PTO during the prosecution of the '766 patent, (Paper No. 145, 3); and

> (2) withholding information about related litigation involving the '766 patent.

(Paper No. 149, 11-12).

Related to the first basis is Meihao's assertion that Leviton also failed to advise the PTO that it had copied claims from the Germain application into the '766 application. To prevail on its first claim of inequitable conduct, Meihao must provide clear and convincing evidence (1) that the Germain application was material to patentability of the '766 patent, (2) that Leviton failed to disclose evidence of the Germain application during the prosecution of the '766 patent, and (3) that it did so with an intent to deceive the PTO. To prevail on the second claim of inequitable conduct, Meihao similarly must provide clear and convincing evidence (1) that information about related litigation was material to the patentability of the '766 patent, (2) that Leviton failed to disclose this evidence during the prosecution of the '766 patent, and (3) that it did so with an intent to deceive the PTO. Leviton does not assert that it

13

disclosed either the Germain application or the related
litigation in the prosecution of the '766 patent. Moreover, while
Narcisse denies he "copied" the claims as a matter of law, he
does not deny the similarity -- indeed the identical or
substantially identical language of many of the claims in both
the Germain and '766 applications. More to the point, he does not
claim to have advised the PTO of his "copying." Accordingly, this
Court does not have to resolve any disputes as to fact as to what
was disclosed, but only whether what was <u>not</u> disclosed was
"material" <u>and</u> withheld with an intent to deceive the PTO.
Similarly, this Court does not have to resolve any dispute as to
whether Narcisse informed the PTO of the "copying" of claims.  He
admits he did not.  In answer to Meihao's charge of inequitable
conduct, Leviton asserts only that it was under no obligation to
disclose either the Germain application or the related litigation
in the prosecution of the '766 patent, as neither was material to
the patentability of '766. (See Paper No. 147, 3, 5-10, 22-23)

    In making its determination, the Court must first make a
determination as to whether Leviton's admitted nondisclosure of
the Germain application (and related "copying") and related
litigation rises to threshold levels of both materiality and
intent. <u>See</u> <u>Eli Lilly</u>, 471 F.3d at 1381; <u>Li Second Family L.P. v.</u>
<u>Toshiba Corp.</u>, 231 F.3d 1373, 1378 (Fed. Cir. 2000). If the facts
indicate that the nondisclosure - the misconduct - meets these
threshold levels, the Court then moves to the second stage of the

14

inquiry, the balancing test, which requires that the Court weigh materiality and intent and make an equitable determination regarding inequitable conduct. Li, 231 F.3d at 1378; see also Digital, 437 F.3d at 1315-16. The more material the non-disclosure, the less intent will be required to make such a determination, and vice versa. Li, 231 F.3d at 1378; see also Digital, 437 F.3d at 1315.

Before discussing the materiality of the failure to disclose the Germain application (and related failure to report copying of Germain claims) and the related litigation, the Court shall review the broad and specific provisions of the PTO law relevant to these questions. These provide the framework for evaluating Leviton's conduct in light of PTO expectations.

### Governing PTO Regulations and Manual Provisions

All persons associated with the prosecution of a patent application are bound by a duty of disclosure, candor, and good faith in dealing with the PTO. See 37 C.F.R. § 1.56 (2000)("Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section."). This duty is obviously imposed to facilitate the PTO doing its job. See Id. ("The public interest is best served, and the most effective patent examination occurs when, at the time an application is

15

being examined, the Office is aware of and evaluates the teachings of all information material to patentability."). Additionally, Title 37, § 1.604(b) of the C.F.R. states that "[w]hen an applicant presents a claim known to the applicant to define the same patentable invention claimed in a pending application of another, the applicant shall identify that pending application, unless the claim is presented in response to a suggestion by the examiner."). Finally, Title 37, § 10.23(c)(7) of the C.F.R. states that it is misconduct to "[k]nowingly withhold[] from the [PTO] information identifying a patent or patent application of another from which one or more claims have been copied." An individual who does so may be subject to reprimand, suspension, or exclusion (either generally or in a specific case). <u>See</u> 37 C.F.R. § 10.130(a)(2000).

Chapter 2000 of the Manual of Patent Examining and Procedure ("MPEP") interprets and explains "the duties owed toward the [PTO] by the inventor and every other individual who is substantively involved in the preparation or prosecution of the application."[7] MPEP § 2000.01. The duty of disclosure, candor, and good faith includes "a duty to disclose to the Office all

---

[7] While the MPEP does not have the force of law, it is entitled to judicial notice as an official interpretation of statutes or regulations as long as it is not in conflict therewith. <u>Litton Sys., Inc. v. Whirlpool Corp.</u>, 728 F.2d 1423, 1439, (Fed. Cir. 1984). <u>Accord In Re Beasley</u>, 117 Fed. Appx. 739, 744 n.7 (Fed. Cir. 2004) Similarly, "the MPEP [is] commonly relied upon as a guide to patent attorneys and patent examiners on procedural matters." <u>Molins v. Textron</u>, 48 F.3d 1172, 1180 n.10 (Fed. Cir. 1995).

16

information known to that individual to be material to

patentability." MPEP § 2001. The duty of disclosure requires that

applicants disclose all information material to patentability,

including:

- information on inventorship, see MPEP §
  2001.04 ("prior invention by another
  inventorship conflicts")

- known information regarding other significant
  copending United States applications, see
  MPEP § 2001.06(b) ("information within their
  knowledge as to other co-pending United
  States applications which are "material to
  patentability" of the application in
  question), and

- information regarding litigation on the
  subject matter for which a patent is being
  sought, see MPEP § 2001.06 (c). ("Where the
  subject matter for which a patent is being
  sought is or has been involved in litigation,
  the existence of such litigation and any
  other material arising therefrom must be
  brought to the attention of the [PTO] . . .
  such [as] . . . questions of inventorship . .
  . "inequitable conduct," and "violation of
  duty of disclosure.)

The Manual also admonishes patent attorneys:

> not rely on the examiner of a particular
> application to be aware of other applications
> belonging to the same applicant or assignee.
> It is desirable to call such applications to
> the attention of the examiner even if there
> is only a question that they might be
> 'material to patentability' of the
> application the examiner is considering.

See MPEP § 2004 ¶ 9. (emphasis added).  Moreover, the Manual

counsels attorneys to disclose information if the question of

materiality is close. See MPEP § 2004 ¶ 10. ("When in doubt, it

17

is desirable and safest to submit information. Even though the attorney, agent, or applicant doesn't consider it necessarily material, someone else may see it differently and embarrassing questions can be avoided."). Thus, the PTO discourages patent attorneys from arrogating to themselves decisions on materiality.

Accordingly, patent regulations and manual provisions set out a comprehensive description of the duty to disclose. It is Meihao's position that Leviton did not fulfill its duty to disclose and in so failing deprived the patent examiner of information material to the issue of patentability of the '766 application.

### Leviton's Fulfillment of its Duty to Disclose

A review of the record demonstrates that there is no dispute as to material fact as to what Leviton disclosed to the PTO in its prosecution of the '766 patent. Leviton neither disclosed the Germain application nor any of the litigation involving the parent patents to '766, not his "copying" of claim language. There is, however, a dispute as to <u>what</u> Leviton was required to disclose as a matter of law and whether the information Leviton failed to disclose was "material," satisfying the first prong of the inequitable conduct doctrine. For the reasons set forth below, the Court has concluded that Leviton failed to make disclosure of information mandated by patent law, regulation, manual provisions and case law and that the undisclosed

18

information was information that a reasonable patent examiner
would have found important to the patentability of the '766
application. Accordingly, this Court finds that Meihao has
satisfied the first prong of the inequitable conduct doctrine.

**Failure to Disclose the Germain Application Materiality**

Meihao argues that Leviton's failure to disclose the Germain
application was "material" stating in essence that a reasonable
patent examiner would have considered the information important
in deciding whether to allow the application to issue as a
patent.

There are several tests which have been used to evaluate
materiality. See Digital, 437 F.3d at 1315-16 (noting the
objective "but for" test, the subjective "but for" test, the "but
it may have" test, the "reasonable examiner" test, and the new
Rule 56 test).[8]  However, because a party seeking to prove
inequitable conduct must establish only a threshold level of
materiality in order to proceed to the balancing stage of the
inquiry, the Federal Circuit has adopted the reasonable examiner
test, arguably the broadest of the tests as applicable. Under the
reasonable examiner standard, omissions or misstatements are
considered material if "a reasonable examiner would have

---

[8] The newest of the tests, referred to as "the new Rule 56" test, was
not created with the intention that it become the exclusive test, but
only to provide an additional test of materiality. Id. at 1316; see
also Impax, 468 F.3d at 1374 (noting that a misstatement or omission
can be determined material under either the new Rule 56 test or the
reasonable examiner test).

considered such [information] important in deciding whether to allow the . . . application." Id. at 1314 (quoting Dayco Products Inc. v. Total Containment, Inc., 329 F.3d 1358, 1363 (Fed. Cir. 2003)).[9]

The other tests remain; some, of course, seen as establishing a narrower -- or higher -- standard of materiality. See Digital, 437 F.3d at 1314 ("[I]n 1992, the PTO amended Rule 56, creating an arguably narrower standard of materiality.") However, the "reasonable examiner" standard remains the "gateway" standard, testing whether withheld information meets the threshold level of materiality required for a finding of inequitable conduct. Despite this clear holding of Digital, and other precedent that materiality does not rest on whether or not

---

[9] Under the new Rule 56 test, information is material when it is not cumulative, and

> (1) it establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or

> (2) it refutes, or is inconsistent with, a position the applicant takes in:

>> (I) Opposing an argument of unpatentability relied on by the Office, or

>> (ii) Asserting an argument of patentability.

> A prima facie case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.

37 C.F.R. 1.56 (b).

the withheld information would invalidate the patent, <u>see</u> <u>Li</u>, 231

F.3d at 1383, Leviton relies solely on the "but for" test in

arguing that the information it failed to disclose was not

material. (<u>See</u> Paper No. 147, 20-23.) The PTO explicitly and

firmly rejected application of such a "but for" test, as have the

courts, as indicated above.

> The suggested 'but for' standard would not
> cause the Office to obtain the information it
> needs to evaluate patentability so that its
> decisions may be presumed correct by the
> courts. If the Office does not have needed
> information, meaningful examination of patent
> applications will take place for the first
> time in an infringement case before a
> district court. Courts will become
> increasingly less confident of the Office's
> product if they get the impression that
> practitioners and inventors can routinely
> withhold information from the Office, or that
> practitioners and inventors can make up their
> own minds about what is patentable.

<u>See</u> Duty of Disclosure, 57 Fed. Reg. 2021, 2024 (Jan. 17, 1992).

The "but for" test is plainly a result-oriented standard, with

the patent attorney pre-determining the conclusion of the PTO.

In its argument for that standard, Leviton is essentially

saying "no harm, no foul", that is, a patent examiner even with

information regarding Germain application (and related

litigation) would have granted the '766 patent. As stated above,

this is clearly not the preferred standard under PTO guidance and

case law.[10] This Court therefore rejects Leviton's position that

---

[10] This is not, however, to say that analysis of the withheld
information under the "but for" standard is irrelevant to the
materiality decision. Failure to meet this "but for" standard might

the "but for" test controls and that under that test the

information withheld was not "material," in favor of the

reasonable examiner standard.

### Copying of Claim Language

Before discussing how the Germain application might be material

to the various determinations that a patent examiner necessarily

must make, the Court has concluded that information on "copying"

of claims is essentially material per se under the PTO

regulations. Title 37, § 10.23(c)(7) declares that it is

misconduct to "[k]nowingly withhold[] from the PTO information

identifying a patent or patent application of another from which

one or more claims have been copied." It is an absolute,

unqualified duty, not dependent on applicant judgment of

materiality or relevancy or anything else. If an applicant copies

language from claims from one application to another, the PTO

wants to know, under pain of disciplinary action. Leviton offers

no legal argument, excusing Narcisse from the duty under 37

C.F.R. § 10.23(c)(7), but merely tries to change the subject in

its opposition. In its attempt to address what it characterized

as "Meihao's Improperly Copied Claims Theory," Leviton said there

was "nothing presumptively wrong with having the same or similar

claims in two different patent applications owned by the same

---

suggest that while the withheld information was "material," it was not
highly so. Such a finding would be relevant at the second stage or
balancing stage of the equitable misconduct analysis. See Li, 231 F.3d
at 1378.

company," that the patent examiners did not reject the '766 and Germain applications under Section 112, first paragraph and that there is "no credible evidence that any Greenberg Traurig attorney intended to deceive the PTO." (Paper No. 147, 20-21.) While Leviton's patent counsel, Narcisse refused to admit to "copying" claims, no other inference can be drawn from his deposition testimony than that he lifted the claim language from the Germain application and used it in the '766 application. There could be no clearer, no more unequivocal statement of the duty to disclose than § 10.23(c)(7). Leviton offers no satisfactory explanation for the failure to advise the PTO of <u>de facto</u> copying in light of the declarative, unqualified language of § 10.23(c)(7), except that it did not choose to.[11]  Without any further discussion, the high materiality of the information on the copying of the claim language Germain application into the '766 application is established.

### The Importance of the Germain Application to a Reasonable Patent Examiner

Meihao proffers several reasons under patent law why a patent examiner would find the withheld information important to the patentability of '766. Specifically, Meihao argues that the Germain application raises questions about (1) the inventorship

---

[11]  Meihao relied on the deposition testimony of Narcisse on this and other points.  Leviton submitted no substantive affidavits on the facts of the drafting of the applications, the rationale for its actions or inactions, etc.

of the '766 patent, (2) whether the '766 patent specification supports the claims, and (3) whether the Germain application could have been the basis of a double patenting rejection of the '766 patent. (Paper No. 145, 19-20.) Moreover, the Rules of the PTO, Meihao argues, expressly required disclosure of the Germain application. (See Id. (citing 37 C.F.R. § 1.56; 37 C.F.R. § 1.604(b); 37 C.F.R. § 10.23; MPEP § 2001.06(b)).

While conceding that some of the claim language of the Germain and '766 applications is nearly identical (see Paper No. 147, 19 ("There is nothing improper or unusual about two applications having common textual language and similar claims, particularly when the applications originate from the same company/assignee.")), Leviton dismisses each of Meihao's arguments. Leviton primarily argues that the Germain application cannot be material to the patentability of the '766 patent because Germain is not prior art to '766, as '766's priority date predates Germain's by three years. (Paper No. 147, 16-18.)[12] As

---

[12] Leviton's briefing appears to recognize "prior art" as the only material information. That is a crabbed view, firmly rejected by the Courts. See, e.g., Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., 326 F.3d 1226, 1234 (Fed. Cir. 2003) ("Materiality is not limited to prior art but embraces any information that a reasonable examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a patent." citing GFI, 265 F.3d at 1274)(emphasis in original.); Accord Dayco Products, Inc. v. Total Containment Inc., 329 F.3d 1358, 1363 (Fed. Cir. 2003) citing Akron Polymer Container Corp. v. Exxel Container, Inc., 148 F.3d 1380, 1382 (Fed. Cir. 1998)("Information did not need to be prior art in order to be material, but 'instead embrace[d] any information that a reasonable examiner would substantially likely consider important in deciding whether to allow an application to issue as a patent.'").

Meihao notes, Leviton's argument assumes the answer to precisely
the disputed issues:

> [whether] the copying of the claims from the Germain
> application into the '766 patent is evidence that the
> latter is <u>not</u> entitled to an earlier priority date
> [because the inventors of '766 predecessor patent are
> not the inventors of the new Germain claims or the
> inventors of the Germain predecessor patent had already
> received a patent on this subject or because the
> specifications do not support the new claims.]"

(Paper No. 149, 5.) These are the issues that the patent examiner
would be expected to sort out <u>if</u> given information about the
German application. Moreover, Leviton's "prior art" argument does
not address what can only be said to be a PTO imperative that a
patent applicant reveal any copying of claims from patent
applications. 37 C.F.R. § 10.23(c)(7). This Court is convinced
that Leviton did have such a duty, if on no other basis than the
regulations explicitly require disclose of the Germain
application, as it contains "copied" claims.

Leviton then contends that Meihao's arguments regarding
inventorship and double patenting rely on misinterpretations of
patent law. (Paper No. 147, 19-20.) On close analysis, Leviton's
arguments can all be rejected as a matter of law. The Court has
concluded that the Germain application could conceivably have
raised questions (1) about the inventorship of the '766 patent,
(2) whether the '766 patent specification supports the claims,
and (3) whether there would have been a double patenting
rejection of the '766 patent - all making the Germain application

25

highly material. But, even if the legal merit of the inventorship, specifications and double patenting questions are debatable, not conclusive, the information should not be withheld but presented to the patent examiner, who can decide, as the case law and MPEP make strikingly clear.

### Inventorship

The law is clear that a person is only entitled to a patent if he himself invented the subject matter sought to be patented. 35 U.S.C. § 102(f); see also Chisum, supra, at § 2.01 ("Only a true and original inventor may obtain a patent...The requirement bars a patent even if the true inventor does not complain or if the true inventor is not known."). Furthermore, an inventor is only considered to have invented the features of his invention that he appreciates at the time of its conception. See Invitrogen Corp. v. Clontech Labs., Inc., 429 F.3d 1052, 1063 (Fed. Cir. 2005) ("[C]onception requires that the inventor appreciate that which he has invented."); Hitzeman v. Rutter, 243 F.3d 1345, 1358-59 (Fed. Cir. 2001) ("[A]n inventor who failed to appreciate the claimed inventive features of a device at the time of alleged conception cannot use his later recognition of those features to retroactively cure his imperfect conception."). "As a critical requirement for obtaining a patent, inventorship is material." PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc., 225 F.3d 1315, 1321 (Fed. Cir. 2000); see also MPEP § 2001.04 ("Materiality is defined in 37 CFR 1.56(b)...[and] includes, for

26

example, information on ...prior invention by another, inventorship conflicts, and the like."). The Federal Circuit has determined that misrepresentations or omissions to the PTO regarding inventorship are highly material under either the reasonable examiner standard or the new Rule 56 test. See PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc., 225 F.3d 1315, 1321-22 (Fed. Cir. 2000) (finding that misinformation about inventorship is highly material under both the reasonable examiner standard and the newer Rule 56 test, regardless of whether the inventorship of the patents as issued is actually correct). Applying these principles, and considering the strong inference of misrepresented inventorship raised by the identical or nearly identical claim language, it is clear that the Germain application was material on the issue of inventorship.

Leviton responds that its common ownership of the two patents makes it permissible for the two to have identical claim language. (See Paper No. 147, 20 ("[T]here is nothing presumptively wrong with having the same or similar claims in two different patent applications owned by the same company.").) Leviton's common ownership, however, does not undermine the requirement that each patent must issue to its true and original inventor. Although the '766 patent and the Germain application are both owned by Leviton, Leviton acknowledges that they share no common inventors. (Paper No. 147, 9.) This means that each patent, despite Leviton's common ownership, must have been

27

invented in its entirety by its listed inventors, who appreciated

at that time the scope and features of their invention. See 35

U.S.C. § 102(f); Invitrogen, 429 F.3d at 1063. Leviton has

conceded that the Germain application and the '766 application

have similar claims and identical language, but contends that

each was invented by its respective listed inventors. (Paper No.

147, 19.) The evidence confirms that the '766 patent and the

Germain application have many claims that are identical, or very

nearly so.[13] This Court need not determine whether the Germain

application and '766 patent were each invented by their listed

inventors; indeed, that question is not before the Court. See

PerSeptive, 225 F.3d at 1322 ("[W]hether the inventorship of the

patents as issued is correct does not determine the materiality

of the statements in this case, just as whether concealed prior

art would actually invalidate the patent is irrelevant to

materiality."). This Court need only determine whether the

Germain application raises significant questions about

inventorship, enough to raise a prima facie case of

unpatentability or that a reasonable examiner would have found it

---

[13] (Compare Paper No. 145, Ex. 11, (Germain Application) with Paper No. 145, Ex. 13 ('766 Patent)). Claim 1 of the '766 patent has only three words that differ from claim 31 of the Germain application. (Compare id., Ex. 11, 9, ¶ 31 with id., Ex. 13, 11, ¶ 1). Claim 11 of the '766 patent again has only three words that differ from claim 42 of the Germain application. (Compare id., Ex. 11, 10, ¶ 42 with id., Ex. 13, 12, ¶ 11). Claims 3, 13, and 14 of the '766 patent are identical to claims 32, 43, and 44 of the Germain application. (Compare id., Ex. 11, 9, ¶ 31 with id., Ex. 13, 11, ¶ 1). Claims 5 and 15 of '766 have one word that differs from claims 35 and 46 of Germain. (Compare id., Ex. 11, 9-10, ¶¶ 35, 46 with id., Ex. 13, 12-13, ¶¶ 5, 15).

28

important. The Court is convinced that it does, as the Germain application raises important questions about potential misrepresentation of inventorship of the '766 patent. The potential of such misinformation or omissions, which would be highly material to patentability, is sufficient to establish a threshold or greater level of materiality. As Meihao aptly stated, "Leviton's withholding of the Germain reference prevented the examiner from undertaking the relevant analysis -- or even knowing to ask the question." (Paper No. 149, 9)

### Whether the Specifications Support '766 Claims

Leviton argues that because the '766 claims are supported by the exact same patent specification (written description) filed by its inventors in 1999, the '766 patent predates the Germain application, and the Germain cannot be prior art. (Paper No. 147, 17) Leviton continues that the fact that the PTO determined that the specification fully supported the claims of '766, including those new claims not present in the parent application, is evidence that the '766 patent was invented years before the Germain application and is not prior art. (Paper No. 147, 7) While the specification of the invention did not change with the filing of the '766 application, and the specification does in fact predate the Germain application, the claims filed in the '766 application are not the same as those filed in its parent application, and were indeed revised before the filing of the '766 application in 2004 to cover newly discovered infringing

29

GFCI products. (Paper No. 147, 6-8) Meihao's inequitable conduct
argument hinges on its allegation that the new claims
incorporated into the '766 patent were not invented by the listed
inventors of the '766 patent, but by the inventors of the Germain
application, and were included in "an obvious attempt to broaden
the claim language to cover Meihao's GFCIs." (See Paper No. 145,
10) Meihao asserts that Leviton copied these claims from the
pending Germain application into the '766 patent in order to get
the benefit of the earlier filing date accorded to '766 and
eliminate years of prior art. (Paper No. 145, 24) ("By copying
the claims of the '766 patent from the Germain application,
Leviton attempted to move the claimed priority date for those
claims back three and a half years, from February 3, 2003...to
August 20, 1999. That made the claims much more valuable—and more
likely to issue in the first place—in the '766 patent than they
would have been in the Germain application, because the change
eliminated three and a half years of potentially invalidating
prior art.").

     As the law cited above makes clear, claims may not be
incorporated into an invention if they were not appreciated by an
inventor at the time of the invention's conception, even if the
specification can support them. See Invitrogen Corp. v. Clontech
Labs., Inc., 429 F.3d 1052, 1063 (Fed. Cir. 2005) ("[C]onception
requires that the inventor appreciate that which he has
invented."); Hitzeman v. Rutter, 243 F.3d 1345, 1358-59 (Fed.

Cir. 2001) ("[A]n inventor who failed to appreciate the claimed inventive features of a device at the time of alleged conception cannot use his later recognition of those features to retroactively cure his imperfect conception."). This is because the claims define the scope of protection granted by a patent. See Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" quoting Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)); see also Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[W]e look to the words of the claims themselves ... to define the scope of the patented invention."); Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996) ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims."). The fact that an invention is capable of features beyond those appreciated by the inventor at the time of its conception does not mean that he can later assert that those features are covered by his patent by expanding the claims. Indeed, the opposite is true. To permit such an assertion would allow an inventor to greatly expand the scope of his patent to cover features of the invention he did not truly invent himself. Here, the revised claims of the '766 patent include terms of art

31

(such as "movable bridge") not present in the patent
specification or any of the parent patents, but which abound in
the Germain application. (<u>Compare</u> Paper No. 145, Ex. 11 (Germain
Application) <u>with</u> Paper No. 145, Ex. 13) Such evidence strongly
suggests that disclosure of the Germain application may have
raised a question as to whether the '766 patent specification
actually supports the claims. The fact that the patent examiner
did not reject the '766 claims for inadequate support under § 112
is not definitive on the question of Leviton's duty to disclose.
The Court agrees with Meihao's conclusion: it is unknown "what
analysis the examiner may or may not have performed as to the
written description requirement of § 112, ¶ 1. What is clear is
that the examiner acted in the dark. Leviton withheld the very
reference that would have caused any reasonable examiner to
question the '766 patent application's compliance with the
statute." (Paper No. 149, 9) This Court is not deciding whether
the examiner's decision that the '766 patent specification
supported the claims is correct,[14] nor whether disclosure of the
Germain application would compel a decision that the
specification does not support the claims. The only question that
matters at this point of the inquiry is whether disclosure of the

---

[14] Additionally, Meihao disputes that the patent examiner "found" that
the specification supports the claims of '766 patent "as no such
finding is explicit in the prosecution history." (Paper No. 149, 9)
While acknowledging that it may be implicit, the Court need not
resolve this, as the patent examiner's ultimate finding is not
controlling on the issue of duty to disclose.

Germain application could have raised questions as to compliance with § 112, ¶ 1, such as to raise a prima facie case of unpatentability or whether a reasonable examiner would have found the information important. The Court has concluded that as to the question of compliance with § 112, the Germain application likely would have raised questions regarding inventorship or the specifications' support for the new claims in the '766 patent to a reasonable examiner, thereby making the Germain application material.

## Double Patenting

There is also a dispute as to whether the law required disclosure of the Germain application as potentially serving as the basis of a double patenting rejection, and thus whether the Germain application was material to the patentability of the '766 application on this basis. Leviton never makes a substantive, factual argument that the Germain application could not serve as the basis for a double patenting rejection of '766. Indeed, Narcisse in his deposition stated that: "if two different inventive groups tried to submit the same claim in two different applications, both were owned by Leviton, that could give rise to a double patenting rejection." (Paper No. 117, Ex. 13) Rather, Leviton relies solely on legal arguments, which this Court rejects.

While this Court has concluded that Narcisse violated 37 C.F.R. § 10.23(c)(7) and copied the claim language, that

33

conclusion is not necessary to confidently say that a patent
examiner would find the Germain application important. Disclosure
of a copending patent application with identical or strikingly
similarly worded claims is required even if the language is not
"copied," as such copending applications are clearly material
when they could serve as the basis of a double patenting
rejection. See MPEP § 2001.06(b) (discussing the "duty to bring
to the attention of the examiner, or other Office official
involved with the examination of a particular application,
information within their knowledge as to other copending United
States applications which are "material to patentability" of the
application in question). Disclosure of such applications is
obviously necessary to facilitate the PTO doing its job. The
basic premise of patent law dictates that a company or person may
not claim the same invention or obvious modifications of the same
invention in more than one patent. In re Paolo Longi, et al., 759
F.2d 887, 892 (Fed. Cir. 1985); see also Donald S. Chisum, Chisum
on Patents § 9.03 (2008). This premise stems from "the policy
that the public should be able to act on the assumption that upon
expiration of the patent it will be free to use not only the
invention claimed in the patent but also modifications or
variants which would have been obvious to those of ordinary skill
in the art at the time the invention was made. . ." Paolo Longi,
759 F.2d at 892-93 (quoting In re Zickendraht, 319 F.2d 225, 232
(1963) (Rich, J., concurring)). Thus, if the PTO determines that

34

a person is seeking to obtain a second patent for the same invention or an obvious modification, it will issue a double patenting rejection to deny the second patent. <u>Id.</u> The Federal Circuit has recognized that commonly-owned patents by different inventors can serve as the basis for double patenting rejections, <u>see</u> <u>Paolo Longi</u>, 759 F.2d at 892 (collecting cases), and Congress has noted that such rejections are "necessary in order to prevent an organization from obtaining two or more patents with different expiration dates covering nearly identical subject matter." 1984 U.S.C.C.A.N. 5834.

The Federal Circuit has held that "under the reasonable examiner standard of materiality, 'an application was highly material to the prosecution of an application where it could have <u>conceivably</u> served as the basis of a double patenting rejection.'" <u>Dayco</u>, 329 F.3d at 1365 (quoting <u>Akron Polymer Container Corp. v. Exxel Container, Inc.</u>, 148 F.3d 1380, 1382 (Fed. Cir. 1998)(emphasis added)). As previously discussed, Leviton has conceded that the Germain application and the '766 application have similar claims and some identical language, and the evidence confirms that many claims are identical, or very nearly so. These similarities alone convince the Court that the Germain application is highly material to the prosecution of the '766 patent, because it could have "conceivably" served as the basis of a double patenting rejection of the '766 patent. <u>See</u> <u>Akron</u>, 148 F.3d at 1382 ("In the light of the considerable

35

overlapping content in the specifications and claims of the two [copending] applications [belonging to the same company and prosecuted by the same lawyers], we concluded that the Venus application was highly material to the prosecution of the '829 patent, because it could have conceivably served as the basis of a double patenting rejection.") (referring to the court's previous decision in <u>Akron Polymer Container Corp. v. Exxel Container, Inc.</u>, 69 F.3d 554 (Fed. Cir. 1995) (unreported)); <u>see also</u> <u>Dayco</u>, 329 F.3d at 1365-66.[15] Additionally persuasive, however, is the undisputed fact that the '766 patent later served as the basis for a double patenting rejection in the Germain

---

[15] Leviton argues that a copending patent application can serve as the basis for a provisional double patenting rejection but not a statutory double patenting rejection under 35 U.S.C. § 101. <u>See</u> MPEP § 706.02. While apparently aimed to confound the issue, this proposition does not undermine the materiality of the Germain application. Federal Circuit precedent confirms that a copending application that could lead to a provisional rejection can be highly material. <u>See</u> <u>Dayco</u>, 329 F.3d at 1365-66 (determining that disclosure of the copending '196 application, filed in 1992, could have led to double patenting rejections in the applications that issued as the patents-in-suit, which all claim a 1989 filing date); <u>Akron</u>, 148 F.3d at 1382 (noting its prior conclusion that a copending application was highly material to the prosecution of the patent-in-suit, as it could have served as the basis of a double patenting rejection). The same Federal Circuit precedent also disproves another argument of Leviton's, that the PTO cannot issue a double patenting rejection due to the existence of a later-filed application. (Paper No. 147, 20) ("Also, no double patenting rejection of claims in the '766 application would be appropriate because the effective filing date of the '766 case is years earlier than the Germain - a fact immediately apparent on the face of the '766 application as filed in the PTO.") <u>See</u> <u>Dayco</u>, 329 F.3d at 1365-66 (holding that disclosure of the '196 application, filed in 1992, could have led to double patenting rejections in the applications that issued as the patents-in-suit, which all claim a 1989 filing date); <u>Akron</u>, 148 F.3d at 1381-82 (noting with approval its prior holding that disclosure of later filed Venus application could have led to a double patenting rejection in the Katz application).

application. (<u>See</u> Paper No. 145, Ex. 12, PTO communications

mailed 9/14/05 and 6/16/06.) The PTO determined that '766

disclosed nearly everything contained within the Germain

application. (<u>Id.</u>) This determination confirms for this Court

that the Germain application and the '766 patent do not contain

patentably distinct material. Had the Germain application been

disclosed in the '766 application, it may well have served as the

basis for a double patenting rejection in '766.

For all these reasons, the Court finds that the Germain

application was highly material to patentability under the

reasonable examiner standard and should have been disclosed to

the PTO.

## Failure to Disclose Related Litigation

There is also a dispute as to whether the law required

disclosure of related litigation, and whether this information

was material to the patentability of the '766 application on this

basis. The MPEP requires disclosure of related litigation:

> Where the subject matter for which a patent is being
> sought is or has been involved in litigation, the
> existence of such litigation and any other material
> information arising therefrom must be brought to the
> attention of the U.S. Patent and Trademark Office.
> Examples of such material information include evidence
> of possible prior public use or sales, <u>questions of
> inventorship</u>, prior art, allegations of 'fraud,'
> '<u>inequitable conduct</u>,' and '<u>violation of duty of
> disclosure</u>.'... Such information might arise during
> litigation in, for example, pleadings, admissions,
> discovery including interrogatories, depositions, and
> other documents and testimony.

MPEP § 2001.06(c)(emphasis added). Such information is material

"because it signals the examiner that other material information relevant to patentability may become available through the litigation proceedings." <u>Nilssen v. Osram Sylvania, Inc.</u>, 504 F.3d 1223, 1234 (Fed. Cir. 2007); <u>see also</u> <u>Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.</u>, 120 F.3d 1253, 1258 (Fed. Cir. 1997).

Meihao alleges that Leviton failed to disclose that the parent patents of the '766 patent have been litigated in at least twelve different lawsuits filed before the '766 patent issued, and that the validity and/or enforceability of the patents had been challenged in at least eight of the twelve cases. (Paper No. 145, 8 and Ex. 18, 22-25) Critically, in its opposition,[16]

---

[16] In an earlier submission, Leviton did question whether the "subject matter" of the related litigation (parent patents) and the '766 patent application was the same. (Paper No. 70, 5-6)  It was an incredible position which Meihao cogently debunked.

> If the '766 patent discloses different subject matter than the previously-litigated patents, it was improperly issued. The '766 patent purports to be a continuation of to patents at issue in the related cases.  A continuation application is an application, filed during the pendency of an application previously filed by the same inventor, that discloses and claims only subject matter disclosed in the original or parent application, and that is entitled to the parent's filing date.  <u>See</u> 35 U.S.C. § 120 (a continuation application may claim 'an invention disclosed...in an application previously filed in the United States'); 37 C.F.R. § 1.53(d)(2) (a continuation application must 'disclose[] and claim only subject matter disclosed in the prior application').  The specifications of the '766 and '558 patents are identical.  Leviton concedes as much in its Motion, and its actions during prosecution confirm that the patents have the same subject matter.  Leviton filed terminal disclaimers as to the '766 patent to avoid double patenting rejections.  Ex. B at LS03210-12.  If the '766 patent claims different from its predecessor patents, there would have been no reason for Leviton to file a terminal disclaimer.

Leviton does not deny that the parent patents of the '766 patent were involved in such litigation and involved the same "subject matter," and that the validity and/or enforceability of patents had been challenged in at least eight of the twelve cases. Indeed, in his deposition, Narcisse admitted knowing of the allegations in Meihao litigation of claims of invalidity and unenforceability of the patents in other litigation while prosecuting the '766 application. (Paper No. 145, Ex. 20, 162) Rather, Leviton argues that these other cases are not material, as none resulted in a finding that any claim of the '766 patent is invalid under 35 U.S.C. §§ 102-103, and also that the reexamination proceeding confirms that '766 was patentable over the prior art references cited in those other litigations. (Paper No. 147, 22) Again Leviton is ignoring the plain language of the patent manual and is arrogating to itself what it determines is "material" and subject to disclosure.

As to Leviton's first point, the Manual obviously does not require the disclosure of only successful litigation on the subject matter for which a patent is being sought. MPEP § 2001.06(c). The law clearly requires disclosure of litigation relating to an original patent when evaluating the patentability of a later patent, as such information is material to

---

(See Paper No. 76, 9.)

Leviton did not make this argument again.

39

patentability. See Nilssen, 504 F.3d at 1234 (determining that it was inequitable conduct to fail to disclose litigation involving patents pertaining to the same general subject matter claimed in the patents in suit, while the patents in suit were pending during the time of the litigation); see also Critikon, 120 F.3d at 1258. As stated earlier, it is not this Court's job to determine whether the related litigation, if disclosed, would have prevented the '766 patent from issuing. In this proceeding, it is sufficient that this Court is confident that a reasonable examiner would have found the existence of litigation challenging the validity of the '766 parent patent highly important in evaluating the patentability of the '766 patent. Leviton's failure to disclose related litigation in its prosecution of the '766 patent was thus material. Notwithstanding the indisputable duty to disclose litigation involving the same subject matter, and the undisputed fact that there was litigation involving the same subject matter as of the '766 application, Leviton neither disclosed the related litigation nor provided in this case any good faith explanation for not disclosing the related patent litigation under patent law.

Leviton's second point is also unavailing. At the September 3, 2008 hearing, Leviton argued that on re-examination it submitted the Germain application and information on related litigation, that the patent examiner considered it and nonetheless affirmed the patentability of '766. In furtherance of

40

this argument, Leviton submitted the Declaration of James Hosmer,
one of its attorneys, attaching parts of the record of the
reexamination of the '766 patent, including materials Leviton
submitted. The submission consisted of an August 7, 2007 letter
from Claude Narcisse to the Commissioner on Patents, enclosing a
memorandum style "Information Disclosure Statement (17 pages) and
the Information Disclosure Statement by applicant (PTO Form
PTO/SB/08a (05-07). (Paper No. 155, Ex. H)

Meihao responds that any "belated disclosure would neither
cure Leviton's inequitable conduct, nor have any bearing
whatsoever on the issues before this Court." (Paper No. 156, 8)
This Court agrees. Molins PLC v. Textron, 48 F.3d 1172, 1177
(Fed. Cir. 1995) is directly on point. In Molins the patentee had
withheld material information during original examination. On re-
examination, the examiner had the previously withheld
information, indicated he had considered it and re-issued the
patent. Notwithstanding this PTO action, the Federal Circuit
affirmed the lower court's finding that the patentee had
committed inequitable conduct because the documents "were not
cited when they should have been." Molins, 48 F.3d at 1182. In
reaching that conclusion, the Federal Circuit declared:

> [T]he standard to be applied in determining whether a
> reference is "material" is not whether the particular
> examiner of the application at issue considered the
> references to be important; rather, it is that of a
> "reasonable examiner." Nor is a reference immaterial
> simply because claims are eventually determined by an
> examiner to be patentable there over. Thus, the fact

41

>  that the examiner did not rely on [the withheld
>  reference] to reject the claims under reexamination . .
>  . is not conclusive concerning whether the reference
>  was material.

Id. at 1179-80 (internal citations omitted). Thus, the Court

agrees with Meihao that under these circumstances, the results of

the re-examination shed no light on the materiality question

before the Court. Moreover, this is an even stronger case than

Molins as the re-examination at issue did not involve the Germain

patent but four others. Further, Meihao does not concede that the

Germain application and related litigation was properly before

the patent examiner and/or was indeed considered by the patent

examiner.

Reference to the Germain application and to related

litigation was not included in the IDS form or format. See 37

C.F.R. § 1.98(a)(1)(I)-(iii). Meihao states, correctly, that the

examiner does not seem to be under any obligation to consider

information not complying with regulations, and that "as an

experienced patent prosecutor Mr. Narcisse would know that the

examiner would rely on the IDS list, not the accompanying

memorandum, when determining what references to review. MPEP

609.04(a)" (Paper No. 156, 8). See 37 C.F.R. § 1.97(I); MPEP §

609 ("A separate list is required so that it is easy to confirm

that applicant intends to submit an information disclosure

statement and because it provides a readily available checklist

for the examiner to indicate which identified documents have been

42

considered . . . use of form PTO/SB/08A and 8B, IDS to list the documents is encouraged.").

While Narcisse's memorandum style "IDS" does reference the Germain application (Paper No. 155, Ex. H, 14) it is one of 162 patent references and 13 non-patent documents in that memorandum. (<u>Id.</u>) The IDS does not reference the Germain application. (<u>Id.</u> at 20-48)

Narcisse, in his memorandum, discussed litigation involving the '558 patent (the parent patent to '766) (Paper No. 155, Ex. H, 4-6) and referenced litigation raising the issues of improper inventorship, claim copying, lack of specifications and support of claims. (<u>Id.</u> at 10-12) The IDS, though, does not reference the related litigation. Leviton did submit three litigation documents. However, as Meihao notes, these documents were three among over 200 documents disclosed. MPEP § 2004.13 ("It is desirable to avoid the submission of long lists of documents if it can be avoided... If a long list is submitted, highlight those documents which have been specifically brought to applicant's attention and/or known to be of most significance.") Additionally, there is absolutely no indication that the patent examiner on appeal "considered" the Germain application nor the related litigation. While the patent examiner noted on the IDS that Leviton submitted that "ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH/RB/," neither the Germain application nor the related litigation are scheduled on the IDS form.

43

Finally, the August 21, 2008 Answer of the Patent Examiner does not indicate his consideration of these documents and the issues they raised as to patentability. Rather it discusses and rejects arguments that certain claims in the '766 patent were anticipated by the Echtler, Sherman, Dufresne and Bereskin patents.

Having concluded that the Germain application and the related litigation were highly material to the patentability of the '766 patent, both of which Leviton concedes that it did not disclose, the question remains whether the facts establish that Leviton intended to deceive the PTO in its failure to disclose. If the facts demonstrate a threshold level of intent to deceive, this Court will proceed to the balancing inquiry and make an equitable determination regarding inequitable conduct.

### Intent to Deceive

Because a party can rarely prove intent to deceive by direct evidence, intent is "generally inferred from the facts and circumstances surrounding the applicant's overall conduct." Impax, 468 F.3d at 1374. Intent to deceive is inferred when "the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, indicate[s] sufficient culpability to require [such] a finding." Id. (citing Kingsdown Med. Consultants, Ltd. v. Hollister, Inc., 863 F.2d 867, 876 (Fed. Cir. 1988) (en banc in relevant part)); Li, 231 F.3d at 1381. A court "must decide whether the evidence respecting

44

culpable intent makes the fact reasonably inferable either way or
whether the evidence is so one-sided that the factual issue of
intent may be decided as a matter of law." Paragon Podiatry Lab.,
Inc. v. KLM Labs., Inc., 984 F.2d 1182, 1190 (Fed. Cir. 1993). In
a case involving nondisclosure of information, intent to deceive
is inferred when the evidence shows that "the applicant made a
deliberate decision to withhold a known material reference."
Molins, 48 F.3d at 1181 (Fed. Cir. 1995); see also Eli Lilly, 471
F.3d at 1382.

"[A] finding that particular conduct amounts to 'gross
negligence' does not of itself justify an inference to intent to
deceive. . ." Kingsdown Medical Consultants v. Hollister
Incorporated, 863 F.2d 867, 876 (Fed. Cir. 1988). "Gross
negligence may or may not compel an inference of an intent to
mislead. Such an inference depends upon the totality of the
circumstances, including the nature and level of the culpability
of the conduct and the absence or presence of affirmative
evidence of good faith." Hewlett-Packard Co. v. Bausch & Lomb
Inc., 992 F.2d 1556, 1562 (Fed. Cir. 1989). In inferring intent
to deceive from the facts and circumstances surrounding gross
negligence, the Federal Circuit has distinguished between
situations where counsel makes an error "which by definition
results from inattention," and those "more egregious acts of
omission and commission that have been seen as reflecting the
deceitful intent element of inequitable conduct in our cases."
Kingsdown, 863 F.2d at 875; compare Kingsdown (finding no intent

45

to deceive when counsel mistakenly copied a claim from an
unamended version of the patent, rather than the later amended
version, into a continuing application) with Molins, 48 F.3d at
1181-82 (finding that intent to deceive is properly inferred when
an experienced patent practitioner, aware of the duty to disclose
material information, knew of a highly material reference but did
not cite it). As discussed more fully below, the facts and
circumstances of this case clearly place it in the latter
category. Moreover, "[i]ntent may be inferred where a patent
applicant knew, or should have known, that withheld information
would be material to the PTO's consideration of the patent
application." Critikon, Inc. v. Becton Dickinson Vascular Access,
Inc., 120 F.3d 1253, 1256 (Fed. Cir. 1997). The Federal Circuit
continued in Critikon that:

> It is axiomatic that '[c]lose cases should be
> resolved by disclosure, not unilaterally by
> applicant. This sentiment is also repeatedly
> reflected in The Manual of Patent Examining
> Procedure (MPEP), which, although it does not
> have the force of law, is well known to those
> registered to practice in the PTO and
> reflects presumptions under which the PTO
> operates.

Id. (internal citations omitted)

"A party charging inequitable misconduct may make a prima
facie case by showing an unexplained violation of the duty of
candor.  In a responsive denial, the patentee may set forth facts
which show that under the particular circumstances as the
applicant and/or his attorney perceived them, an inference of
wrongful intent should not be drawn. Facts showing, for example,

46

their good faith mistake in the law or the facts or mere
negligence may be enough to raise a genuine dispute.  Absent
explanation, the evidence of a knowing failure to disclose...
reasonably supports an inference that the inventor's attorney
intended to mislead the PTO." <u>Paragon Podiatry</u>, 984 F.2d at
1192.  Moreover, summary judgment on equitable conduct has been
granted "where for example 'the affidavits to explain the
representations made to the PTO were' bare declaration[s] of lack
of intent to mislead' and the explanations provided in the
affidavits were either 'non-responsive' or lacked evidentiary
support.' [But] summary judgment [has been refused] where the
plaintiff submitted an affidavit that 'set forth a non-frivolous
explanation that could lead a finder of fact to determine that
his declaration [to the PTO] was not false or misleading ... or
where the plaintiff state[d] facts supporting a plausible
justification or excuse for the misrepresentation'" <u>Digital</u>
<u>Control, Inc. v. The Charles Machine Works</u>, 437 F.3d 1309, 1313-
14 (Fed. Cir. 2006) (internal citations omitted).

The Court has reviewed all the facts and circumstances
surrounding Leviton's conduct at issue here including any
evidence indicative of good faith.  In doing so, the Court has
concluded that Leviton intended to deceive the PTO, based on the
following findings:

- Mr. Narcisse, of Greenberg Traurig who prosecuted both
  the Germain and '766 patent applications, is a highly
  experienced patent lawyer.

- He and his firm were longtime counsel to Leviton.

47

- He was knowledgeable about patent law, regulations and manual provisions which mandate, or at least strongly counsel, disclosure of the Germain application and related litigation.

- He drafted both the Germain and '766 patent applications within a relatively short time period.

- Considerable parts of the claim language in the Germain and '766 applications are identical or substantially similar.

- His (and Leviton's) explanations (or failure of explanation) for why he did not advise the PTO of the Germain application and related litigation notwithstanding his knowledge of the duty to disclose were unconvincing and implausible in light of his experience and knowledge.

- His (and Leviton's) explanation (or lack of same) for the identical or substantially similar claim language in the Germain and '766 applications and his failure to notify the PTO of the copying was unconvincing and implausible in light of his experience and knowledge.

- Leviton had a strong motive to deceive.

- There is no evidence of countervailing good faith in Leviton's dealing with the PTO.

These facts and circumstances relevant to the Court's conclusion of intent to deceive will be discussed further below.

### Narcisse's Patent Law Experience and Knowledge

Narcisse is a very experienced patent attorney. Narcisse worked at a patent boutique firm after graduating law school in 1991 for about four years (Paper No. 145, Ex. 20, 11-12) He became a member of the patent bar in 1995, at which time he says he became very familiar with the laws governing patents, including the MPEP and 37 CFR. (Paper No. 145, Ex. 20, 26-28)

48

About two years after leaving that firm, he went to work for Lucent Technologies, where he did mostly patent prosecution work, and prepared and prosecuted at least 40 applications. (Paper No. 145, Ex. 20, 14-17) He then went to Greenberg Traurig, where he immediately began patent work for Leviton. (Paper No. 145, Ex. 20, 18-19) He has prepared more than 20 applications for Leviton. (Paper No. 145, Ex. 20, 22) He states that he keeps up with the changes in patent law by reading articles, noting rule changes, and attending courses. (Paper No. 145, Ex. 20, 28-29)

The Germain application was filed on October 22, 2003 and claims priority to February 3, 2003. It was filed and prosecuted by Greenberg Traurig attorneys Paul J. Sutton, Barry Magidoff, and Claude Narcisse. Greenberg Traurig has been patent counsel for Leviton in many cases and for many years, before Narcisse joined the firm. (Paper No. 145, n.2 & 3 and Paper No. 70, 3.) Its claims, like those in '766, were drafted by Narcisse. (Paper No. 145, Ex. 20, 54-55) It lists Frantz Germain and five others as co-inventors. (Id.) On April 19, 2004, Narcisse filed the '766 application and drafted its claims. (Id. at 39, 52) It lists DeSalvo and Ziegler as co-inventors. (Id. at 69-72) Narcisse admits the language of Claim 31 of the Germain application is "identical" with the language of Claim 1 of the '766 application except that Claim 31 refers to "a moveable bridge" while Claim 1 of '766 refers to "at least one moveable bridge." (Id. at 57-60).

In his deposition, Narcisse admitted that he was aware of

49

the existence of the Germain application during the prosecution of the '766 patent. (Paper No. 145, Ex. 20, 116) He stated that he did not disclose the Germain application to PTO during prosecution of the' 766 patent, because he thought "the Germain application [was] not a prior art reference to the '766 application..." (Id. at 116-117)

As discussed above in regard to materiality, there are several relevant provisions of the patent law, some of which would mandate, and others at least strongly counsel, disclosure of the Germain application and related litigation.

In his deposition, Mr. Narcisse acknowledged the provisions of patent law appearing to require disclosure. Narcisse readily acknowledged his duty of candor set out in 37 C.F.R. 1.56. Furthermore, Narcisse acknowledged that the MPEP advises practitioners to disclose information to the PTO when there is even the slightest suspicion that its disclosure is mandated by the rules, (Q; "[Is it] your understanding that in cases which are not entirely clear, it is better to disclose the information to the Patent Office and let the Patent Office decide what is material and what is not?" A: "Yes, that's true.") (Paper No. 145, Ex. 179-80.) The MPEP advises practitioners specifically on the broad scope of the duty to disclose: "When in doubt, it is desirable and safest to submit information. Even though the attorney, agent, or applicant doesn't consider it necessarily material, someone else may see it differently and embarrassing

50

questions can be avoided." MPEP § 2004.10. "In short, the
question of relevancy in close cases, should be left to the
examiner and not the applicant." <u>Id.</u> (quoting <u>U.S. Industries v.</u>
<u>Norton Co.</u>, 210 USPQ 94, 107 (N.D. N.Y. 1980)); <u>see also</u> <u>LaBounty</u>
<u>Mfg., Inc. v. U.S. Int'l Trade Comm'n</u>, 958 F.2d 1066 (Fed. Cir.
1992).

**37 C.F.R. § 10.23(c)(7) (Obligation to**
**Disclose Copying of Claims)**

As to the 37 C.F.R. § 10.23(c)(7) duty to advise PTO of
information identifying patent or patent application of another
from which one or more claims have been copied, Mr. Narcisse
similarly admitted his knowledge of the provision. (<u>See</u> Paper No.
145, Ex. 20, 137)

As to the copying of claims from the Germain application
into the '766 application, Narcisse does deny "copying" the
claims, (Paper No. 145, Ex. 20, 125), but acknowledges that *he*
*alone* drafted the claims in both applications. (<u>See</u> Paper No.
145, Ex. 20, 54 (Q: "And who wrote the claims in [the Germain]
application?" A: "I did." Q: "Did anyone assist you in drafting
the claims?" A: "No."), 55-56 (Q: "Did anyone assist you in
drafting the claims in the '766 patent application?" A: "I don't
believe so.").) He also acknowledges the similarity of the claim
language of the two patent applications, ("I was aware that there
were claims in the '766 application that were very similar to
initially filed claims in the Germain application.") (Paper No.

51

145, Ex. 20, 208), and denies that the similarity of language was a coincidence, (Q: "Are you saying the similarity between the claim language is a coincidence?" A: "I'm not saying that.") (Paper No. 145, ex. 20, 125) Neither in his deposition nor in any affidavit to the Court did Narcisse (or Leviton) provide any explanation - plausible or otherwise - why Leviton and its attorneys did not advise the PTO of the copying of claims from the Germain application to another.

This Court does not know by what mental device or artifice Mr. Narcisse testified that he did not "copy" the claims in the face of identical language, but the only logical inference from his testimony and the claim language itself is that he copied the claim language from the Germain application into the '766 application.

As to counsel's obligation to disclose claims that have been copied from one application to another, see 37 C.F.R. § 10.23(c)(7), in its opposition, Leviton artfully but transparently attempts to dodge the question of copying of claims. (Paper No. 147, 20-21) Leviton does not argue that it or its counsel did not copy claims from the Germain application into the '766 application. Indeed, Leviton does not address copying as a matter of fact at all (it would, of course, be difficult to do so now having wrongfully instructed its counsel not to answer such questions at their depositions). Rather, Leviton attempts to ignore this key issue, arguing instead (and irrelevantly to the

point of inequitable conduct), that "the examiners in both the '766 and Germain applications reviewed the applications in light of Section 112 (as they are required to do) and never rejected the claims for inadequate support under Section 112, first paragraph." (Paper No. 147, 20) That position does not address the fact of copying (which under 37 C.F.R. § 10.23(c)(7) must be revealed to PTO) nor the materiality of the Germain application to the '766 patent with their identical or substantially similar claims - regardless of whether proven to be "copied" or not.

But, despite his knowledge of the duties of disclosure, Narcisse still failed to disclose the Germain application, (Q: "Did you ever disclose the existence of the Germain application to the PTO during the prosecution of the '766 patent?" A: "No.") (Paper No. 145, Ex. 20, 116) Narcisse also admitted that he freely followed language from another Leviton owned patent application (perhaps, he says, '558, parent patent to '766) in drafting the Germain application. (Id. at 152) He offered no explanation as to why he did not advise the PTO of the Germain application in light of its "copying." He simply refused to admit to the technical "copying" de jure of the Germain claims into the '766 application while admitting to the de facto acts of copying. A comparison of the language of the claims of the Germain and '766 applications makes his deposition testimony incredible. (Compare Paper No. 145, Ex. 11 (Germain Application) with Paper No. 145, Ex. 13 ('766 application) and n.14 supra). When asked if

53

he had "ma[d]e a determination not to disclose that there claims

in the '766 application that were very similar to initially filed

claims in the Germain application] to the Patent Office," Mr.

Narcisse answered:

> I don't think there was any conscious
> determination to do it. It was simply not
> material, and so it was not something that
> you had to consciously make a determination.
> It was not material to the patentability of
> the claims of the '766 application.

(Id. at 209) Of course, 37 C.F.R. § 10.23(c)(7) does not qualify

disclosure of copying only if it is "material."

### 37 C.F.R. § 1.604(b) and MPEP 2001.6(b)

As to MPEP 2001.06(b) (Applicants "have a duty to bring to

the attention of the examiner, or other Office official involved

with the examination of a particular application, information

within their knowledge as to other co-pending United States

applications which are 'material to patentability' of the

application in question."), Narcisse said he understood it "was a

requirement at the time you were prosecuting the '766 patent

application?" He also admitted that the Germain and '766

applications were "co-pending" at the time of the prosecution of

the '766 application. (Id. at 154) As to 37 C.F.R. 1604(b),

"[w]hen an applicant presents a claim known to the applicant to

define the same patentable invention claimed in a pending

application of another, the applicant shall identify that pending

application, unless the claim is presented in response to a

54

suggestion by the examiner." Narcisse said he understood it to be
part of his duty of disclosure with respect to prosecuting
patents before the patent office at the time of the '766
prosecution." (Id. at 176-77) However, Narcisse questioned
whether this provision mandated the disclosure of the Germain
application because the regulation refers to an application "of
another," and both applications were owned by Leviton. (Paper No.
145, Ex. 20, 177-78) Importantly, his opinion on this point was
tentative "Im not sure if this rule applies." (Id. at 178) "I
don't think it does." (Id.) But notwithstanding the tentativeness
of his opinion (upon which he did not disclose the Germain
application to the PTO), he did not discuss the questions with
anyone. (Id. at 215) He did, however, agree in principle that in
terms of the duty to disclose "in cases which are not entirely
clear, it is better to disclose the information to the Patent
Office and let the Patent Office decide what is material and what
is not." (Id. at 179-180)  As to this provision, the Court has
concluded that Meihao's – not Narcisse's -- interpretation of the
regulation and manual provision is correct.[17] The language of the
regulation and manual provision clearly refers to "another
[applicant]." Since only inventors can be applicants and since it

---

[17] Leviton cites the motions hearing held before this Court on
September 17, 2007 as evidence of Meihao's concession to this point.
(See Paper No. 130, 34) At the motions hearing, Ms. Manning made clear
that she would doublecheck applicability of these sections to patents
owned by the same assignee, and would need to reread the provisions to
provide a firm answer. (See Paper No. 130, 34)

is undisputed that the applicant inventors in the Germain and '766 applications are different, 37 C.F.R. § 1.604(b) unambiguously mandates disclosure of this information to the PTO. Indeed, Narcisse's bald assertion that no disclosure was required because of Leviton's ownership of both patents is without support in the language of the regulation and Narcisse offered no other support for his position.

Moreover, case law clearly provides that common ownership does not eliminate the possibility of a double patenting rejection. See Akron, 148 F.3d at 1383-84; Dayco, 329 F.3d at 1366. In fact, in answer to the question: "if the Patent Office had two claims with different inventive entities with almost identical wording, based on your experience and knowledge of Patent Office practice and procedure, would the Patent Office examiner at least initially have issued a double patenting rejection in one of those applications?" Narcisse stated that he "[doesn't] know what the examiner would have done." (Id. at 211) Interestingly, earlier in the deposition, he acknowledged unequivocally that a double patenting rejection was a possibility.

> Q: If two different inventive groups tried to submit the same claim in two different applications, but both were owned by Leviton, that could give rise to a double patenting rejection, isn't that right?
>
> A: Yes.

(Id. at 88)

56

When asked if the examiner would have inquired about the inventorship of the '766 patent, if faced with two claims with different inventive entities with almost identical wording, Mr. Narcisse answered: "Maybe. I don't know." (Id. at 211-212)

Narcisse also said during prosecution of the '766 patent, he did not think that the Germain application was "material" information (id. at 119 and 127), although his counsel did not let him answer why it was not material. (Id. at 120) His explanation as to why he did not disclose the Germain application, of which of course he was well aware, to the PTO during the prosecution of the '766 application was "[b]ecause the Germain application was not a prior art reference to the '766 application." (Id. at 117)   Leviton takes the position that the Germain application with a 2003 priority date was not a prior art reference to the '766 application because the '766 application enjoys the 1999 priority date of its parent patent. Even if this is assumed (and, of course, this is hotly contested by Meihao), the case law is clear that "[m]ateriality is not not limited to prior art but embraces any information that a reasonable examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a patient." Britol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., 326 F.3d 1126, 1234 (Fed. Cir. 2003); Dayco, 329 F.3d at 1363. Narcisse's view of law of materiality was plainly wrong.

MPEP 2001.06 (Related Litigation)

It is undisputed that Leviton knowingly failed to disclose related litigation involving the parent patents of '766. Narcisse stated that he was aware that MPEP § 2001.06 (c) imposed a duty to disclose related litigation. (Paper No. 145, Ex. 20, 156) He was aware that the '558 patent - the parent patent to '766 - was the subject of litigation (id. at 156-157) and, more specifically, of the allegations of invalidity and unenforceability of the '588 patent in the instant Meihao litigation. (Id. at 161-62) Similarly, he recalls involvement in three lawsuits involving the '558 parent patent, filed prior to the issuance of the '766 patent. (Id. at 205-206) Neither Narcisse in his deposition nor Leviton in any affidavits presented any factual explanation for failing to inform the PTO of the related litigation - MPEP § 2001.06(c). As discussed supra, Leviton's legal arguments in its briefing were without legal merit and unconvincing. Leviton has made no attempt to provide a good faith explanation for its failure to disclose the litigation. See Critikon, 120 F.3d at 1259 ("Given the materiality and the failure at any point to offer a good faith explanation of the pattern of nondisclosure, an intent to mislead may be inferred."). Considering the totality of the facts and circumstances, this Court finds Narcisse's explanations for his nondisclosure unconvincing and Leviton's otherwise failure of explanation unacceptable and without support in patent law.

Intent to deceive cannot be inferred from the decision to

58

withhold information when the reasons given for withholding are plausible. <u>Dayco</u>, 329 F.3d at 1367.  Conversely, as here, intent to deceive can be inferred from the non-disclosure, where the party gave unconvincing or no reasons for withholding information that patent law, regulation, MPEP and case law mandated, or strongly advised, to be disclosed.  Leviton gave no explanation - plausible or otherwise - why it did not inform the PTO of its "copying" of claims into the '766 patent application from the Germain application.  Narcisse simply - and incredibly - denied a <u>de jure</u> copying.  While the only logical inference from the facts is that he did in fact copy the claim language.  The Germain application was withheld from the PTO because it was not prior art or not material.  The information on co-pending applications was withheld because the inventions were owned by the same entity.  The information on related litigation was withheld, according to Leviton briefing because that related litigation was not successful.

The facts and circumstances indicate Narcisse's intentional, deliberate deception of the PTO. However, even if Narcisse's failure to disclose the Germain application, the copying of claim language and related litigation was based on gross negligence, namely, a mistaken belief that disclosure was not mandated by the laws of the PTO, this gross negligence "in this instance" is sufficient to support an inference of an intent to mislead or deceive the PTO, in light of all the facts. <u>See</u> <u>Hewlett-Packard</u>,

59

882 F.2d at 1562 (stating that "the proof of gross negligence may be circumstantial evidence which gives rise to an inference of intent to mislead in some instances"). Narcisse disregarded the clear command of § 10.37(c)(7) to disclose copying of claims from one application into another application. Narcisse's crabbed view that prior art was the only information material to patentability so he didn't have to advise the PTO of the Germain application is clearly wrong. Moreover, '766 was prior art to Germain only under his self-serving and questionable view of inventorship of the identical or substantially similar claims in both the Germain and '766 patent applications. Narcisse's professed knowledge of the law coupled with his failure to determine the scope of that law gives rise to such an inference, including a high level of culpability, in light of his experience. When placed in the larger context of Leviton's actions, Narcisse's errors and failures cannot be excused as the product of rushed inadvertence of albeit even an experienced professional.  His (and Leviton's) explanations and lack of explanations are implausible, and without support.  This Court therefore determines that the facts and circumstances compel an inference of Leviton's intent to mislead or deceive the PTO in its prosecution of the '766 patent.

### Leviton Had a Strong Motive to Deceive

Leviton had a strong motive to deceive the PTO, that is, to keep the previously filed Germain application from the patent

60

examiner for the '766 application as it might raise questions of
inventorship, whether the specifications support the claims or
questions of double-patenting and endanger the issuance of the
'766 patent, and might endanger the expedited PTO consideration
through its Petition to Make Special.  The '766 patent would be
far more valuable than the Germain patent in Leviton's business.
The Germain application only claims priority to February 3, 2003.
The '766 application claims a much earlier priority, to August
20, 1999. Meihao argued - and Leviton did not disagree - that
this earlier priority date "made the claims much more valuable
... in the '766 patent than they would have been in the Germain
application, because the change eliminated three and a half years
of potentially invalidating prior art" (Paper No. 145, 24) At the
hearing, Meihao's counsel reported that its product, embodying
apparently a new UL standard shipped into the United States after
August 20, 1999, but before February 3, 2003. Unless, she argued,
Leviton could identify specifications in a patent with an earlier
priority date than Meihao's ship date, that would support these
new claims (which read on Meihao's patent), these claims would be
anticipated by Meihao's product. Thus, there would appear to have
been a significant motive for Leviton to conceal the Germain
application from the '766 patent examiner. Paraphrasing Meihao's
counsel at the hearing, it is irrefutable that a patent examiner
might question the inventorship of the '766 claims by one set of
people when the same or very substantially similar claims were

61

said to be invented by another set of people only six months
earlier in the Germain application.

This Court acknowledges as does Meihao, that "there is
nothing improper, illegal or inequitable in filing a patent
application for the purpose of obtaining a right to exclude a
known competitor's product from the market; nor is it in any way
improper to amend or insert claims intended to cover a
competitor's product the applicant's attorney has learned about
during the prosecution of a patent application." Kingsdown
Medical Consultants, Ltd. v. Hollister, Inc., 863 F.2d 867, 874
(Fed. Cir. 1988).  However, as the Federal Circuit continued in
Kingsdown, "[a]ny such amendment or insertion must comply with
all statutes and regulations. . ." Id. The gravamen of Meihao's
inequitable conduct complaint is that Leviton's attorneys played
"fast and loose" with the governing law, ignoring their
overarching duty of candor and disclosure in complying with the
governing statutes, regulations and manual provisions. The Court
agrees.

### Absence of Countervailing Good Faith

Finally, there is no evidence of countervailing good faith
in Leviton's dealings with the PTO.  Akron Polymer Container
Corp. v. Exxel Container, Inc., 148 F.3d 1380 (Fed. Cir. 1998) is
highly instructive here.  The facts, with one notable exception,
are strikingly similar. It is fair to say that but for that
notable exception, the Federal Circuit would have found intent to

62

deceive and inequitable conduct. "But for the fact that Container actually disclosed the fact of co-pendency of the two applications to the PTO, while still failing to disclose the Venus application to the Katz application examiner, it could be argued that the other facts in this case are sufficient to support a threshold finding of deceitful intent by clear and convincing evidence." Id. at 1384. The plaintiff in Akron argued that Container intended to deceive the PTO during the prosecution of the '829 patent (the "Katz" application) by failing to inform the patent examiner of the "Venus" application covering "quite similar subject matter" filed some four months later. As here, both applications were assigned to the same company. That fact was immaterial to the Court's analysis. The Federal Circuit noted the critical factual findings of the district court:

> [T]he facts show that the same law firm and the same
> attorneys prosecuted both applications and that those
> attorneys were aware of the similarity of the
> inventions disclosed in the two applications. Indeed
> the facts support inferences that the prosecuting
> attorneys were aware of the overlap of the two
> applications and the possible consequences should the
> PTO find the invention not patentably distinct.

Id. at 1383.

The difference between the facts in Akron and this case is that the prosecuting lawyers did ultimately reveal the Katz application to the Venus application examiner after the notice of allowance for the Katz application but before issuance of the patent. Of course, after allowance, "[a]n application may be

63

withdrawn from issue at the initiative of the PTO . . ." Herbert

F. Schwartz, <u>Patent Law and Practice</u> § 8.V. (5th ed. 2006). Here,

Leviton's attorneys did <u>not</u> advise the patent examiner of the

Germain application <u>before</u> the issuance of the '766. Leviton,

however, argues that it did disclose the Germain application to

the patent examiner during the re-examination proceedings,

apparently proffering this fact as evidence of its good faith. In

the Declaration of James T. Hosmer, Leviton submitted parts of

the Re-examination file to the Court and asserted that several

references to the Germain application were submitted to the

patent re-examiner, including interrogatory answers in another

'766 patent infringement suit relating to the Germain

application, an earlier Meihao complaint referencing the Germain

application issue and an answer in another lawsuit referencing

the Germain application issue. (Paper No. 155-2, ¶¶ 6-8) The

notations of the examiner, Leviton argues, demonstrate that he

considered them in reaching his decision. (<u>Id.</u>) The Court has

considered this, but rejects it as evidence of any countervailing

good faith on several grounds.  As noted in the earlier

discussion, <u>supra</u>, on the materiality of the Germain application

and related litigation, first, the re-examination proceedings did

not involve the Germain application and the substantially similar

and in some instances identical claim language. In the request

for Inter Partes Preexamination dated June 6, 2005, the requester

stated that "the owner[s] of the '766 patent have made clear

their belief that this patent is valid and enforceable, not least through recent and continuing assertion of the '766 patent in various patent infringement actions brought in federal district courts." The requester sought to have Claims 1-22 of the '766 Patent reviewed in light of the Echtler, Sherman, Dufresne and Bereskin patents.

In its September 1, 2005 Decision Granting *Inter Partes* Reexamination, Examiner Ramon M. Barrerra confirmed the scope of the reexamination request, encompassing Claims 1-22, and those four patents. Examiner Barrerra subsequently confirmed the patentability of the '766 claims, and distinguished them from the claims contained in the four patents. That was the extent of the reexamination.

In Appellant's June 6, 2007 Redrafted Brief on Appeal the party that originally requested the reexamination appealed the decision of the Examiner, arguing that the Examiner erred by adopting "an excessively narrow claim construction," and that '766 was anticipated by each of the four patents. As stated in Leviton's Brief on Appeal, submitted to the PTO in June, 2006, "[t]he issues which may properly be considered in this Appeal are whether the inventions, as defined in claims 1 and 11 are anticipated under 35 U.S.C. § 102 (b) by the four <u>patents at issue in the Reexamination</u>." (emphasis added). In its brief, Leviton reasserted that only four patents were considered under 102(b) by the Examiner in the Reexamination proceeding: Echtler,

65

Sherman, Dufresne, and Bereskin.[18]

Leviton now asserts that its disclosure of the Germain application in the re-examination is evidence of its good faith. However, a patent reexamination is "intended to deal only with substantial new questions of patentability, limited to issues concerning prior art that were not before the examiner during the earlier examination." 69 C.J.S. *Patents* § 150 (citing <u>In re Portola Packaging, Inc.</u>, 110 F.3d 786 (Fed, Cir. 1997)). Reexamination is also "limited solely to a review of the claims for which reexamination was requested." MPEP § 2643; <u>see also</u> Donald S. Chisum, <u>Chisum on Patents</u>, § 11.07, n.35 ("The overall legislative purpose of reexamination...suggests that reexamination's scope should be limited generally to the question of patentability raised by the cited patents and printed publications.")(citing <u>In re Recreative Technologies Corp.</u>, 83 F.3d 1394, 1396 (Fed. Cir. 1996)); <u>In re Freeman</u>, 30 F.3d 1459, 1468 (Fed. Cir. 1994)("the ability of a patentee to amend claims during reexamination must be seen in light of the fundamental purpose of reexamination - the determination of validity in light of a substantial new question of patentability," raised by prior

---

[18] Leviton rejected the additional arguments made by the Appellant, which Leviton emphasized were not presented to the Examiner during the Reexamination. The goal was to defend the Examiner's decision, largely by asserting that the issues originally presented by the Appellant were narrow, and limited. In Appellant's Brief on Appeal, it attempted to broaden the scope of the original reexamination. However, the Examiner confirmed in his August 21, 2008 answer that the appealable issues were limited to those considered in the original reexamination and affirmed the original decision.

art.).  The reexamination was requested for a review of the

patentability of '766 claims, in light of the Echtler, Sherman,

Dufresne, and Bereskin patents.  Thus, the scope of the

reexamination was limited to a review of those four patents.

Moreover, emphasis was placed on the narrow scope of the

reexamination in Leviton's Brief on Appeal.

Leviton now points to the positive outcome achieved in the

reexamination in light of the disclosure of the Germain

application both as evidence of its good faith and the lack of

materiality of the Germain application. As discussed earlier, it

is not persuasive evidence of lack of materiality. The decision

of Examiner Barrerra, both originally and on appeal, did not

establish the general and absolute patentability of the '766

claims. Rather, it established patentability only against the

four patents at issue. The decision was not intended to

accomplish anything more. Nor, as discussed below, is it

persuasive evidence of good faith. First, it should be clear that

Examiner Barrerra's decision does not bear upon whether Leviton

has engaged in inequitable conduct or violated its duty of

disclosure. "The PTO will not consider breach of the disclosure

duty, that is, inequitable conduct, whether during the original

prosecution, a prior reexamination or reissue, or the current

reexamination, as a ground for rejecting the patent's claims."

Chisum, supra, at § 11.07. Thus, Examiner Barrerra's decision

confirming the patentability of the '766 claims is not direct

67

evidence of Leviton's fulfillment of its duty of candor.

Second, the Court agrees with Meihao that the timing and manner of Leviton's eventual disclosure of the Germain application to the PTO suggest bad, not good, faith and certainly brings it within <u>Akron</u>. (Paper No. 156, 7-8.) The disclosure was not made until August 7, 2007, during the appeal phase of the reexamination proceedings. Mr. Narcisse does mention the Germain application but indicates to the examiner that it is not material information and was one among 162 patent references and 13 non-patent documents. (Paper No. 155-6.) Moreover, Meihao observes correctly that the references cited in the August 7, 2007 memorandum are not the same as listed on the Information Disclosure Statement ("IDS"). The IDS forms disclose 196 patents or patent applications, not including Germain, as well as 13 non-patent documents. (<u>Id.</u>) It is only the IDS that bears the examiner's notations of his consideration. Meihao also argues that the examiner is not bound to consider his August 7, 2007 memorandum titled "Information Disclosure Statement" "as it is in fact <u>not</u> an IDS because it does not meet any of the requirements for the content of each page," citing 37 C.F.R. § 1.98(a)(1)(I)-(iii). Whether Meihao is correct or not that the examiner had no technical obligation to consider it, the presentation certainly was confusing and more importantly, there is no definitive indication that the examiner considered this non-IDS scheduled information regarding the Germain application and related

68

litigation in his rulings. In sum, the timing and manner of
Leviton's disclosure of the Germain application and related
litigation, suggests, in this judge's view, bad, not good faith.
See Molins PLC v. Textron, Inc., 48 F.3d 1172, 1184 (Fed. Cir.
1995) (Burying a particularly material reference in a prior art
statement containing a multiplicity of other references can be
probative of bad faith.) Leviton's "disclosure" of the Germain
application and related litigation in the appeal phase of the re-
examination proceedings was tailored less to enlighten and inform
the PTO than to provide an argument in this litigation that
disclosure was effected.  The intent to deceive finding is, quite
frankly, consistent with and bolstered by Leviton's obdurate and
unprincipled position on discovery during the course of this
case, discussed infra.

Because the evidence demonstrates threshold levels of
materiality and intent, the Court "must weigh them to determine
whether the equities warrant a conclusion that inequitable
conduct occurred." Molins, 48 F.3d at 1178. A finding of
inequitable conduct reflects a court's judgment that "the
applicant's conduct is so culpable that the patent should not be
enforced." Id. (citing LaBounty, 958 F.2d at 1070). Here, the
Court has determined that Leviton's failure to disclose the
Germain application was highly material to the prosecution of the
'766 patent, as it raises questions about misrepresentation of
inventorship, whether the specifications supported the claims and

could have conceivably served as the basis of a double patenting
rejection. <u>See</u> <u>Dayco</u>, 329 F.3d at 1365; <u>Akron</u>, 148 F.3d at 1382.
In the same way, disclosure of the copying of claim language from
the Germain application, involving the same subject matter but
different inventors would have been very important to a
reasonable examiner.  The Court also determined that the failure
to disclose related litigation was highly material.  The law
clearly required disclosure of such information which disclosure
might have spurned the examiner to further inquiry in light of
the litigation of the parent patent and allegations of
inequitable conduct.  The Court has also determined that the
facts and circumstances indicate that Leviton's conduct was so
culpable as to require a finding of intent to deceive on these
issues. The equities warrant a conclusion that inequitable
conduct occurred.   Furthermore, in light of the clear and
convincing evidence demonstrating high levels of materiality and
intent, this Court finds that Leviton's inequitable conduct
constitutes an independent basis for exceptionality under § 285.
<u>See</u> <u>Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.</u>, 279 F.3d
1922, 1034 (Fed. Cir. 2002); <u>Beckman Instrum., Inc. v. LKB</u>
<u>Produkter AB</u>, 892 F.2d 1547, 1551 (Fed. Cir. 1989); <u>Stevenson v.</u>
<u>Sears, Roebuck & Co.</u>, 713 F.2d 705, 713 (Fed. Cir. 1983); <u>Century</u>
<u>Wrecker</u>, 913 F. Supp. at 1292; <u>Tenax Corp.</u>, 22 U.S.P.Q. at 1268-
69.

     "Inequitable conduct in patent prosecution is an offense
70

against the PTO and the public." <u>Akron</u>, 148 F.3d at 1383.   Our
legal and regulatory system necessarily includes some <u>ex</u> <u>parte</u>
proceedings, from a U.S. Attorney's request for a search warrant
in a criminal investigation to a party's request for a temporary
restraining order in civil litigation, to an inventor's
application for a patent.   Each of these <u>ex</u> <u>parte</u> applications
are dependent on the scrupulous candor and integrity of the
single interested party before the decisionmaker.   In the absence
of the clarifying and probing of an adversary, the decisionmaker
must be able to count on the applicant's compliance with its duty
to the institution of the court or the regulatory agency, not
simply its duty to the narrower interests of its particular
client.   In its competitive rush to advance its client's business
interests, Leviton's counsel's stepped over the line, to the
detriment of not only Meihao but the well-being of the system.

## Frivolous Infringement

Meihao's second basis for an award of fees against Leviton
is Leviton's alleged pursuit of frivolous infringement claims for
months. (Paper No. 145, 8, 25) Meihao asserts that Leviton
pursued the case for nearly a year on allegations Leviton now
concedes are without merit. (Paper No. 145, 9) As discussed
above, Leviton brought this infringement suit with the knowledge
that the patent in suit was likely invalid due to its failure of
disclosure.   Based on this Court's finding of inequitable
conduct, the facts clearly show that Leviton pursued litigation

71

that it knew, or should have known, was baseless, sufficient to violate either Federal Circuit law or Federal Rule of Civil Procedure 11.

"Litigation misconduct and unprofessional behavior are relevant to the award of attorney fees, and may suffice to make a case exceptional under § 285." <u>Sensonics, Inc. v. Aerosonic Corp.</u>, 81 F.3d 1566, 1574 (Fed. Cir. 1996); <u>see also</u> <u>Rambus Inc. v. Infineon Tech. AG</u>, 318 F.3d 1081, 1106 (Fed. Cir. 2003); <u>Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.</u>, 279 F.3d 1022, 1034 (Fed. Cir. 2002). A case may be found exceptional both because of unjustified or frivolous litigation, as well as conduct that violates Federal Rule of Civil Procedure 11.[19] <u>Brooks</u>, 393 F.3d at 1381; <u>Beckman Instrum., Inc. v. LKB Produkter AB</u>, 892 F.2d 1547, 1551 (Fed. Cir. 1989). Federal Circuit law dictates that "[a] frivolous infringement suit is one which the patentee knew or, on reasonable investigation, should have known was baseless." <u>Stephens v. Tech International, Inc.</u>, 393 F.3d 1269, 1273-74

---

[19] "Rule 11 imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well grounded in fact, legally tenable, and 'not interposed for any improper purpose.'" <u>Cooter & Gell v. Hartmarx Corp.</u>, 496 U.S. 384, 393 (1990). The duty imposed by the rule is continuous, and requires that attorneys inquire into and acknowledge facts that reveal that their earlier reliance has become misplaced. <u>See</u> <u>Meadow Ltd. Partnership v. Heritage Sav. & Loan Assoc.</u>, 118 F.R.D. 432, 434 (E.D. Va. 1987). While this duty does not require the parties or counsel to dismiss the case once it appears baseless, it does apply to "every paper signed during the course of the proceedings and not only to the pleadings." <u>Brubaker v. City of Richmond</u>, 943 F.2d 1363, 1382 (4th Cir. 1991) (adopting the "snapshot" view of Rule 11, in which Rule 11 review focuses upon whether counsel's conduct comported with Rule 11 at the instant the signature was placed on the document).

(Fed. Cir. 2004) (quoting <u>Haynes Int'l Inc. v. Jessop Steel Co.</u>, 8 F.3d 1573, 1579 (Fed. Cir. 1993), <u>reh'g granted on other grounds</u>, 15 F.3d 1076 (Fed. Cir. 1994)). While the evidence must show that the litigation was pursued in bad faith, bad faith is inferred where the patentee is "manifestly unreasonable in assessing infringement, while continuing to assert infringement in court." <u>Eltech</u>, 903 F.2d at 811.

The above conclusion that Leviton committed inequitable conduct in prosecuting the '766 patent by failing to disclose the Germain application or copying or the related litigation is sufficient to determine that Leviton knew its infringement suit was baseless at the time of its filing, and impose fees. <u>U.S.A.I, L.P. v. Stryker Sales Corp.</u>, 267 F.3d 1370, 1386 (Fed. Cir. 2001) (Patentee with knowledge of his inequitable conduct "should be charged with the expense of defending against this frivolous lawsuit.") Independent of the inequitable conduct, however, there are disputes of fact which prevent resolution on this record of Meihao's charge that Leviton pursued and maintained frivolous claims.

Leviton filed its suit on March 31, 2005. It is undisputed that Meihao discontinued manufacturing the accused product in 2007 after making a design change to its GFCI products being sold in this country, and provided evidence of its revised product to Leviton on February 2, 2007. (Paper No. 145, Ex. 17, 6.) Leviton

concedes that by May 10-11, 2007,[20] it had confirmed that Meihao
had discontinued manufacturing and selling the original accused
infringing products. (Paper No. 147, 12, 25 ("By switching to a
new GFCI design, Meihao effectively conceded the injunction that
Leviton sought against the original accused product.").) Leviton
continued to pursue the case for nearly a year after receiving
evidence of Meihao's revised product, from February 2, 2007 until
its voluntary dismissal of the case on December 17, 2008.
Leviton did not move to dismiss the case either in February or
May, but attempted to settle, before moving for dismissal in
November.  (Id. at 13)  While Meihao denies that the lawsuit
motivated the change in its product design, this change at least
suggests that the filing of the action was justified.  The
reasonableness of Leviton's continued prosecution of the case
after February 2 (for 10 months) and prosecution as to the
modified Meihao product, is in dispute.  Leviton claims that it
needed time to review the modified product and confirm certain
matters on deposition.  Meihao disagrees.  After the May 2007
depositions, Leviton says it was trying to settle the case.
Since it sought damages as well as injunctive relief,
continuation of the suit while attempting to resolve damages (or
indeed the terms of a voluntary dismissal) does not seem

---

[20] Leviton acknowledges that Meihao produced the new, revised product
to counsel on February 2, 2007, but asserts that Leviton did not
confirm that Meihao was no longer importing and selling the original
accused product until May 10-11, 2007, when Leviton deposed Meihao
officials. (Paper No. 145, Ex. 17, 6; Paper No. 147, 12)

necessarily unreasonable.

But, Meihao argues that Leviton improperly accused the
modified products of infringing, demanded discovery about them
and took a position directly contrary to its representations to
the PTO so it could accuse Meihao's new design of infringement.
(Paper No. 145, 9) Leviton does not address Meihao's assertion
that Leviton (through its expert, Dr. De La Ree) "rewrote the
claim language ... to broaden the claim language to cover
Meihao's [new] GFCIs." (Id. at 10) On this record, the Court
cannot judge whether prosecution of the infringement claim
against the modified product for any period of time was frivolous
or not.  Accordingly, the Court cannot determine whether
Leviton's continued prosecution under these circumstances until
November, 2007 is sanctionable.  As Meihao notes, there was a
great deal of litigation activity after Meihao's submission of
samples of its new product (see Id. 14), which ultimately proved
totally unnecessary given Leviton's voluntary dismissal in
November.  In hindsight, a stay of proceedings should have been
requested, to allow a decision on any infringement of the new
Meihao product and negotiation of any damages or the terms of
dismissal without the additional, significant expense to Meihao.
However, the initial prosecution of the suit was improper and a
ground for imposition of fees for exceptionality.

**Refusal to Provide Discovery**

75

Meihao's third basis for asserting exceptionality is another form of litigation misconduct, Leviton's refusal to provide discovery. Meihao asserts that Leviton did not produce documents or appear for scheduled depositions, and made groundless objections. (Id. at 11, 25-26.) Prior to the dismissal of the lawsuit, this judge, as discovery judge, had conducted a review of two motions to compel filed by Meihao, and was mere days away from releasing an opinion granting the motion to compel Messrs. Sutton, Magidoff and Narcisse to comply with subpoenas (Paper No. 117) in its entirety and granting the motion to compel production of discoverable documents (Paper No. 116) in substantial part. (See Paper Nos. 116 and 117)  This intimate knowledge of the discovery in the litigation, combined with a  review of the record and submissions, compels the conclusion that Leviton indeed engaged in misconduct during discovery that is independently sufficient to make the case exceptional.

"Litigation misconduct and unprofessional behavior are relevant to the award of attorney fees, and may suffice to make a case exceptional under § 285." Sensonics, 81 F.3d at 1574; see also Rambus, 318 F.3d at 1106; Epcon, 279 F.3d at 1034. Indeed, "[i]t is the judicial duty to refuse to condone behavior that exceeds reasonable litigation tactics." Sensonics, 81 F.3d at 1575. In making determinations of exceptionality based on litigation misconduct, courts have considered late production of documents, withdrawal of patents near trial, failure to list

76

documents on a privilege log, false and misleading testimony, and misleading discovery responses. <u>See</u> <u>Rambus</u>, 318 F.3d at 1106; <u>Nilssen v. Osram Sylvania, Inc.</u>, 528 F.3d 1352, 1358 (Fed. Cir. 2008).

Here, Leviton's conduct "exceed[ed] reasonable litigation tactics." <u>Sensonics</u>, 81 F.3d at 1575.  Its litigation position at a number of discovery points was measured to maximize delay and cost and to thwart discovery on the key inequitable conduct defense. While the trial judge may be knowledgeable of other vexatious litigation conduct, this opinion will discuss the discovery conduct that demonstrates a modus operandi, that the Court cannot ignore.

First, on January 25, 2007, Meihao served deposition subpoenas duces tecum on Leviton's patent prosecutors, Messrs. Sutton, Magidoff and Narcisse of Greenberg Traurig for February 7, 8 and 9, starting at 9:00 a.m.  (Paper No. 70, ex. A-C.)  None of the deponents appeared on February 7; nor were any documents produced on February 5.  On February 7, Leviton belatedly (at 11:09 PM) filed a motion to quash the subpoenas and a protective order (Paper No. 70), arguing principally that the subpoenaed witnesses were also acting as Leviton's litigation counsel and need to depose had not been established.  This potential issue, of course, was known to Leviton since at least May 6, 2005, the filing of Meihao's complaint raising the invalidity and unenforceability of the '766 patent based on  inequitable

conduct. (Case No. 05-1243l, Paper No. 1) Leviton's litigation
position on this issue was without merit and resulted in delay
and expense.

First, the majority of cases and commentators provide that a
deponent (whether a party or non-party) must obtain an order
excusing his appearance before the date set for discovery.  8
Charles Alan Wright & Arthur R. Miller, Federal Practice and
Procedure § 2035 (2008)("At least with regard to depositions, the
order should ordinarily be obtained before the date set forth
discovery..."); 8 Moore's Answer Guide: Federal Pretrial Civil
Litigation § 8.62 ("Ensure that motion [for a protective
order]...will be filed prior to scheduled date for deposition.");
Hare v. Governmental Employees Ins. Co., 132 F.R.D. 448, 450
(E.D. Texas 1990) ("[A] deponent who realizes he cannot appear at
a scheduled deposition bears the burden...to get an order
postponing the deposition") Robert Billet Promotions, Inc. v. IMI
Cornelius, Inc., WL 672385 *2 (E.D. Pa. Nov. 8, 1995) ("A party
cannot, as defendants have done here, fail to attend a properly-
noticed deposition without a court order"); Alexander v. F.B.I.,
186 F.R.D. 78, 86 (D.D.C. 1998) ("The filing of a motion for
protective order does not automatically relieve a party from
attending a deposition.") King v. Fidelity Nat'l of Baton Rouge,
712 F.2d 188, 192 (5th Cir. 1983)("motion to quash must be not
only made but *granted* before the scheduled deposition to excuse
compliance.") Some courts are more lenient, requiring that the

78

deponent must, at least, apply for a protective order before the time set for the deposition.  See, e.g., East Boston Ecumenical Community v. Mastrorillo, 133 F.R.D. 2, 4 (D. Mass. 1990) ("[A] party cannot unilaterally decide that he or she is not going to attend a duly noticed deposition without at least applying for a protective order before the time set for the deposition").  Leviton neither got a judicial order nor applied before the 9:00 a.m., February 7 deposition.

Second, the law is likewise clear that a litigant company cannot thwart discovery of patent prosecution issues through retention of its patent prosecution counsel as its litigation counsel.  Notably, in its motion to quash, Leviton cites only general authorities on the propriety of depositions of opposing counsel in litigation (see Paper No. 70, 3-4), ignoring totally the sizable body of patent law recognizing the right to depose patent prosecutors, even if trial attorneys as well.

As Meihao pointed out in its opposition (see Paper No. 76, 12-13), courts regularly permit the depositions of patent prosecution counsel, finding the information sought relevant and the inquiry proper when a party raises the defense of inequitable conduct. See Genal Strap, Inc. v. Dar, 2006 WL 525794, *2 (determining that the patent prosecution attorney's deposition was crucial to the inequitable conduct defense); aaiPharma, Inc. v. Kremers Urban Dev. Co., 361 F. Supp. 2d 770, 774 n.3 (N.D. Ill. 2005) (stating that the deposition of counsel involved in

the prosecution of the patents in suit was relevant to the affirmative defense of inequitable conduct); <u>Alcon Labs., Inc. v. Pharmacia Corp.</u>, 225 F. Supp. 2d 340, 344 (S.D.N.Y. 2002) (allowing deposition of lead trial counsel who prosecuted patent - in suit because his "mental impressions during the patent prosecution period are at issue... due to the inequitable conduct defense"). <u>Environ Products, Inc. v. Total Containment, Inc.</u>, 41 U.S.P.Q. 2d 1302, 1306 (E.D. Pa. 1996) ("The affirmative defense of inequitable conduct makes [the attorney's] mental impressions during the re-examination proceedings an issue in this litigation.  A party is entitled to discover relevant, non-privileged information from any individual with access to such information, even when that individual is the opposing party's trial counsel); <u>Hay & Forage Industries v. Ford New Holland</u>, 132 F.R.D. 687, 690 (D. Kan. 1990) (allowing deposition of trial counsel who prosecuted the patent-in-suit because counsel "appears to be the best and perhaps only source for much of the information sought" about inequitable conduct); <u>Amicus Communications L.P. v. Hewlett-Packard Co., Inc.</u>, 1999 WL 33117227, at *2 (D.D.C. Dec. 3, 1999) ("several courts have allowed the depositions of patent prosecution counsel...")

In its motion and reply, Leviton grasps at straws, citing case law that does not involve patent infringement, inequitable conduct or any analogous situation. Leviton does not cite a single patent case challenging the sizable authority supporting

deposition.  Rather, Leviton cites Shelton v. American Motors
Corp., a product liability case which holds that trial counsel
must show that "no other means exist to obtain the information
[sought] than to depose opposing counsel."  805 F.2d 1323, 1327
(8th Cir. 1986).  Leviton states that the Fourth Circuit follows
Shelton, but does not cite a single Fourth Circuit case relying
on it, in the general context or the patent situation.  Moreover,
as the Alcon court stated, "Shelton was not intended to provide
heightened protection to attorneys who represented a client in a
completed case and then also happened to represent that same
client in a pending case where the information known only by the
attorneys regarding the prior concluded case was crucial." 225 F.
Supp. 2d at 343.  Thus, there is apparent unanimity among courts
that alleged infringers are entitled to the deposition of patent
prosecution counsel (even if trial counsel) where inequitable
misconduct is alleged.  As a legal commentator noted:  "Where
trial counsel prosecute the patent-in-suit and inequitable
conduct is pled, courts have almost without exception held that
the prosecuting attorney must be made available for deposition,
even though he is also trial counsel."  18 Geo. J. Legal Ethics
421, 460 (Spring, 2005).  While the author says "almost without
exception," in none of the cases he cites for this proposition
was a deposition denied except ResQnet.Com, Inc. v. Lansa, Inc.,
2004 WL 1627170 (S.D.N.Y. July 21, 2004). In that case, the
deposition was denied at least in part because the Court found

81

that the inequitable conduct defense had not been properly pled.

Quite simply, Leviton was unable to cite a single analogous case, involving patent prosecution counsel serving as trial counsel, where the court disallowed deposition on the issue of inequitable conduct, because there are none. Courts that have addressed this issue have made it abundantly clear: patent prosecution counsel cannot escape deposition merely because they currently serve as trial counsel in subsequent litigation.  Here, the depositions of Leviton's patent counsel were clearly relevant to Meihao's asserted defense of inequitable conduct.

In addition to arguing that Greenberg Traurig's status as trial counsel barred its lawyers' depositions as patent prosecutors, Leviton further argues depositions that Meihao essentially must prove its inequitable conduct claim before deposing counsel. Leviton imposed a requirement of patent prosecution unknown to the federal rules: Meihao must prove one of the elements of the inequitable misconduct - the materiality of the information allegedly improperly withheld from the PTO - before getting discovery on any aspects of inequitable conduct. (Paper No. 70, 7-10.) In deposing Leviton's patent counsel, Meihao sought to discover factual information relating to counsel's actions in prosecuting the '766 patent. Without this information, Meihao would be unable to prove the facts underlying its claim of inequitable conduct — that Leviton knew of the Germain application at the time it prosecuted the '766 patent,

82

knew of its materiality, knew of the law requiring disclosure of such material copending applications, but failed to disclose the Germain application anyway. (<u>See</u> discussion <u>supra</u> regarding Leviton's inequitable conduct.)

Furthermore, Leviton conceded in its motion to quash that depositions of trial counsel should be permitted if the party seeking them has shown that "no other means exist to obtain the information than to depose opposing counsel." (Paper No. 70, 6 quoting <u>Shelton</u>, 805 F.2d at 1327; <u>see also</u> <u>Hay & Forage</u>, 132 at 690 (finding that the requesting party demonstrated "sufficient need for the depositions [of patent counsel]" because counsel was "the best and perhaps the only available source for much of the information sought"). Although this concession reflects a stricter standard than perhaps warranted, even under this standard Meihao was entitled to depose Leviton's patent counsel. The facts clearly indicate that Meihao had no other way to discover information regarding patent prosecution counsel's actions and knowledge at the time Leviton prosecuted the '766 application. By Leviton's own admission, the law clearly indicates that Meihao should have been permitted to depose Leviton's patent counsel, even if trial counsel as well.

Leviton's untimely and unjustified motion to quash resulted in Meihao's expenditure of attorneys' fees in opposition and

delay in discovery on its inequitable conduct defense.[21]   Leviton

resisted and resisted the depositions of its patent prosecutors

and then _appeared_ to capitulate before any ruling was made. On

March 21, 2007, Greenberg Traurig moved to withdraw (Paper No.

85), which was granted the next day (Paper No. 87.) Subsequently,

two of Leviton's patent prosecutors - Messrs. Narcisse and

Magidoff - appeared for their depositions on April 4 and May 3.

However, Leviton counsel imposed numerous objections to Meihao's

questions and instructed them not to answer.  On instructions

from Leviton counsel, Narcisse refused to answer 37 questions and

Magidoff, 38. (Paper No. 117, 13, 18 and Ex. 14 and 16), almost

all on the basis of work product.[22] These questions attempted to

explore the relationship between the Germain application and the

'766 patent and the decision not to disclose the Germain

application to the PTO and conversations with co-counsel

regarding prosecution, conversations with inventors seeking facts

or technical information.  The claim language and actions taken

or not taken during prosecution - all highly germane - indeed

---

[21] The trial judge never ruled on the merits of the motion to quash, denying the motion as moot on May 30, 2007, as Greenberg Traurig had withdrawn as trial counsel. On February 26, 2007, Meihao filed a cross motion to compel compliance with subpoenas (Paper No. 77) affirmatively seeking relief - the depositions of Leviton's patent prosecutors. Judge Davis held this motion sub curia on May 23, 2007, and on May 24, 2007, referred all discovery to the undersigned judge.
[22] Of Narcisse's 37 questions, 32 evoked only work product objections, 3 attorney-client privilege, and 2 both. (Paper No. 117, Ex. 14.) Of Magidoff's 38 questions, 36 evoked only work product objections, and 2 evoked both work product and attorney-client privilege. (Paper No. 117, Ex. 16.)

critical - to Meihao's inequitable conduct defense. (See Paper No. 142, Ex. 21 and 22)

On the key issue of similarity of the claim language of the Germain and '766 applications, for example, Mr. Narcisse declined to answer each of the following questions, claiming the work-product exception:

- "Can you tell me with respect to Claim 1 where you got the language for Claim 1?" (Ex. 13 at 52: 13-15);

- "So isn't it a fact that Claim 1 of the '766 application was copied from Claim 31 of the Germain application?" (Id. at 60:15-17);

- "How can you explain [the almost identical language in the two claims]?" (Id. at 61:24);

- "Can you tell me where you got the phrase, 'movable bridge'?" (Id. at 62:16-17);

- "Did you discuss with Mr. Sutton before the '766 application was filed whether it would be appropriate to copy claims from the Germain application?" (Id. at 96:2-5);

- "Did you consider disclosing the Germain application to the PTO?" (Id. at 117:12-13);

- "Prior to the issuance of the '766 patent, did you consider whether the Germain application was prior art to the application?" (Id. at 118:19-22);

- "Why didn't you believe that [the Germain application] was prior art?" (Id. at 120:14-15);

- "So how could you say [the claims] weren't copied?" (Id. at 125:9-10);

- "How do you explain the similarity in claim language?" (Id. at 125:22-23); and

- "Did you ever consider whether the language of the '766 patent claims that you had drafted would be in violation of [the PTO rule prohibiting 'Knowingly

withholding from the Office information identifying a
patent or patent application from which one or more
claims have been copied']?" (<u>Id.</u> at 137:24-138:3).

Perhaps most importantly, Narcisse acknowledged that he <u>could</u>
explain the similarities in the claim in the two applications
language, (Paper No. 145, Ex. 20, 61 (Q: "Can you explain, Mr.
Narcisse, the almost identical language in the two claims?" A:
"Yes, I can."), but when asked to do so, counsel instructed him
not to answer. (Paper No. 145, Ex. 20, 61-62) (Paper No. 117, ex.
14 and 16, Paper No. 124, ex. 11) On July 6, 2007, Meihao filed a
motion to compel seeking, <u>inter alia</u>, another deposition of
Messrs. Narcisse and Magidoff where they would be ordered to
answer the questions that they were improperly instructed not to
answer.[23] (Paper No. 117)

During this Court's extensive review of Meihao's motion to
compel the depositions before Leviton's dismissal of the case, it
became clear that Leviton's conduct after producing counsel for
deposition was manifestly unreasonable and vexatious. (<u>See</u> Paper
Nos. 117, 121, and 124.)  First, Leviton's litigation position on
Meihao's proper line of inquiry in the Narcisse and Magidoff
depositions is indefensible.  In its motion, Meihao identified 37
questions that Narcisse refused to answer on instructions of
counsel, and 38 that Magidoff refused to answer, on instructions

---

[23] Meihao also asked for an order for Mr. Sutton to appear for
deposition as despite multiple requests. (<u>See</u> ex. 19-22 to Paper No.
117) This motion was referred to the undersigned judge. While a ruling
on the motion was not issued before Leviton's dismissal of the case,
the analysis was complete.

of counsel (Paper No. 117, 13, 18 & Ex. 14, 16.)  Leviton did not

attempt to justify <u>any</u> of its objections or instructions not to

answer on a question-by-question basis, nor even mention the

content of the disputed questions in its opposition.   This

disinterested and inadequate opposition once a motion was brought

is the clearest example of the vexatious nature of Leviton's

litigation conduct.  As Meihao observed, "[i]n the extensive

briefing on this issue, Leviton did not attempt to justify a

single specific objection and instruction not to answer." (Paper

No. 145, n.9 & 14.)  Instead, Leviton relies only on broad work

product allegations and its incorrect stance on the law of work

product as relating to inequitable conduct.  (<u>See</u> Paper No. 121.)

Leviton did not deny the relevance of the questions which

obviously went to the inequitable conduct defense but merely

attacked as "strained" and "unsupported" Meihao's allegations of

inequitable conduct defense.  Amazingly, Leviton did not do what

the law clearly requires a party who is asserting privilege to

do: demonstrate that all the elements of the privilege have been

met.  This failure of Leviton to meet its burden in and of itself

provides the basis to compel the answers.  <u>Victor Stanley, Inc.</u>

<u>v. Creative Pipe, Inc.</u>, 250 F.R.D. 251, 266-67 (D.Md. 2008).

Leviton's unsupported objections and instructions not to answer

demonstrate that Leviton was clearly resisting discovery to

postpone or prevent Meihao from uncovering the very facts

necessary to prove its inequitable conduct defense, rather than

87

on any good faith basis.

The burden is on the proponent of the privilege to demonstrate "not only that an attorney-client relationship existed, but also that the particular communications at issue are privileged [(confidential)] and that the privilege was not waived." Id. See also In Re: Grand Jury Subpoena, 341 F.3d 331, 335 (4th Cir. 2003) (citing United States v. Jones, 696 F.2d 1069, 1072 (4th Cir. 1982)); Accord United States v. Martin Marietta, 886 F. Supp. 1243, 1244 (D. Md. 1995). Similarly, it is the party invoking work product immunity that bears the burden of proving their preparation in anticipation of litigation. In re Minebea Co., 143 F.R.D. 494, 499 (S.D.N.Y. 1992).

As the Fourth Circuit explained in United States v. (Under Seal), "[i]n practical terms, this burden requires the proponent to explain, through *ex parte* submissions if necessary to maintain confidentiality, the significance or meaning of an otherwise cryptic document." 748 F.2d 871, 876 (4th Cir. 1984). When the requesting party challenges the sufficiency of the privilege assertion, the producing party bears the burden of establishing an evidentiary basis (such as an affidavit) to support each element of each privilege or work product protection sought, for each question or each document. Victor Stanley, 250 F.R.D. at 266-67. If the evidentiary basis is not established, the documents should be produced. Id. ("If...the requesting party challenges the sufficiency of the assertion of

88

privilege/protection, the asserting party ...bears the burden of establishing an evidentiary basis - by affidavit, deposition transcript, or other evidence - for each element of each privilege...claimed for each document or category of document produced because of the failure of the asserting party to meets its burden."). <u>See also</u> <u>Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust No. 1B</u>, 230 F.R.D. 398, 409-10 (D. Md. 2005); <u>Neighborhood Dev. Collaborative v. Murphy</u>, 233 F.R.D. 436, 442 (D. Md. 2005); <u>Byrnes v. Jetnet Corp.</u>, 111 F.R.D. 68, 71 (M.D.N.C. 1986). Thus, Leviton failed to mount any good faith defense of its obstructionist position in the Narcisse and Magidoff depositions.

Second, Leviton's opposition to these questions on the inequitable conduct defense on work product grounds was without colorable merit. Leviton argued both in the hearing and in its opposition to the further deposition of its patent prosecutors and to the production of certain documents that, under <u>In re Spalding Sports Worldwide, Inc.</u>, 203 F.3d 800, 807 (Fed. Cir. 2000), Meihao had to establish a prima facie case of common law fraud (not just inequitable conduct) to defeat attorney-client privilege or overcome work product immunity. (Paper No. 121, 512 <u>et seq</u>; Paper No. 122, 28-29). This is another of Leviton's novel and complex arguments, which on careful examinations proves wholly without merit.

Leviton appears to have greatly confused the controlling

law. First, Leviton over reads _Spalding_ by applying its holding
to work product immunity, when in fact _Spalding_ dealt only with
the attorney-client privilege. See _Spalding_, 203 F.3d at 803
(stating that the issue is "whether Spalding's invention record
is protected by the attorney-client privilege"). _Spalding_
considered the applicability of the attorney-client privilege to
invention records and the showing necessary to overcome that
privilege under the crime-fraud exception; it did not consider
what showing a requesting party must make in order to overcome
work product immunity. See _id._ ("[A] party challenging _the
attorney-client privilege_ must make a prima facie showing that
the communication was made in furtherance of a crime or fraud.")
(emphasis added). Second, Leviton neglects to note an important
difference between attorney-client privilege and work product
immunity. While Leviton correctly notes that both privilege and
immunity can be overcome by a showing of fraud sufficient to
invoke the crime-fraud exception, see, e.g., _Hercules_, 434 F.
Supp. at 153 (considering the applicability of the crime fraud
exception to both the attorney-client privilege and work product
immunity), work product immunity also can be overcome by a
showing of substantial need and undue hardship, which has nothing
to do with the crime-fraud exception. See, e.g., _id._ at 150
(noting that the work product doctrine protects documents
prepared in anticipation of litigation "unless substantial good
cause can be shown for its production"). The law of attorney-

client privilege cannot be imported wholesale to determine rights

under the work product immunity doctrine, as Leviton rather

indiscriminately seeks to do.[24]

---

[24] The different histories and rationales of the attorney-client
privilege and work product immunity show that Leviton cannot simply
disregard the law of work product immunity and apply in its place the
law of attorney-client privilege. The attorney-client privilege is the
oldest of all legal privileges for confidential communications, dating
back centuries. See Upjohn v. United States, 449 U.S. 383, 389 (1981);
Hunt v. Blackburn, 128 U.S. 464, 470 (1888); 3 Jack B. Weinstein &
Margaret A. Berger, Weinstein's Federal Evidence § 503.30 (Joseph M.
McLaughlin, ed., Matthew Bender 2d ed. 1997). Although the theory
behind the privilege has changed slightly throughout the years, the
privilege has always been considered essential to an effective, just,
and expeditious legal system. See Upjohn, 449 U.S. at 389 ("[The]
purpose [of the attorney-client privilege] is to encourage full and
frank communication between attorneys and their clients and thereby
promote broader public interests in the observance of law and
administration of justice."). The privilege remains largely
sacrosanct; there are only five specific enumerated exceptions: crime-
fraud exception, which excepts communications made in furtherance of a
crime or fraud; an exception for certain relevant communications by a
deceased client; one for communications relevant to a breach of duty
between the attorney and client; one for communications relevant to a
document to which the attorney is a witness; and a joint client
exception.
      The Supreme Court did not recognize an immunity for an attorney's
work product until 1947 in Hickman v. Taylor. 329 U.S. 495 (1947). In
1970, Congress codified the immunity in Rule 26(b)(3). Fed. R. Civ. P.
26 (b) (3). Both the Court and the Rules recognized a need for
protection of a lawyer's work product, but also that unlike the
attorney-client privilege, work product protection was not absolute:
"Where relevant and non-privileged facts remain hidden in an
attorney's file and where production of those facts is essential to
the preparation of one's case, discovery may properly be had."
Hickman, 329 U.S. at 511. In codifying Hickman, Rule 26 (b) (3)
confirmed that work product possessed only a qualified immunity,
discoverable "upon a showing that the party seeking discovery has
substantial need of the materials...and is unable without undue
hardship to obtain the substantial equivalent of the materials by
other means"). Fed. R. Civ. Pro. 26 (b) (3). See also 8 Charles Alan
Wright, Arthur R. Miller, & Richard L. Marcus, Federal Practice and
Procedure § 2025 (2d ed. 1994)); Handgards, Inc. v. Johnson & Johnson,
413 F. Supp. 926, 931 (N.D. Cal. 1976) (explaining the distinct and
different policies behind the attorney-client privilege and work
product immunity); Kirkland v. Morton Salt Co., 46 F.R.D. 28, 30 (N.D.
Ga. 1968) (finding that Hickman gave a lawyer's work product a
"*qualified immunity* rather than a *privilege*, with qualifications to be
determined upon the question of necessity or good cause as shown by
the facts in each case") (emphasis in original); City of Philadelphia

Leviton cites several cases to support its claim that

Spalding established that in a patent case, work product immunity

may be overcome only by showing a prima facie case of common law

fraud and not by demonstrating substantial need.  (Paper No. 121,

12-14.)  Despite that Spalding is central to its claim, Leviton

cites many cases that predate Spalding. Furthermore, like

Spalding, these cases all deal only with the application of the

crime-fraud exception to the attorney-client privilege and work

product immunity.[25]  Leviton misreads these cases by conflating

_____

v. Westinghouse Elec. Corp., 210 F. Supp. 483, 485 (E.D. Pa. 1962)
("[T]he work product principle is not and cannot properly be described
as a privilege. Some Courts have confused the situation by calling it
a qualified privilege, but it is not a privilege at all; it is merely
a requirement that very good cause be shown if the disclosure is made
in the course of a lawyer's preparation of a case.").

[25] See Danisco A/S v. Novozymes A/S, 427 F. Supp. 2d 443, 444-45
(S.D.N.Y. 2006) ("Defendant Novozymes moves to compel production of
certain documents withheld by plaintiff Danisco on grounds of
attorney-client or work product privilege, arguing that these
privileges are inapplicable because the documents were generated *in
furtherance of a fraud on the patent office*.") (emphasis added); Koch
v. Specialized Case Services, Inc., 437 F. Supp. 2d 362, 383-84 (D.
Md. 2005) ("When seeking the production of opinion work product *under
the crime-fraud exception*, the moving party must make an additional
showing.") (emphasis added); Vardon Gold Co., Inc. v. Karsten Mfg.
Corp., 213 F.R.D. 528, 535 (N.D. Ill. 2003) ("The *crime-fraud
exception* provides that communication normally protected by the
attorney-client privilege or work product doctrine are not protected
if they relate to communications made in furtherance of a crime or
fraud.") (emphasis added); Laser Indus., Ltd. v. Reliant Tech., Inc.,
167 F.R.D. 417, 425 (N.D. Cal. 1996) ("[W]e agree that courts should
use the more demanding common-law fraud standard when they determine
whether conduct in prosecuting a patent application justifies *piercing
the attorney-client privilege under the crime/fraud exception*.")
(emphasis added); Monon Corp. v. Stoughton Trailers, Inc., 169 F.R.D.
99, 101-02 (N.D. Ill. 1996) ("[I]n order to pierce *the attorney-client
privilege*, it is not enough to show merely inequitable conduct.
Rather, it is necessary for [defendant] to prove a prima facie case of
common law fraud.") (emphasis added) (internal citations omitted);
Starsight Telecast, Inc. v. Gemstar Development Corp., 158 F.R.D. 650,
655 (N.D. Cal. 1994) ("Documents or communications which otherwise are
protected by the *attorney-client privilege* may be discoverable *if made*

the showing required to obtain documents under the crime-fraud exception with the showing required to obtain documents by a demonstration of substantial need.

Given the historic and continuing differences in the attorney-client privilege and work product immunity, and the absence of any cases to support its argument that proof of common law fraud is required to overcome work product immunity in patent issues, this Court finds that Spalding's holding cannot be read to apply to work product immunity, and that a showing of substantial need and undue hardship is sufficient to overcome fact work product immunity.   Leviton's Spalding argument was a novel and wholly meritless argument.

---

*in furtherance of a crime or fraud*.") (emphasis added); Glaxo, Inc. v. Novopharm, Ltd., 148 F.R.D. 535, 541 (E.D.N.C. 1993) ("In order to pierce the attorney-client privilege [because documents were prepared in furtherance of a crime or fraud], Novopharm must make a *prima facie* showing of fraud"); Leybold-Heraeus Tech., Inc. v. Midwest Instrument Co., 118 F.R.D. 609, 615 (E.D. Wis. 1987) ("Documents which otherwise satisfy criteria for *attorney-client protection* may be discoverable if made in furtherance of a crime or fraud," but require the discovering party to make a prima facie showing that the withholding party "was engaged in or planning a crime or fraud when it sought the legal advice," and also that "the communications were made in furtherance of the fraud.") (emphasis added); Union Carbide Corp. v. Dow Chem. Co., 619 F. Supp. 1036, 1052 (D. Del. 1985) ("Where, as here, the question is not whether a patent is enforceable, but whether the protective shield of the attorney-client privilege may be pierced, the patentee's conduct must be measured against the traditional standard for fraud."); American Optical Corp. v. United States, 179 U.S.P.Q. 682, 684 (C.C.P.A. 1973) ("[T]his court also agrees that the [attorney-client] privilege, *when challenged by a misrepresentation or omission before the Patent Office*, should be pierced when, and only when, a prima facie case of fraud has been shown") (emphasis added); Hercules, 434 F. Supp. at 153-55 (first finding that defendant did not demonstrate substantial need or undue hardship to vitiate the immunity, then considering whether defendant showed a prima facie case of fraud to invoke the crime-fraud exception to vitiate the privilege).

Leviton ignored the decisions before and after <u>Spalding</u> which have consistently determined in patent cases that a showing of substantial need warrants production of fact work product. <u>See Softview Computer Products, Corp. v. Haworth, Inc.</u>, 2000 WL 351411 *4 (S.D.N.Y. March 31, 2000)("[W]here the applicability of the work-product doctrine has been established, factual material may, nevertheless, be ordered produced upon a showing of substantial need and inability to obtain the equivalent without undue hardship.") (internal quotations omitted); <u>McCook Metals LLC v. Alcoa, Inc.</u>, 192 F.R.D. 242, 258-59 (N.D. Ill. 2000) ("In the fact work product doctrine, the burden then shifts to the moving side to demonstrate a substantial need for the information, and that it would be exceedingly difficult to obtain the information any other way."); <u>Duplan Corp. v. Moulinage et Retorderie de Chavanoz</u>, 487 F.2d 480, 484-85 (4th cir. 1973) (recognizing that work product documents, in a patent case, enjoy qualified immunity and are discoverable on a demonstration of substantial need and undue hardship); <u>Handgards, Inc. v. Johnson & Johnson</u>, 413 F. Supp. 926, 931 (N.D. Cal. 1976)(finding, in a patent case, that the "plaintiff has made a sufficient showing of substantial need and undue hardship to overcome the qualified immunity from discovery for non-mental impression work product"); <u>SCM Corp. v. Xerox Corp.</u>, 70 F.R.D 508, 516 (D. Conn. 1976) (finding, in patent litigation, that the discovering party failed to demonstrate substantial need or undue hardship sufficient to

94

obtain work product documents).

Meihao was obviously unable to learn about the drafting of the Germain and '766 claims and other patent prosecution matters, except from patent prosecution counsel. Although Leviton denies the relevance of the information because it is "not directed to the prosecution of the '766 patent application," Meihao has shown substantial need for the information by demonstrating that it is directly relevant to its inequitable conduct defense. (Paper No. 122, 6.) <u>See</u> earlier discussion on Leviton's motion to quash and cases cited therein.

While the bar is higher for entitlement to opinion work product than factual work product, Leviton does not identify which questions it believes implicate opinion work product. From the Court's review, few, if any, do. Nonetheless, Leviton argues vigorously about the hypothetical intrusion into the mental impressions of its patent prosecution attorneys.

In any event, Meihao's entitlement to opinion work product would appear highly justified. While opinion work product, the "mental impressions, conclusions, opinions, or legal theories...concerning the litigation," enjoys extreme protection from discovery, many scholars and courts have allowed that discovery of mental impressions are discoverable in certain limited circumstances.[26]

---

[26] Supreme Court precedent is unequivocal that opinion work product remains immune from discovery unless the requesting party demonstrates much more than substantial need. <u>See</u> <u>Hickman</u>, 329 U.S. at 509-514

This Court agrees that Meihao may discover the mental impressions of Leviton's patent counsel where they have been placed directly at issue due to Meihao's affirmative defense of inequitable conduct. Leviton concedes it its brief that: "although a few courts have permitted limited discovery of mental impressions in the context of an inequitable conduct claim, even in those circumstances courts refuse to allow such discovery of mental impressions when the work in question was <u>also</u> done in

---

("Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and mental impressions of an attorney."); <u>Upjohn</u>, 449 U.S. at 401-402 ("As Rule 26 and <u>Hickman</u> make clear, such work product cannot be disclosed simply on a showing of substantial need and inability to obtain the equivalent without undue hardship. . . [A] far stronger showing of necessity and unavailability by other means would be required than is needed to justify ordinary work product." Although decisions in the Fourth Circuit establish that opinion work product immunity is not entirely absolute, the Fourth Circuit has protected opinion work product from discovery in all cases except in extreme cases justifying the crime-fraud exception. <u>See</u> <u>In re Doe</u>, 662 F.2d 1073, 1079 (4th Cir. 1981) (finding that in extraordinary circumstances, the crime-fraud exception justifies piercing the opinion work product rule). <u>See also</u> <u>Chaudhry v. Gallerizzo</u>, 174 F.3d 394, 403 (4th Cir. 1999) (finding that appellant failed to present the "very rare and extraordinary situation justifying disclosure of opinion work product."); <u>In re Allen</u>, 106 F.3d 582, 607 (4th Cir. 1997) ("[O]pinion work product enjoys a nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances.") (internal citations and quotations omitted). <u>In re Grand Jury Proceedings, Thursday Special Grand Jury</u>, 33 F.3d 342, 348 (4th Cir. 1994). Opinion work product is virtually immune to discovery and may be obtained only in extraordinary circumstances. <u>Compare</u> <u>National Union</u>, 967 F.2d at 984 (holding that tangible opinion work product is immune from discovery "to the same extent as an attorney-client communication"); <u>Duplan II</u>, 509 F.2d at 736 ("[I]f attorneys may not freely and privately express and record mental impressions, opinions, conclusions, and legal theories, in writing, and clients may not freely seek them, then there is justice for no one, and truth, instead of being more readily ascertainable, will become lost in the murky recesses of the memory in the minds of men, who, after all, are human and subject to the human frailty of rationalization."). However, the Supreme Court has not defined when such inquiries into the files and mental impressions of an attorney are "warranted."

anticipation of litigation." Citing only Hercules, Inc. v. Exxon
Corp., 434 F. Supp. 136, 152 (D. Del. 1977) (Paper No. 121, 10.)
This assertion is both incorrect and illogical: if the work was
not done in anticipation of litigation, of course it would not be
protected as work product. Leviton is again confusing the issue.
It is true that courts have found that patent prosecution
documents may enjoy work product immunity if the "primary
motivating purpose behind the performance of the work was to
assist in the pending or impending litigation." Hercules, 434 F.
Supp. at 152. However, courts have found that alleged,
infringing parties may overcome work product immunity when they
need documents or testimony to prove an inequitable conduct
defense. The court in Hercules did not, as Leviton's memorandum
implies, find such work product immunity to be absolute. Rather,
the Hercules court found that the defendant did not demonstrate
substantial need or undue hardship to overcome the immunity. Id.
at 153-155. As the cases cited previously indicate, courts have
articulated an exception to opinion work product immunity by
allowing discovery of counsel's mental impressions when they are
at issue and necessary to the litigation. See, e.g., Environ, 41
U.S.P.Q. 2d at 1306 ("Impressions protected by the work-product
doctrine may be discovered when directly relevant to the
litigation and when the need for production is
compelling.")(emphasis added); Alcon, 225 F. Supp. 2d at 344
(finding that "a prosecuting attorneys' mental impressions are

97

critical to any claim of inequitable conduct on a patent infringement action.") and other cases cited previously. Although the Fourth Circuit has not faced and ruled on the issue, this Court agrees with the Middle District of North Carolina that such a holding is consistent with Fourth Circuit precedent recognizing near absolute immunity for opinion work product. See Charlotte Motor Speedway, 125 F.R.D. at 130-131 (M.D.N.C. 1989) (recognizing that a narrow exception to opinion work product immunity in circumstances where activities of counsel are directly at issue is not inconsistent with Fourth Circuit precedent because the cases are distinguishable on the facts). Furthermore, as previously discussed, such a decision is consistent with significant precedent outside the Fourth Circuit, especially dealing with entitlement to discovery on the inequitable conduct defense. Thus, Meihao could discover the opinions and mental impressions of Leviton's patent counsel where those opinions directly relate to Meihao's affirmative defense of inequitable conduct which these questions did. Leviton's discovery stance was without substantial justification (see Fed. R. Civ. P. 37). Both the lack of merit of its position and its anemic and inadequate briefing confirms that Leviton's principal goal was to delay Meihao's discovery of the inequitable conduct of Leviton.

Finally, this Court also conducted extensive review of Meihao's motion to compel documents from Leviton (see Paper No.

98

116), and concluded that the majority of the documents were clearly discoverable. As in the case of the litigation of the deposition questions to its patent counsel, it is Leviton's approach to document production and resolution of disputes that is unacceptable, as well as its position on the merits of the dispute.  In its opposition, Leviton charges that "Meihao never identifies any theory of relevance for any specific document." (Paper No. 122, 7.)  That is a puzzling position for several reasons.  First, relevance under Rule 26 requires only some nexus between the claim and evidence sought.  <u>See</u> <u>United Oil Co., Inc.</u> <u>v. Parts Associates, Inc.</u>, 227 F.R.D. 404, 409 (D.Md. 2005) (citing *Wright, Miller & Marcus*, <u>supra</u> § 2008).  Moreover, Leviton appeared to have asserted this discovery objection only in opposition to the motion not earlier on its response to the document request, thereby waiving its rights.  Second, the documents for which Leviton questions relevance relate to the Germain application and the parent patents to '766 (Paper No. 125, 3-4) - clearly relevant to the issue here, as Meihao describes and Leviton must have understood. Leviton's resistence to production of documents on this limp - and likely waived basis is wholly unavailing and makeweight.  It is litigation by roadblock.

Altogether Leviton produced four privilege logs: March 9, April 9, July 30 and August 9, 2007. (Paper No. 116, Ex. B and C; Paper No. 122, Ex. 4A and Paper No. 125, Ex. M.)  The last

privilege log identified sixty-five pages of allegedly privileged
documents not previously identified to Meihao or scheduled on any
of the three previous privilege logs. (Paper No. 125, 12) This
failure to identify and schedule assertedly privileged documents
on an initial (or even second or third) privilege log may itself
be grounds for waiver of the privilege. Neuberger, 230 F.R.D. at
418. Moreover, once Meihao challenged Leviton's privilege
assertions, Leviton did not discharge its burden to establish an
evidentiary basis to support each element of each privilege or
work product immunity sought for each document or category of
documents. Neuberger, 230 F.R.D. at 418.

While Leviton did submit affidavits of Claude Narcisse and
Meir Blonder of Leviton which affidavits did reference some (but
not all) of the withheld documents, their affidavits did not
provide support on all the elements of either the attorney-client
or work product privilege. For example, Narcisse did not provide
any significant factual context for the nine documents he
referenced. He was neither the author nor recipient of any of the
documents. He largely parroted the legalese of the United Shoe
case without connecting to the actual factual context of the
document's creation, use and dissemination.

Neither was Mr. Blonder the author or recipient of any of
the documents he referenced. His affidavit did belatedly identify
many of the authors and addressees of the withheld documents.
However, he too simply parroted the necessary legalese of the

100

United Shoe case without connecting to actual factual context of the document's creation, use and dissemination.

Additionally, in its opposition to production of these documents Leviton made the same faulty arguments as in its opposition to further depositions of patent counsel.

Ultimately on in camera review, Leviton's privilege/work product assertions were only valid for 17 documents which were draft applications sent to Leviton counsel for review and advice, invention disclosure materials and a few emails and faxes between Leviton and its counsel asking for or giving legal advice. Many more were clearly without privilege, or work product protection. In the latest privilege log, Leviton had scheduled 80 documents as enjoying privilege or work product status. (Paper No. 125, Ex. M) Accordingly, under Fed. R. Civ. P. 37, Leviton's position on the vast majority of the assertedly privileged documents was not "substantially justified" and an award of fees is appropriate under that rule, as well as under § 285 as another example of vexatious litigation conduct.

This Court therefore finds that Leviton's litigation misconduct provides another basis for a finding of exceptionality under § 285. Were this Court to award attorneys' fees solely on the basis of Leviton's litigation misconduct, the award would necessarily be limited to an amount "bear[ing] some relation to the extent of the misconduct." See Read Corp. v. Portec, Inc., 970 F.2d 816, 831 (Fed. Cir. 1992); see also Rambus, 318 F.3d at

101

1106. Because the award of fees in this litigation is not based solely on litigation misconduct, but also on Leviton's inequitable conduct in prosecuting the patent, such a limitation on the award is unnecessary.

## Conclusion

In light of the foregoing analysis, Meihao has demonstrated by clear and convincing evidence two separate bases for a finding of exceptionality under § 285: Leviton's inequitable conduct in prosecuting the '766 patent, and this conduct in discovery, reflecting a strategy of vexatious litigation in pursuit of its infringement claims against Meihao and in defeat of Meihao's discovery on its inequitable conduct. See Beckman, 892 F.2d at 1552 (upholding the district court's finding of exceptional circumstances based on a strategy of vexatious litigation). As discussed throughout this opinion, the facts and surrounding circumstances demonstrate that Leviton intentionally withheld the Germain application from the PTO while prosecuting the '766 patent, because the Germain application (and copying of claims) potentially would have raised issues of inventorship, double-patenting and whether the specifications supported the claims as would the knowledge of other related litigation.  These issues could have prevented the issuance of the '766 patent or at least defeated the petition to make special.  Then, Leviton brought this lawsuit for infringement based on a patent received without full disclosure to the PTO and engaged in a strategy of vexatious

102

litigation, aimed at thwarting discovery of its inequitable conduct, finally choosing to dismiss the case before any adverse rulings.

This lawsuit is not the first time Leviton has caused undue expense and burden to Meihao. Leviton brought a suit alleging infringement of a related patent against Meihao two years before bringing the current suit. That suit ended in 2006 with this Court's grant of summary judgment of non-infringement to Meihao, a decision affirmed by the Federal Circuit in 2007. See Shanghai Meihao Elec., Inc. v. Leviton Mfg. Co., Inc., 409 F. Supp. 2d 643 (D. Md. 2006), aff'd, 212 Fed. Appx. 977 (Fed. Cir. 2007). While this earlier litigation did not involve the patent at issue in this litigation, it may be a further indication of Leviton's unprincipled approach to litigation. While I cannot comment on Leviton's litigation conduct in that case, Judge Davis, the trial judge in that (and this) case, may have a view. Moreover, Leviton has brought twelve different lawsuits on patents related to the '766 patent, including five different suits on the '766 patent alone, and Meihao reported - and Leviton did not deny - has never received a favorable judgment on the merits. (See Paper No. 145, Ex. 18, 23-24)

This Court recognizes that Congress did not intend, in enacting § 285, for the recovery of fee awards in patent suits to become "an ordinary thing." S. Rep. No. 1503, 79th Cong., 2d Session 1, 2, reprinted in 1946 U.S.C.C.S. 1386, 1387. Rather,

the statute was intended to allow a court to prevent a "gross injustice to an alleged infringer." J.P. Stevens Co., Inc. v. Lex Tex Ltd., Inc., 822 F.2d 1047, 1052 (Fed. Cir. 1987) (citing S. Rep. No. 1503, 79th Cong. 2d Sess. (1946), as reprinted in 1946 U.S.C.C.A.N. 1386, 1387). As discussed throughout the opinion, Leviton's conduct was by no means ordinary, and an award of fees to Meihao is necessary to prevent such a gross injustice. As advised by the Federal Circuit, this judge has considered factors such as "the closeness of the case, tactics of counsel, the conduct of the parties" to achieve "a fairer allocation of the burdens of litigation as between winner and loser." Id. at 1052. Accord Nilssen v. Osram Sylvania, Inc., 528 F.3d 1352, 1358 (Fed. Cir. 2008). Accordingly, this judge recommends that an award of attorneys' fees and costs be made to achieve that "fairer allocation of the burdens of litigation as between winner and loser."

In its Application for an Award of Attorneys' Fees and Costs related to the patent infringement case brought by Leviton. Meihao seeks $238,894.30 for services provided by Andrews Kurth ("Andrews") and $759,168.52 for services provided by Bingham McCutchen ("Bingham"), in addition to $18,863.50 in costs, for a total request of $1,016,926.32.[27] (Paper No. 159, 2)

---

[27] After the fees hearing, Meihao counsel re-reviewed their applications, reducing the request by approximately $150,000. In supplemental affidavits, Ms. Baker Manning and Dr. Chao have explained the discrepancy satisfactorily. (Paper No. 159, Baker Second Declaration, ¶¶ 16-17 and Paper No. 160, Chao second declaration ¶¶ 10-16). Indeed, this re-review gives the Court greater confidence in

After reviewing the foregoing application, memoranda and
exhibits and having considered the arguments of counsel, the
Court recommends an award of $810,659.17 in attorneys' fees and
costs to Meihao.

## Amount of Attorneys' Fees and Costs

It is the responsibility of the Court to determine a
reasonable award of attorney fees. Meihao correctly observes that
"Leviton has never opposed, or even questioned, the amount of
Meihao's costs ... nor challenged the amount of Meihao's
reasonable attorneys fees recoverable under 35 U.S.C. § 285."
(Id. at 4) (Paper No. 159, Baker Second Declaration, 4) The Court
has considered that fact, viewing it essentially as an admission
to the reasonableness of the hourly rates charged and the amount
of hours worked.[30] Nevertheless, the Court has an obligation to
review the attorneys' fees petition independently. CoStar Group,
Inc. v. Loopnet, Inc., 106 F. Supp. 2d 780, 787 (D. Md. 2000).

Upon finding that a case is exceptional under § 285, a Court
may use the lodestar approach to determine reasonable attorneys'
fees. M. Maxwell v. Angel-Etts of California, Inc., 53 Fed. Appx.
561, 568-69 (Fed. Cir. 2002) (citing Hensley v. Eckerhart, 461
U.S. 424, 433-34 (1983)). The lodestar method is the appropriate
standard for determining a reasonable award, by multiplying

_____

the accuracy of the applications.
[30] It is reasonable to infer that Leviton's counsel's hourly rates and
time spent are substantially the same or more than Meihao's.

reasonable hours against the reasonable hourly rate. <u>Hensley</u>, 461
U.S. at 433; <u>CoStar</u>, 106 F. Supp. 2d at 787. The lodestar
approach has been applied to § 285 cases by the Federal Circuit.
<u>Id.</u> <u>See also</u> Herbert F. Schwartz, <u>Patent Law and Practice</u> § 8.V.
(5th ed. 2006).

As a guide for determining reasonableness, some courts
within this District have applied the twelve-part <u>Johnson</u> test.[31]
<u>CoStar</u>, 106 F. Supp. 2d at 787. (applying Rule 37(a)). These
factors can be applied in patent cases. <u>See</u> Schwartz, <u>supra</u> §
8.V. (Stating that the courts consider factors when calculating a
reasonable fee, "including the results obtained; the attorney's
normal billing rate; difficulty and novelty of the case; time and
labor involved; loss of other business; fees customarily charged
for similar services; whether it is a fixed or contingent fee;
reputation, experience, and ability of counsel; fees paid to
opposing counsel; and expenses and advancements."). The old

---

[31] The <u>Johnson</u> factors include:

> (1) the time and labor expended; (2) the novelty and difficulty
> of the questions raised; (3) the skill required to properly
> perform the legal services rendered; (4) the attorney's
> opportunity costs in pressing the instant litigation; (5) the
> customary fee for like work; (6) the attorney's expectations at
> the outset of the litigation; (7) the time limitation imposed by
> the client or circumstances; (8) the amount in controversy and
> the results obtained; (9) the experience, reputation and ability
> of the attorney; (10) the undesirability of the case within the
> legal community in which the suit arose; (11) the nature and
> length of the professional relationship between attorney and
> client; and (12) attorneys' fees in similar cases.

<u>Johnson v. Georgia Highway Express</u>, 488 F.2d 714, 717-19 (5th Cir.
1974).

practice in the Fourth Circuit was to calculate the lodestar award, and then adjust that award upward or downward based on the Johnson factors. <u>See generally</u> <u>Anderson v. Morris</u>, 658 F.2d 246 (4 th Cir. 1981). The Fourth Circuit has explicitly revised its view following the Supreme Court's decision in <u>Blum v. Stenson</u>, which articulated disfavor with that approach. 465 U.S. 886, 896-97 (1984). In <u>Daly v. Hill</u>, the court stated:

> While the Supreme Court continues to endorse use of the Johnson factors in calculating fee awards the Court has disapproved of the procedure endorsed by this court in <u>Anderson</u>. Out of a concern that upward adjustments of a lodestar figure can sometimes result in "double counting," the Court has suggested that most Johnson factors are appropriately considered in initially determining the lodestar figure, not in adjusting that figure upward. According to the Court, the critical inquiry in determining reasonableness [of a fee award] is now generally recognized as the appropriate hourly rate. If the hourly rate is properly calculated, the product of reasonable hours times the reasonable rate normally provides a reasonable attorney's fee within the meaning of § 1988.

790 F.2d 1071, 1077 (4 th Cir. 1986) Thus, this Court follows in form, and considers the <u>Johnson</u> factors within the context of determining reasonable hourly rates.

It is the Court's opinion that a modest reduction in the attorneys' fees sought is necessary. In accord with the Maryland District Court Guidelines[32] and governing precedent, this Court

---

[32] While the Guidelines by their terms, do not apply to attorneys fees under § 285, they provide useful guidance.

has reviewed the fee petition specifically as to 1) the
reasonableness of the rates charged, and 2) the reasonableness of
the hours billed.

### Reasonable Hourly Rate

Only those <u>Johnson</u> factors relevant to the circumstances of
the particular case need to be considered. <u>EEOC v. Service News
Co.</u>, 898 F.2d 958, 965 (4th Cir. 1990) (applying lodestar method
to finding of attorneys' fees in Title VII case, and considering
<u>Johnson</u> factors). Here, the following factors are relevant based
on the facts presented: the novelty and difficulty of the
questions raised; the skill required to properly perform the
legal services rendered; the customary fee for like work; and the
experience, reputation and ability of the attorney. <u>Johnson v.
Georgia Highway Express</u>, 488 F.2d 714, 717-19 (5th Cir. 1974). To
further simplify, when calculating a fee, a court should consider
complexity, skill or reputation, and community rates.

Those relevant <u>Johnson</u> factors have been emphasized by the
courts. <u>Rum Creek Coal Sales Inc. v. Carperton</u>, 31 F.3d 169, 175
(4th Cir. 1994) (citing <u>Blum v. Stenson</u>, 465 U.S. 886, 895
(1984))(The plaintiff is entitled to compensation only at a
reasonable hourly rate, determined according to "the 'prevailing
market rates in the relevant community."); <u>CoStar</u>,106 F. Supp. 2d
at 787-788 (quoting <u>Blum v. Stenson</u>, 465 U.S. 886, 896 n.11
(1984))("The burden is on the fee applicant to produce
satisfactory evidence ... that the requested rates are in line
108

with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."); <u>National Wildlife Foundation v. Hanson</u>, 859 F.2d 313, 317 (4th Cir. 1982)(emphasizing that typically, the relevant community is the community where the court is located.); <u>Montcalm Pub. Corp. v. Virginia</u>, 199 F.3d 168, 173 (4th Cir. 1999)("If the matter is so complex and specialized that 'no attorney with the required skill is available locally, a court may award fees from counsel located elsewhere."); <u>See also</u> <u>Rum Creek</u>, 31 F.3d at 179. In general, complexity, skill, and relative community rates determine reasonable fees in such cases.

Two law firms represented Meihao during the subject litigation: Andrews and Bingham (both located in Washington D.C.). Meihao seeks the following rates for its Andrews attorneys and other personnel:

| Name | Title | J.D. Year or Years Experience | Hourly Rate/Years Experience |
|---|---|---|---|
| Fei-Fei Chao | Partner | 1996 | $500/10 |
| Aldo Noto | Partner | 1990 | $600/17 |
| Frederick Frei | Partner | 1973 | $500/34 |
| Sumeet Magoon | Associate | 1999 | $345/8 |
| Michael Ye, Ph.D. | Associate | 2004 | $275/2 |
| Miranda Perkins | Paralegal | | $145/2 |
| Carey Sakert | Paralegal | | $160/16 |
| Eddy Valverde | Paralegal | | $170.00/10 |

109

| Margaret Jane Strahl | Paralegal | | $170.00/10 |
| | Reference Librarians | | $130.00/20 |

Bingham charged at the following rates:

| Name | Title | J.D. Year | Hourly Rate/Years Experience |
|------|-------|-----------|------------------------------|
| Gary M. Hnath | Partner | 1983 | $460/22-24 |
| Susan Baker Manning | Partner | 1998 | $415/7 $450/8 $500/9 |
| Peter Mei | Partner | 1994 | $450/11 $470/12 $525/13 |
| Fei Fei Chao, Ph.D. | Partner | 1996 | $385/9-10 |
| William Hughet | Of Counsel | 1992 | $465/15 |
| Elizabeth Austern | Associate | 2005 | $325/2 |
| Gerald Chan | Associate | 2001 | $360/4 $415/5 $460/6 |
| Yuri Horwitz | Associate | 2006 | $255/<1 $270/1 |
| Dan Nooter | Associate | 2005 | $325/2 |
| Kevin Leung | Associate | 2001 | $360/4-5 |
| Erich Tzou | Associate | 2006 | $270/1 |
| Emily Bernstein | Paralegal | | $240/18 |
| Eliana Sugarman | Paralegal | | $220/2 |
| Yu-Ing Huang | Paralegal | | $200/0 |
| Michelle Sampilo | Paralegal | | $190/9 |

| Kathleen Caulfield | Paralegal | | $175/8 |
|---|---|---|---|
| Saron Harry | Paralegal | | $175/6 |
| Tim Kistner | Paralegal | | $165/7 |
| Stephanie Brett | Paralegal | | $140/1 |
| | Librarians/ Specialists and other personnel | | $85-$210 |

As to the hourly rates for attorneys, Meihao counsel state in their affidavits that they are "fair, compensatory and consistent with the rates charged by our competitors." (Paper No. 142, ¶ 19 - Bingham; Paper No. 143, ¶ 7 - Andrews) There is no doubt as to the complexity of the underlying patent litigation. Neither is there any doubt as to the reputation and skill of the attorneys at these two firms. But the Court must still undertake an analysis of whether the firm's rates are in-line with standard market rates.

"Evidence of the prevailing market rate usually takes the form of affidavits from other counsel attesting to their rates or the prevailing market rate." CoStar, 106 F. Supp. 2d at 788. "In the absence of sufficient documentation, the court may rely on its own knowledge of the market." Id. See also Lucero v. Trinidad, 815 F.2d 1384, 1385 (10th Cir. 1987). Depending upon the circumstances, courts have considered the rate charged by the petitioning attorney practicing in the appropriate locality, see,

e.g., Rum Creek Coal Sales, Inc. v. Caperton, 31 F.3d 169, 178-9

(4th Cir. 1994); Yamaha Motor Corp. v. Jim's Motorcycles, Inc.,

381 F. Supp. 2d 499, 504 (E.D. Va. 2005), or The Rules and

Guidelines for Determining Lodestar Attorney's Fees in Civil

Rights and Discrimination Cases of this Court (Appendix B to

Local Rules of the District of Maryland), which "provide a

presumptively reasonable range of hourly rates..." Poole v.

Textron, Inc., 192 F.R.D. 494, 509 (D. Md. 2001).

    Bingham has stated that it

> tracks its rates against historical data
> compiled by a major private bank,
> concentrating on a group of 15 leading firms
> of similar scope, experience and quality.
> Over the last five years, Bingham McCutchen's
> billing rates have been at or below the
> median.

(Paper No. 142, ¶ 19)

    Bingham neither submitted the study to the Court, nor

provided the names of the peer firms, limiting its evidentiary

value. However, counsel did provide specific rates for 2006 for

the asserted peer group of firms, demonstrating that the average

hourly rates for Bingham partners and associates were lower than

the average hourly rates for peer firms' attorneys, although the

average hourly rates were slightly higher for Bingham paralegals,

than the peer firms. (See Paper No. 159, 7) Andrews did not

provide its average hourly billing rates.

    Additionally, Meihao counsel offered the American

Intellectual Property Law Association's Report of the Economic

Survey 2007 ("AIPLA Report") as support for the comparability of Bingham and Andrews' rates with those charged in the competitive marketplace.[33] The report did not break down the rate by numbers of years of experience. That report showed that the 2006 mean average hourly billing rate for partners in the Washington, D.C. CMSA area was $435.00. The mean average billing rate for Boston CMSA was $512.00; New York City CMSA $453.00; and Philadelphia CMSA $405.00. No mean average rate was given for the Baltimore CMSA, although "Other East" was $306.00. According to the Census Bureau, the Washington D.C. consolidated metropolitan statistical area (CMSA) for 2006 did not include Baltimore (See http://www.census.gov/population/www/metroareas/lists/2006/List1.txt. Baltimore is in a CMSA of its own, with Towson and other surrounding areas, and has been for all years with available CMSA data. Id.

According to the survey, the mean average hourly billing rate for associates in the Washington, D.C. CMSA was $297.00; Boston CMSA, $310.00, New York City CMSA, $341.00 and Philadelphia CMSA, $242.00. Again, no mean average rate was given for the Baltimore CMSA although "Other East" was $216.00. The hourly rates charged for partners' time at Bingham[34] were $460.00

---

[33] The report also gives typical costs of litigation by amount in controversy. That data suggests Meihao's fees were within median costs in like patent infringement cases. (See Second Supplemental Affidavit ¶ 19-20.)
[34] Per agreement with Meihao, Hnath and Chao's rates were frozen at 2005 rates.

(Hnath), $415.00 (2005); $450.00 (2006) and $500 (2007); (Baker Manning) $450.00 (2005), $470.00 (2006) and $525.00 (2007); (Mei) $385.00 (Chao while at Bingham) and $465.00 (Hughet "of counsel"). These rates were slightly higher than the average billing rate in the AILPA Report for the Washington, D.C. area in 2006 (with the exception of Chao, who had the least number of years of experience as an attorney, but significant scientific education). Of course, if the rates are compared to those in "Other East" or "Philadelphia CMSA," they are considerably higher. The hourly rates charged for the Andrews' partners were $500.00 (Chao), $500.00 (Frei) and $600.00 (Noto) - again higher than the AILPA average hourly rate for the Washington, D.C. area.

Bingham associate hourly rates for Austern, Chan, Nooter and Leung were all higher - sometimes by quite a lot - than the AILPA average for Washington, D.C. Only Tzou and Horwitz billed below the median, and only barely at $270.00, and they had only one year of experience. One Andrews associate was charged at $275.00, with two years of experience; the other at $345.00, with eight years of experience. Both above the Washington, D.C. AILPA average hourly rate.

As for paralegal rates, Meihao counsel provided the Private Bank Study (showing that Bingham paralegals' rates were higher than those of peer firms) and their own affidavit statements on the reasonableness of the rates charged. However, the biographical information on education and experience, submitted

114

for some of the paralegals (especially those charged at rates $200-$240 an hour) certainly provides a basis for some marked increase from standard paralegal rates, such as those set forth in the Court's guidelines ($95-$115, the highest presumptive range in 2008), but arguably not a doubling. Accordingly, the Court shall reduce all paralegal hourly rates by 10% in recognition of the lack of specific support for these higher Washington, D.C. rates.

Having considered the Private Bank survey, the AILPA report, counsel's affidavits, Leviton's failure to object to rates,[35] the Court's own experience and the highly technical and specialized nature of patent law practice, the Court accepts the Bingham and Andrews hourly attorney rates as within the high range of reasonable rates for the Washington, D.C. area.[36] Meihao has not, however, presented any support for its payment of Washington, D.C. rates, either by demonstrating that Baltimore rates are the same as those in D.C., or that there was no Baltimore firm capable of handling the defense of the patent infringement action. Montcalm Pub. Corp. v. Virginia, 199 F.3d 168, 173 (4th Cir. 1999); Homes v. Medical Components, Inc., 761 F. Supp. 1193-

---

[35] This "fees paid to other counsel" is a factor routinely considered in adjusting the lodestar amount. Schwartz, supra ¶ 8.V.

[36] Other Johnson factors supported the rates. Schwartz, supra § 8.V. Counsel indicated that at least as to Chao and Hnath, the rates they charged were lower than their normal billing rates, as they were frozen at 2005 rates. Similarly, the Andrews lawyers gave Meihao a 10% discount of its fees when the case transferred from Bingham to the Andrews firm. (Paper No. 160)

1197 (E.D. Pa. 1990).

The Court shall reduce the Bingham and Andrews' hourly rates by 10% to reflect the Baltimore market. <u>See</u> <u>Board of Education of Frederick County v. I.S. ex rel. Summers</u>, 358 F. Supp. 2d 462, 471 (D. Md. 1995). ("The prevailing rates in the Baltimore community are generally lower than those in Washington, D.C."); <u>Compare</u> the Local Rules Guidelines (Highest 2008 presumptive rate range for attorney with 15+ years of experience is $275-$400; highest 2008 presumptive rate range for paralegals is $95-$115); AILPA Reports (mean average billing rate for Washington, D.C. for partners and associates was more than 7% and 19% higher respectively than for partners and associates in Philadelphia and more than 30% and 28% higher respectively for partners and associates in "Other East" area.)

### Reasonable Hours

Again, the lodestar method is the appropriate standard for determining a reasonable award, by multiplying reasonable hourly rates against reasonable hours. <u>Hensley</u>, 461 U.S. at 433; <u>CoStar</u>, 106 F. Supp. 2d at 787.

For a variety of reasons, the Court was unable to perform a line-by-line or litigation task-by-litigation task analysis, of Meihao counsel's time to confirm that the hours spent were "reasonable." Of course, as noted, Leviton does not challenge the reasonableness of the time spent. Moreover, appellate courts do not require that level of analysis of fee petitions where, as

here, the fee application is complex and the records voluminous,
so long as the trial court sets forth the reasons for its cuts.
M. Maxwell v. Angel-Etts of California, Inc., 53 Fed. Appx. 561,
568-69 (Fed. Cir. 2002); Gates v. Deukmejian, 987 F.2d 1392,
1399-1400 (9th Cir. 1992). For the reasons set forth below, the
Court has concluded that in the main hours spent were reasonable.

To be fair in a case like this, it is well nigh impossible -
even with summaries, charts, etc. - to separate out the various
litigation tasks (and sub-tasks), identify time properly
attributable to these tasks and sub-tasks and make a reasoned and
supportable conclusion as to the reasonableness of time spent.
Moreover, without the assistance of the opposing party, it is
difficult to ferret out specific examples of over-lawyering (such
as multiple lawyers at a deposition or senior lawyers doing
junior lawyer tasks) or excessive time on a brief memorandum.

Having said that, a summary review of the contemporaneous
time records does not manifest such problems. For example, at the
various depositions, Meihao appeared to have only a single
attorney in attendance. At the discovery motions hearing, only
Susan Baker Manning appeared from Bingham. Moreover, the firms
did not seem to overstaff writing projects. For example, Meihao's
Motion to Compel, filed on March 9, 2007, was a 23 page document,
with multiple exhibits, and involved somewhat complicated subject
matter. (Paper No. 79) A review of the time records reveal that
only one attorney spent time preparing the motion - Susan Baker

117

Manning - and she billed a total of 22.5 hours. That was an
efficient use of time.

In determining the reasonableness of the hours billed, the
Court also considers the sufficiency of the documentation
supporting the award requested, and the permissibility of hours
billed by non-attorney and non-paralegal personnel.  Review of
these factors suggest a modest downward adjustment.

The fee applicant bears the burden of establishing
appropriate documentation of the hours spent by counsel
litigating the discovery dispute. Hensley v. Eckerhart, 461 U.S.
424, 433 (1983). If documentation is inadequate, the court may
reduce the fee reward accordingly. Id. The burden is on Meihao to
prove the number of attorney-hours expended; at a minimum the
records submitted must specify, for each attorney, the date, the
hours expended per task, and the nature of the work done. CoStar
Group, Inc. v. LoopNet, Inc., 196 F. Supp. 2d 780, 788-89 (D. Md.
2000). Here, the award sought is almost $1 million; an award of
that magnitude must be supported by adequate documentation.  Per
the Court's request, counsel for Meihao submitted contemporaneous
billing records and summaries of time and expenses. (Paper No.
159)

A review of the contemporaneous billing records was made to
verify that reimbursement was sought only for time-entries
devoted solely to this case from 4/05 - 12/06. The vast majority
of the time entries can be identified definitively as pertaining

to this litigation. For those few entries such as "e-mails and discussions regarding deposition scheduling" and "conduct legal research and review patents," that do not explicitly identify which matter the entry pertains to, it can be inferred from timing, etc. that they do.

However, the Court has made across-the-board reductions of the fee award to account for minor billing deficiencies.[37] With respect to billing deficiencies, the Court has focused on three areas, which will be discussed in turn:  block-billing, insufficient detail, and possible duplicative work, performed by multiple attorneys.

Andrews and Bingham attorneys utilized a technique called block-billing whereby timekeepers group many tasks together, and record the total time expended on those tasks as one lump entry, instead of allocating specific time increments for specific tasks. Under the block-billing system, it is difficult to determine whether work performed was duplicative, unnecessary or inefficient. In re Olson, 884 F.2d 1415, 1428-29 (D.C. Cir. 1989).  Typically, courts have reduced an award of attorneys' fees because of block-billing. See Sea Spray Holdings, Ltd. v. Pali Financial Group, Inc., 277 F. Supp. 2d 323, 326 (S.D.N.Y. 2003)(15%); Gratz v. Bollinger, 353 F. Supp. 2d 929, 939 (E.D.

---

[37] Some courts reduce the number of hours by some percent to account for these deficiencies; others, the award itself. Given the many and different kind of timekeepers with differing hourly rates, it would be unmanageable (and arguably no more targeted) to reduce the hours billed, as opposed to a reduction to the final award amount.

Mich. 2005) (10%); <u>Oklahoma Natural Gas Co. v. Apache Corp.</u>, 355
F. Supp. 2d 1246, 1264 (N.D. Okla. 2004) (by 10%).

The billing records contain numerous multiple-hour entries
containing multiple tasks: telephone calls, meetings, research
and writing, and other efforts.  Here, the use of block-billing
introduces a level of unreliability in time entries and thus less
confidence in the documentation.

Similarly, billing records must contain sufficient detail
for courts to conduct a meaningful review of the billing entries
and instill confidence in the time records.  <u>League of United</u>
<u>Latin Am. Citizens v. Roscoe Indep. Sch. Dist.</u>, 119 F.3d 1228,
1233 (5th Cir. 1997).  <u>See also</u> <u>Tomazzoli v. Sheedy</u>, 804 F.2d 93,
98 n.5 (7th Cir. 1986).[38]

The goal of the fee applicant should be to provide records
which demonstrate careful and precise timekeeping, upon which the
Court can rely.  <u>See e.g., Gay Officers Action League v. Puerto</u>
<u>Rico,</u> 247 F.3d 288, 296-97 (1st Cir. 2001); <u>see also</u>, <u>National</u>
<u>Association of Concerned Veterans v. Secretary of Defense</u>, 675
F.2d 1319, 1327 (1982).  The court must consider not only what

---

[38] Courts have an obligation to require adequate documentation – when
the documentation submitted is vague or incomplete, a court should
reduce the number of hours awarded. <u>Louisiana Power & Light Co. v.</u>
<u>Kellstrom</u>, 50 F.3d 319, 324-25 (5th Cir. 1995) (citing <u>Leroy v. City</u>
<u>of Houston</u>, 831 F.2d 576, 585-86 (5 th Cir. 1987) (finding clear error
and abuse of discretion when district court accepted "faulty records"
without making a reduction)). The district court in <u>Kellstrom</u>,
admitted that it failed to require adequate documentation, and to
undertake a careful analysis of the time and items billed. 50 F.3d at
324-25. Because the court had failed to require adequate
documentation, the appellate court reduced the fee award. <u>Id.</u> at 326.

type of documents Meihao has submitted, but also whether the documents enable this court to do its job.

Both Bingham's and Andrews' billing records contained some entries that were quite vague, (e.g. "Performing legal research on several issues;" e.g. "Researching and organizing patents"). At the Court's request, Meihao did submit its time according to litigation phase, which does not suggest any particular problem; nor frankly is it sufficiently detailed to be very helpful. However, counsel's review (and re-review) of its bills seems careful and aimed at eliminating improper or insufficiently documented time relevant to this case. Additionally, Meihao counsel made a specific reduction in hours billed addressing any concern that excessive hours were billed for work done. For the April 2005 through December 2006 time period, Meihao counsel used a single billing number to record time and expenditures on this case and the appeal in Case No. 03-1701. Counsel attested that for the overlap period, "where the records do not make it explicitly clear that <u>all</u> of the Bingham attorney or non-attorney time for any given time entry was time devoted <u>solely</u> to this case, Meihao does not seek recovery of <u>any</u> of the corresponding fees for attorney and non-attorney time." (Paper No. 142, ¶ 12) Similarly, Meihao only claims § 285 costs after May 11, 2006 (the day the Court dismissed the earlier action, Case No. 03-1701), as a single billing number was used for both this case and Case No. 03-1701 and it was difficult to determine which costs should be

attributed to which case. (<u>Id.</u> at ¶ 13).  Thus, on the whole, review of Meihao's counsel's time records assured the Court that time spent was properly recorded and within reason.

Finally, when multiple lawyers or firms have been involved in a case, that may signal duplication of work or inefficiencies that the opposing side should not pay for.

While two law firms were involved in the defense of this litigation, the Court will not reduce the award for the inefficiencies often associated with change of firms. First, here, Dr. Chao, one of the original attorneys on the case, left the Bingham firm and joined the Andrews firm, taking the Leviton case with her. Some months later, Meihao changed its defense counsel, returning the defense to the Bingham firm, specifically to Mr. Hnath and Ms. Baker Manning who had worked on the case with Dr. Chao initially. Second, in her supplemental affidavit, Dr. Chao states that because some new attorneys were added to her defense team when the case was moved to her new firm, the client asked for, and the firm agreed to, a 10% discount of fees. (Paper No. 160.)  Accordingly, the lodestar award will be adjusted downward by 10% for block-billing and some limited documentation deficiencies.

Finally, as detailed in the Second Declarations of Susan Baker Manning and Fei Fei Chao, a number of people - not attorneys or paralegals - were employed in the underlying litigation, and actually billed their time. (Paper No. 159) These

individuals include reference librarians, an office librarian, a research specialist, litigation technology specialists, and an IP coordinator. (Id.) Susan Baker Manning explains that those individuals are employed in order to reduce costs (by billing at lower rates) and to improve the quality of work-product. (Id.) While this seems like a sensible approach, courts have not widely approved payment of hourly rates for services of this kind. At least historically, as part of an attorneys' fee award, librarian, research and similar costs were normally considered overhead, and were not separately recoverable. See 1-16 Court Awarded Attorney Fees 16.02 (2008)(clerical and other non-legal chores are not properly included in the lodestar calculation); see also M. Howes v. Medical Components, Inc., 761 F. Supp. 1193, 1200 (E.D. Pa. 1990) (citing PPG Industries, Inc. V. Celanese Polymer Specialities Co., 658 F. Supp. 555, 559 (W.D.Ky. 1987) ("secretarial services, word processing equipment, library and general office staff...[t]hese services are generally considered part of an attorney's overhead, and as such, have usually been deleted from awards made to attorneys under 35 U.S.C. § 285...[t]his is a sound practice.")(internal citations omitted)); Michigan v. United States EPA, 254 F.3d 1087, 1095-96 (D.C. Cir. 2001)(disallowing recovery for clerical and administrative work, and staff overtime; those things are part of "overhead" costs); In re Olson, 884 F.2d 1415, 1426-27 (D.C. Cir. 1989) (stating that while fee awards may include work performed by law clerks

123

and paralegals, work performed by librarians, clerical personnel

and support staff should not be included, especially absent

evidence that such fees comport with community practice.)

This may be a situation where the development of the law is

lagging behind the practice in the legal community. However,

Meihao did not provide any evidence that such hourly fees comport

with community practice or provide any evidence that the hourly

rates charged are reasonable in the relevant community.

Nonetheless, the Court took a functional approach, reviewing the

time entries for these non-legal personnel attempting to

distinguish (and award fees for) traditional legal work from work

historically categorized as "overhead." While there is no bright

line test, it appears that much of the work of these specialists

would be reimbursable if performed by an attorney or paralegal.

Librarians and Specialists (<u>Bingham</u>)

Research Specialist Leung - work is similar to
that of a paralegal (Example: "Conduct legal research
regarding prosecution laches...")

Reference Librarians Palmer and Jordan - work is
similar to that of a paralegal (Example: "Research to
obtain <u>Phillips v. AWH</u> decision for Ms. Manning."

Office Librarian Dippery - work seems less similar
to that of a paralegal (Example: see entry from
01/17/07: "Performed searches to locate and purchase
copies of books")

Litigation Technology Specialists

-   Wardell - work is <u>not</u> similar to that of
a paralegal (Example: see entry from 12/21/06: "Produce
client documents in electronic and paper format. Create
production database to track the history of the

production."). His work is technology-focused and non-legal.

      -   Streitz - work is similar to that of a paralegal (Example: see entry from 05/06/07: "Draft timeline re comparison of the prosecution histories of Disalvo and Germain patent applications..."). This work seems more substantive, and not of an administrative, overhead type.

IP Interface Coordinator DeVore - work is <u>not</u> similar to that of a paralegal (Example: see entry from 04/02/07: "Create file histories of 10/690,776...Order non-PAIR created file histories from Patent Place..."). Seems more like administrative overhead work.

Based on this review, the time for Wardell, DeVore and Dippery will not be awarded; the time of the rest of librarians and specialist will be awarded.

The hourly rates charged for these specialists range from $210 to $175, similar to the Bingham's paralegal rates. As with its paralegals, the biographical information on education and experience submitted for some, especially at the higher rates, provided a basis for an increase from standard paralegal or even young associate rates.[39]

The hourly rates charged for Andrews' reference librarians was $130 - less than its paralegal rates. Because the work

---

[39] The guidelines provide the following presumptively reasonable hourly rates:

        <u>Local Guideline Rates (as amended, 2008):</u> Less than 5 years experience ($150-190), 5-8 years ($165-250), 9-14 years ($225-300), 15+ years ($275-400). Paralegals ($95-115)

        <u>(as amended 2004):</u> Less than 5 years ($135-170), 5-8 years ($150-225), 8+ years ($200-275). Paralegals ($90)

performed was similar to that work done by paralegals and young associates and was of a legal nature, the Court will treat them as paralegals or young associates for purposes of determining and awarding an appropriate hourly rate of $130.

### The Fee Award Calculation

The Court attaches as Appendix A its Fee Award Calculation, embodying the three adjustments to the Meihao fee cost petition.

- 10% hourly rate reduction for all timekeepers to reflect lower Baltimore rates;

- 10% reduction of lodestar amount (hours billed X reduced hourly rate) to account for block billing and some documentation deficiencies;

- elimination of hourly fees for non-traditional timekeepers doing administrative, overhead type work;

These adjustments result in a recommended award of $726,579.15 in attorneys' fees.

### Costs

As for costs, "[C]osts - other than attorney's fees - should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1).[40] Recoverable costs include:

1) Fees of the clerks and marshal;

---

[40] Leviton does not oppose Meihao's request for costs under Federal Rule of Civil Procedure 54, and, as a prevailing party in the litigation, Meihao is entitled to recover such costs. See Power Mosfet Tech., L.L.C. v. Siemens AG, 378 F.3d 1396, 1416 (Fed. Cir. 2004) (determining that alleged infringer who has all claims dismissed against it with prejudice is a prevailing party for the purposes of Rule 54(d)(1)).

> 2) Fees of the court reporter for all or any
> part of the stenographic transcript
> necessarily obtained for use in the case;
> 3) Fees and disbursements for printing and
> witnesses;
> 4) Fees for exemplification and copies of
> papers necessarily obtained for use in the
> case;
> 5) Docket fees under section 1923 of this
> title;
> 6) Compensation of court appointed experts,
> compensation of interpreters, and salaries,
> fees, expenses, and costs of special
> interpretation services under section 1828 of
> this title.

28 U.S.C. § 1920. After performing a summary review, it appears

that is precisely what the Meihao has labeled "costs," and the

Court approves the request. Additionally, only where certain

costs are recoverable under § 285, and not under Rule 54, has

Meihao sought recovery under § 285. (Paper No. 159, 3) Meihao has

requested costs such as printing, postage and faxing costs; such

costs are appropriate, and the Court approves the request. See

Central Soya Co., Inc. v. GEO A. Hormel & Co., 723 F.2d 1573,

1578 (Fed. Cir. 1983)("We interpret attorney fees to include

those sums that the prevailing party incurs in the preparation

for and performance of legal services related to the suit.").

Similarly, the Court has reviewed the costs sought under 35

U.S.C. § 285 and has found them appropriate under the governing

law. Litigation expenses such as faxing, postage, printing and

other general office costs have been held to constitute

litigation expenses, appropriately recoverable under fee

statutes. Trimper v. City of Norfolk, 58 F.3d 68, 75 (4th Cir.

tagar

1995); see also Eli Lilly and Company v. Zenith Goldline

Pharmaceuticals, Inc., 264 F. Supp. 2d, 753, 779 (Fed. Cir.

2003)(allowing costs under § 285 almost identical to those sought

under 285 in the instant case: postage, facsimile, printing and

other similar costs.). The costs and expenses sought by Meihao,

under § 285, are appropriate.

After multiplying the hours expended against the attorneys'

and paralegals' hourly rates, and taking the aforementioned

reductions, and adding costs the Court recommends an award of

$810,659.17 to the Meihao.

### Conclusion

It is hereby recommended that Leviton be ordered to pay

Meihao costs in the amount of $84,080.02 and reasonable

attorneys' fees in the amount of $726,579.15.

Date: 12/23/08                    /s/
                                  Susan K. Gauvey
                                  United States Magistrate Judge

**APPENDIX A**

**Attorneys' Fee Calculations**

<u>Bingham</u> - $690,367.00 requested in fees

The following billed hours and sums are subtracted from the sum $ 690,367.00.

1.   Elimination of Hours of Non-Legal Personnel.

| <u>December 2006</u> | Hours | Rate | | |
|---|---|---|---|---|
| Dippery | 1.3 | @ 175.00 | = | 227.50 |
| Wardell | 9 | @ 200.00 | = | 1800.00 |
| | | | | |
| <u>January 2007</u> | | | | |
| Dippery | 8.9 | @ 190.00 | = | 1691.00 |
| Wardell | 0.5 | @ 210.00 | = | 105.00 |
| | | | | |
| <u>March 2007</u> | | | | |
| Wardell | 4.0 | @ 210.00 | = | 840.00 |
| | | | | |
| <u>April 2007</u> | | | | |
| deVore | 6.2 | @ 85.00 | = | 527.00 |
| Wardell | 25.0 | @ 210.00 | = | 5250.00 |
| | | | | |
| <u>May 2007</u> | | | | |
| Wardell | 29.5 | @ 210.00 | = | 6195.00 |
| | | | | |
| <u>June 2007</u> | 0.5 | @ 210.00 | = | 105.00 |
| Wardell | | | | |
| | | | | |
| <u>July 2007</u> | | | | |
| Wardell | 0.7 | @ 210.00 | = | 147.00 |
| | | | | |
| <u>August 2007</u> | | | | |
| Wardell | 0.4 | @ 210.00 | = | 84.00 |

                                          <u>TOTAL</u>:  $16,971.50

That sum is subtracted from the total sum billed by Bingham timekeepers.

$ 690,367.00
<u>-   16,971.50</u>
673,395.50

2.    Reduction to Better Reflect Rates Charged in Baltimore Legal
      Market.

      The reduced sum of $673,395.50 is reduced by 10%,
representing a 10% reduction of billable rates, to better reflect
standard rates charged by attorneys and paralegals in the
Baltimore legal market.

$$\begin{aligned}
\$\ 673,395.50 \times .10 &= 67,339.55 \\
-\quad 67,339.55 & \\
\hline
606,055.95 &
\end{aligned}$$

3.    Reduction to Address Block-Billing and Documentation
      Deficiencies.

      The adjusted sum of $606,055.95 is further reduced by 10% to
compensate for the billing deficiencies discussed in the Court's
opinion.

$$\begin{aligned}
\$\ 606,055.95 \times .10 &= 60,605.60 \\
-\quad 60,605.60 & \\
\hline
545,450.35 &
\end{aligned}$$

      The sum of $545,450.35 is added to the $68,801.52 in Bingham
expenses.

                        $ 545,450.35
                        + 68,801.52
**TOTAL**                 614,251.87

<u>Andrews</u> - $223,615.80 requested in fees.

1.    Reduction to Better Reflect Rates Charged in Baltimore Legal
      Community.

      The $223,615.80 is reduced by 10%, representing a 10%
reduction of billable rates, to better reflect standard rates
charged by attorneys and paralegals in the Baltimore legal
market.

$$\begin{aligned}
\$\ 223,615.80 \times .10 &= 22,361.58 \\
-\quad 22,361.58 & \\
\hline
201,254.22 &
\end{aligned}$$

2.    Reduction to Address Block-Billing and Documentation
Deficiencies.

      The reduced sum of $201,254.22 is further reduced by 10% to
compensate for the billing deficiencies discussed in the Court's

2

opinion.

$$\begin{array}{r} \$\ 201,254.22 \ x \ .10 = 20,125.42 \\ -\ \ \ 20,125.42 \\ \hline 181,128.80 \end{array}$$

The sum of $181,128.80 is added to the $15,278.50 in Andrews'
expenses.

$$\begin{array}{r} \$\ 181,128.80 \\ +\ \ 15,278.50 \\ \hline \end{array}$$

**TOTAL**                          196,407.30


The Bingham and Andrews sums are added together.

$$\begin{array}{r} \$\ 614,251.87 \\ +\ 196,407.30 \\ \hline \end{array}$$

**GRAND TOTAL**                    810,659.17
**OF FEES AND COSTS**

3